**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| **Sherecia Willis, Individually** | ) | |
| **and as Next Friend, Parent,** | ) | |
| **and Natural Guardian of** | ) | |
| **Minor Child, CW** | ) | |
| | ) | |
|     **Plaintiffs,** | ) | **Civil File No. 1:17-cv-00015** |
| | ) | |
|     **Vs.** | ) | |
| | ) | |
| **United States of America,** | ) | |
|     **First Defendant** | ) | |
| | ) | |
| **Venkatesan Gorantla, M.D.** | ) | |
| **2260 Wrightsboro Road,** | ) | |
| **Augusta, GA 30904** | ) | |
|     **Second Defendant** | ) | |
| | ) | |
| **Augusta Hospital, LLC (DE)** | ) | |
| **d/b/a Trinity Hospital of Augusta** | ) | |
| **1573 Mallory Lane,** | ) | |
| **Brentwood, TN, 37027** | ) | |
|     **Third Defendant** | ) | |
| | ) | |
| **Augusta Physician Services, LLC** | ) | |
| **1573 Mallory Lane,** | ) | |
| **Brentwood, TN, 37027** | ) | |
|     **Fourth Defendant** | ) | |

## <u>MOTION TO EXCLUDE TESTIMONY OF THOMAS DAWSON/<br>TD&P CONSULTING, INC.</u>

COMES NOW Plaintiff Sherecia Willis, individually and as representative of CW, her minor child, and moves to exclude the purported expert testimony of Defendants' witness, Thomas Dawson, who has filed an expert report in this matter under the name of his business, TD&P Consulting, Inc. Mr. Dawson is a lawyer and health-care lobbyist whom the United States has hired to testify regarding various collateral sources that Mr. Dawson contends Ms. Willis could use to pay for all or part of CW's future medical expenses. As demonstrated below, this testimony

is legally irrelevant, highly prejudicial, unreliable, and unhelpful to the trier of fact. For these reasons, the only other federal district judge in Georgia who has ever considered Mr. Dawson's testimony has excluded it. This Court should exclude it as well.

## I.   Statement of Relevant Facts

On May 21, 2018, Defendants filed an expert disclosure of a company called TD&P Consulting, Inc. (Doc. 124.) The expert report attached as Exhibit 1 to the disclosure purports to have been prepared by Thomas Dawson. (Doc. 124-1, the "Report.") The *curriculum vitae* and list of prior testimony that accompany the Report also are Mr. Dawson's. (Doc. 124-3, 124-4.)

Mr. Dawson is a lawyer and lobbyist based in Washington, D.C., who formerly worked on Capitol Hill and now hires himself out as an expert in healthcare policy. *See* Dawson C.V. (attached hereto as Exh. A). When he was deposed in the State of Washington in August 2016, he testified that he had been retained as an expert in upward of 100 personal-injury cases — **always for the defense** — but that he had never actually testified at trial. *See* Deposition of Tom Dawson dated August 30, 2016, *Carmona v. Multicare Health Systems*, *Inc.*, Case No: 15-2-12042-5 KNT (Super. Ct. of King County, Wash.) (attached hereto as Exh. B), pp. 21:19-23 (never testified at trial in over 100 cases); 69:23-70:1 (retained exclusively by the defense). Mr. Dawson further testified at that time that he had been admitted to testify at trial (but had not testified) in a total of two cases, and had been excluded from testifying in "at least three cases . . . because the description of the work was speculative." *Id.*, p. 22:10-18. In the nearly three-year period since then, Mr. Dawson claims that he has testified at trial in exactly one case, in the Circuit Court of Calhoun County, Alabama. (Doc. 124-4, p. 4.) Despite his extensive list of engagements as a defense expert, he has never testified at trial in any federal court. (Doc. 124-4.)

Mr. Dawson's Report puts forth opinions on seventeen questions, all or almost all of which concern CW's eligibility for various collateral-source benefits. These questions are as follows:

1. Whether the "individual mandate" and "guaranteed issue" requirements under current health law impact Mr. Willis' access to healthcare benefits?

2. Whether Mr. Willis meets the definition of disabled under federal and Georgia State law?

3. Whether Mr. Willis is eligible to participate in the Georgia Medicaid program under state standards?

4. Whether Mr. Willis is eligible to participate in Medicaid through the exception established by Children's Health Insurance Program (CHIP)?

5. Whether Mr. Willis is eligible for the Katie Beckett program?

6. Whether Mr. Willis qualifies for the EPDST program?

7. Whether Mr. Willis is eligible to participate in a Georgia Medicaid HCBS waiver?

8. Whether Mr. Willis is eligible to participate in the TRICARE program?

9. Whether Mr. Willis is eligible for the TRICARE Extended Care Health Option (ECHO)?

10. Whether Mr. Willis should take up a qualified health plan?

11. Whether TRICARE is governed by federal coordination of benefits rules?

12. Whether Mr. Willis is eligible to participate in the Children 1st program?

13. Whether Mr. Willis is eligible for the Children's Medical Services (CMS) program?

14. Whether Mr. Willis is eligible for services under IDEA?

15. Whether Mr. Willis is eligible for IFSP services?

16. Whether Mr. Willis is eligible for an individualized education plan?

17. Whether the costs in the Berens report [*i.e.*, the expert report of Plaintiff's life care planning expert] represent the reasonable value of medical expenses in Georgia?

Mr. Dawson purports to base his opinions on his "education, training, experience, and expertise in healthcare coverage analysis, public health, and healthcare policy." Report, p. 4. His first 16 opinions, set forth in Parts 2-9 of his Report, all purport to be based on his analysis of

statutory and regulatory materials regarding eligibility for various federal and state programs. (Doc. 124-1, pp. 6-31.) His final opinion, which on its face appears to concern "the reasonable value of medical expenses in Georgia," actually is based on Mr. Dawson's alleged legal analysis of the concept of reasonable value, which in his opinion ought to be a sort of aggregate of what **all** payors, including not only individual patients such as CW but also major health-insurance companies and government payors such as Medicare and Medicaid, pay in the marketplace for a given type of healthcare service. Mr. Dawson criticizes Plaintiff's life-care planner, Ms. Berens, for not using the lower amounts paid by government programs and insurance companies to weight down the "reasonable values" of healthcare services in CW's life care plan.[1]

In addition to these disclosed opinions, Mr. Dawson has attached three categories of appendices to his Report. Mr. Dawson's Report does not explain with any specificity the manner in which the numbers in his appendices were calculated or the relationship, if any, between the appendices and Mr. Dawson's disclosed opinions. In accordance with the legal opinion contained in Mr. Dawson's Report, however, it appears that Appendix A uses Medicaid and Medicare fee schedules and private carrier reimbursement rates to weight down the "reasonable value" of the future medical goods and services that CW will need. (Doc. 124-1, pp. 38-102.) Appendix B purports to be a "coverage analysis" describing whether certain healthcare items set forth in CW's life-care plan would be covered by various public benefit programs. (*Id.*, pp. 103-178.) Appendix C purports to summarize how much it would cost CW out-of-pocket if he were to fund the items

---

[1]     Doc.124-1, pp. 32-33. This part of Mr. Dawson's Report also implies a similar criticism of Defendants' life-care planner, Susan Riddick-Grisham, but Mr. Dawson does not mention that in his Report. In fact, in his Appendices, Mr. Dawson concludes that Ms. Riddick-Grisham, too, significantly overstated the cost of basically every item she attempted to value. This conclusion follows directly from Dawson's methodology, which downwardly weights the reasonable value of medical services by averaging in the Medicare and Medicaid reimbursement rates for those services. Neither side's life-care planner used that methodology.

in his life-care plan using some combination of public benefit programs and/or private insurance (assuming that CW would remain eligible for such forms of coverage for his entire remaining life expectancy). (*Id.*, pp. 179-214.) Thus, the general legal and methodological assumptions behind the Appendices are the same as those stated in the Report.

### Argument and Citation to Authority

Mr. Dawson's opinions should be excluded in their entirety, for several reasons.

First, Mr. Dawson's opinions are legally irrelevant. Georgia's collateral-source rule (which applies in this Federal Tort Claims Act case) renders irrelevant and inadmissible Mr. Dawson's opinions regarding various public benefit programs and insurance policies that Mr. Dawson contends could be used to pay for CW's future medical care. Numerous federal courts have ruled such testimony inadmissible, including the only other federal court in Georgia in which Mr. Dawson has ever attempted to testify. This Court should do the same.

Second, any probative value Mr. Dawson's opinions may have — and they have none — is more than outweighed by the substantial risk of prejudice. Georgia courts have frequently emphasized the significant prejudice that would result if a jury were allowed to hear evidence regarding a plaintiff's insurance coverage or receipt of benefits under public programs. Such testimony not only lacks probative value but also severely prejudices the plaintiff by giving the jury a mistaken view of the proper measure of damages.

Finally, Mr. Dawson's testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). It is well established that an expert witness cannot properly testify to a legal conclusion; but that is exactly what Defendants want Mr. Dawson to do. His disagreement with the life-care planners about the "reasonable value" of CW's future medical care is legal and not factual in nature. In other words, he does not opine that the

life-care planners are factually wrong about what providers charge individuals for the medical goods and services at issue; he merely thinks that "reasonable value" **legally** ought to be weighed down by the lower amounts that some providers accept (or are forced to accept) under the Medicare and Medicaid fee schedules. This is not proper expert testimony.

For the foregoing reasons, and as demonstrated below, this Court should enter an order *in limine* excluding the testimony of Thomas Dawson/TD&P, Inc. in its entirety.

### A.    Almost all of Mr. Dawson's proposed testimony is inadmissible because it violates the collateral-source rule.

It is well established that "state collateral source rules are applied in FTCA actions." *Douglas v. United States*, 658 F.2d 445, 449 n.5. (6th Cir. 1981); citing *Klein v. United States*, 339 F.2d 512, 517-18 (2d Cir. 1964); *Cooper v. United States*, 313 F. Supp. 1207, 1212 (D. Neb. 1970); *see also* 28 U.S.C. § 1346(b)(1) (providing that the United States is liable for the torts of its employees "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred").

In Georgia, "[t]he collateral source rule permits an injured party to recover damages from a defendant notwithstanding that the plaintiff received compensation from other sources." *Bennett v. Haley*, 132 Ga. App. 512, 522 (1974). Because evidence of collateral compensation is irrelevant to the award of damages, it also is inadmissible. As the Georgia Court of Appeals has explained:

> The common law rule in Georgia bars the defendant from presenting any evidence as to payments of medical, hospital, disability income, or other expenses of a tortious injury paid for by a plaintiff, governmental entity, or third party and taking credit towards the defendant's liability in damages for such payments, because a tortfeasor is not allowed to benefit by its wrongful conduct or mitigate its liability by collateral sources provided by others. *Cincinnati &c. Co. v. Hilley*, 121 Ga. App. 196, 201 (173 S.E.2d 242) (1970). The common law rule made no exceptions for the introduction of evidence as to a collateral source, which rule remains applicable today. *McDonald v. Simmons*, 207 Ga. App. 692 (428 S.E.2d 690) (1993).

*Candler Hosp. v. Dent*, 228 Ga. App. 421, 421, 491 S.E.2d 868, 869 (1997). "The collateral source rule is an absolute evidentiary *bar.*" *Amalgamated Transit Union Local 1324 v. Roberts*, 263 Ga. 405, 408 (1993) (emphasis in original).

The collateral-source rule applies to medical care that is paid for by a branch of the armed services. *Whitaker v. Talbot*, 122 Ga. App. 493, 494 (1970). Similarly, federal courts have held that Social Security insurance benefits, *United States v. Hayashi*, 282 F.2d 599 (9th Cir. 1960); *Smith v. United States*, 587 F.2d 1013 (3d Cir. 1978), Civil Service retirement benefits, *United States v. Price*, 288 F.2d 448 (4th Cir. 1961), and Medicare or Medicaid payments for the cost of medical expenses, *Bennett*, *supra*, 132 Ga. App. 512; *Siverson v. United States*, 710 F.2d 557 (9th Cir. 1983); *Titchnell v. United States*, 681 F.2d 165 (3d Cir. 1982), also are collateral-source benefits.

Of the seventeen topics on which Mr. Dawson proposes to testify, fully sixteen of them **explicitly** concern collateral sources that Mr. Dawson contends might pay for some portion of Plaintiff's future medical damages. As Mr. Dawson's third set of Appendices makes clear, his reason for discussing these alleged collateral sources is to argue that the "reasonable value" of CW's future medical care is just the remaining portion that he would have to pay out of pocket. (Doc. 124-1, pp. 179-214.) Though repackaged in terms of "reasonable value," Dawson's position on this issue basically is that a plaintiff should be allowed to recover only the net amount that would come out of pocket after the plaintiff's future medical expenses are covered by insurance or a public benefit program.

As explained above, however, this position disregards Georgia law, which "permits an injured party to recover damages from a defendant notwithstanding that the plaintiff received compensation from other sources." *Bennett*, 132 Ga. App. at 522. Just this year, in fact, the Georgia

Senate considered a bill to amend the Official Code of Georgia so that the plaintiff in a personal-injury case would be entitled to recover no more than amounts actually paid out of pocket for medical care. http://www.legis.ga.gov/Legislation/en-US/display/20192020/SB/155. The proposed legislation never made it out of the Senate. *Id.* Defendants cannot be allowed to do, through Mr. Dawson's testimony, what the Georgia General Assembly has declined to do through legislation.

Mr. Dawson has been excluded from giving similar testimony in another federal district court in Georgia. In the case of *Rinehart v. GFI Management Services*, *Inc.*, CAFN 1:13-cv-03304-ELR (N.D. Ga.), Mr. Dawson was disclosed as an expert by the defendant to testify to the same theory that Defendants proffer here.[2] The plaintiff in that case moved *in limine* to exclude Dawson's testimony based on the collateral-source rule, and Judge Eleanor Ross of the Northern District of Georgia granted the plaintiff's motion and barred Dawson's testimony. *See Rinehart*, Case 1:13-cv-03304-ELR (N.D. Ga.), Doc. 188 (Order dated Nov. 30, 2016), p. 3 (granting Plaintiff's Motion *in Limine*, Doc. 153).

In fact, the United States has made variants of this same argument unsuccessfully for decades, in courts around the country. The Third Circuit rejected the argument 55 years ago in the case of *Feeley v. United States*, explaining that

> acceptance of the government's position would result in forcing the plaintiff, financially speaking, to seek only the available public assistance. Private medical care would be obtained at the plaintiff's own expense. We think that this is an unconscionable burden to place on the plaintiff. A victim of another's tort is entitled, we think, to choose, within reasonable limits, his own doctor and place of confinement, if such care is necessary. To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice. The plaintiff may not be satisfied with the public facilities; he may feel that a particular private physician is superior; in the future because of over-crowded conditions he may not even be able to receive timely care. These

---

[2]    Mr. Dawson gives an incorrect case number for this case in his list of prior testimony. The correct case number is as given here.

> are only a few of many considerations with which an individual may be faced in selecting treatment. The plaintiff's past use of the government facilities does not ensure his future use of them. He will now have the funds available to him to enable him to seek private care. He should not be denied this opportunity.

*Feeley v. United States*, 337 F.2d 924, 934-35 (3d Cir. 1964); *see also Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993) (applying Wisconsin collateral-source rule in FTCA case to hold that the plaintiff's eligibility for veteran's medical benefits did not entitle the United States to a reduction of an award of future medical costs); *Malmberg v. United States*, 816 F.3d 185, 192 (2d Cir. 2016) ("federal law does not require an offset against a veteran's damages award for future medical care that could be provided at a VA facility"); *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1084 (2d Cir. 1988) ("It should be pointed out that any award for future medical expenses should not be limited on the ground that, as a veteran, plaintiff is entitled to free VA medical care, hospitalization, and institutionalization. He is not obligated to seek medical care from the party whose negligence created his need for such care simply because that party offers it without charge."); *Hester v. United States*, No. 8:10-cv-1565-T-24 MAP, 2012 U.S. Dist. LEXIS 13398, at *3 (M.D. Fla. Feb. 3, 2012) (to the same effect).

For these reasons, Mr. Dawson's opinions 1-16 must be precluded as a flagrant violation of the Georgia collateral-source rule.

> **B.      Mr. Dawson's opinions nos. 1-16 also are inadmissible because they are far more prejudicial than probative.**

Mr. Dawson's testimony regarding CW's eligibility for various forms of public and private coverage is dubious, at best. As demonstrated above, almost all of it is irrelevant and barred by the collateral-source rule. In addition, Dawson's testimony disregards the very real possibility that CW's eligibility for such programs may change in the future. Indeed, even in the year or so since Mr. Dawson propounded his opinions in this case, CW's eligibility for TriCare **already** has

changed, because his mother has been discharged from the United States armed forces. This was a perfectly foreseeable possibility, but Mr. Dawson did not account for it in his Report. His failure to do so demonstrates the flaws in his methodology.

Not only is it foreseeable that the **factual** basis for CW's eligibility may change (as it already has); it also is quite foreseeable that the **legal** criteria for eligibility for the collateral-source coverage mentioned in Mr. Dawson's Report may well change in CW's remaining life expectancy. Indeed, it seems rather likely that they will change. *See*, *e.g.*, "Trump Administration Files Formal Request to Strike Down All of Obamacare," *New York Times*, May 1, 2019.[3] But regardless of what may happen in the future, the point is that Mr. Dawson does not know today. Nor does Plaintiff, and nor does the Court. To permit Mr. Dawson to present himself to the jury as an expert on prognosticating future political and legislative developments that no one else in the courtroom can foresee would be improper. These are matters of electoral and legislative will which are inherently unpredictable, even by lobbyists such as Mr. Dawson.

The significant prejudicial effect of Mr. Dawson's proposed testimony easily outweighs its extremely low probative value. In the leading case of *Denton v. Con-Way S. Express*, 261 Ga. 41, 42 (1991), the Supreme Court of Georgia explained that evidence of a party's insurance "is highly prejudicial and it can influence the entire case, no matter which side attempts to introduce it." Such evidence is deemed "inherently prejudicial because its infectious nature tends to contaminate the entire trial." *Id.* Accordingly, in Georgia courts, evidence of insurance coverage generally is grounds for a mistrial. *Moore v. Price*, 158 Ga. App. 566, 567 (1981).

---

[3]    Available online at https://www.nytimes.com/2019/05/01/health/unconstitutional-trump-aca.html?fbclid=IwAR1t3Ss1UkB-hG7AONfsJ6Lofh5O4EUGy_2Rg6PMp7_20gEIiHDcJHvBdx8 (last viewed May 6, 2019).

Because the prejudicial effect of Dawson's collateral-source testimony would be great, while its probative value, if any, would be slight, this testimony should be excluded pursuant to Federal Rule of Evidence 403 as well.

###### C.   Dawson's testimony fails the *Daubert* test because it is unreliable and unhelpful to the trier of fact.

Finally, Mr. Dawson's testimony should be excluded because it fails the standard for admissibility under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow.* Mr. Dawson's testimony is not reliable because he cannot know — as none of us can know — whether CW will continue to be eligible for the programs that Dawson analyzes in his Report. And in addition, Mr. Dawson's testimony — specifically including his seventeenth opinion regarding the purported "reasonable value" of future medical care — is not helpful to the jury because it is based on legal conclusions regarding the meaning of "reasonable value." Mr. Dawson is not an economist or a physician; he is an attorney and lobbyist. His opinions are only as good as his methodology, and his methodology necessarily is based on his professional qualifications. These qualifications are purely legal, but it is well established that "the court must be the jury's only source of law." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). Mr. Dawson's misguided effort to serve as a legal expert, instructing the jury to award damages inconsistently with the applicable law, must fail.

#### Conclusion

For the foregoing reasons, this Court should exclude in full the proposed opinion testimony of Tom Dawson and TD&P, Inc.

This 7th day of May, 2019.

Respectfully submitted,

*/s/ Nelson O. Tyrone,III*
Nelson O. Tyrone, III

Georgia Bar No. 721189
(admitted Pro Hac Vice)
Daniel J. Conner, Jr.
Georgia Bar No. 940568

TYRONE LAW FIRM
1201 Peachtree St., NE
400 Colony Square, Suite 2000
Atlanta, GA 30361
(404) 377-0017 telephone
(404) 249-6764 facsimile


LEIGHTON MOORE
Georgia Bar No. 520701
(admitted Pro Hac Vice)
The Moore Law Firm, PC
100 Peachtree St. Suite 2600
Atlanta, GA 30303
leighton@moorefirmpc.com

Charles Pardue
Georgia Bar N. 561212
Pardue and Associates, P.C.
211 B. Bobby Jones Expressway
Martinez, GA 30907
706.823.2000
chuckpardue@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the **MOTION TO EXCLUDE TESTIMONY OF THOMAS DAWSON/TD&P CONSULTING, INC.** upon all parties of record via electronic filing and email as addressed as follows:

Shannon Statkus, Esq.
Jason Blanchard
Assistant US Attorney
Southern District of GA
P.O. Box  2017
Augusta, GA 30903

James Painter, Esq.
F. Michael Taylor, Esq.
Amanda D. Lynde
Brennan, Wasden & Painter, LLC
801 Broad Street, Ste. 501
Augusta, GA 30901

This 7th day of May, 2019.

Respectfully submitted,

*/s/ Nelson O. Tyrone,III*
Nelson O. Tyrone, III
Georgia Bar No. 721189
(admitted Pro Hac Vice)

TYRONE LAW FIRM
1201 Peachtree St., N.E., Suite 2000
Atlanta, GA 30361

**EXHIBIT A**

## THOMAS J. DAWSON ESQ., MPH, MA
1400 Spring Street, Silver Spring, MD• 240.670.7982 (O) or 202.744.3238 (C) • td@tdpartnersconsulting.com

---

## SUMMARY

Highly accomplished policy professional with an extensive background in advocacy, regulatory compliance, healthcare policy such as Medicare, Medicaid, and the Patient Protection and Affordable Care Act. Knowledgeable in managed care, small and large group health insurance, reimbursement policy, health information technology, ERISA, government legislative processes, and project management. Extensive experience as a leader, and organizer with demonstrated ability to execute major projects in a timely fashion. Excellent communication and public speaking skills.

## EXPERIENCE

2010 - Present

**TD&P CONSULTING, INC.**                                                          **Silver Spring, MD**
TD&P Consulting, Inc. is an applied health policy firm focusing on private and public health insurance market, health insurance reform under the Affordable Care Act, healthcare market costs, and providing medical assessments related to head and spinal injury, and the needs of persons with disabilities.

*CEO*
- Provide research and policy analysis on healthcare issues including Medicare, Medicaid, Private Insurance, and the Affordable Care Act.
- Develop cost analysis of healthcare benefits provided in the insurance marketplace.
- Serve as an expert witness on issues related to health insurance reform and the Affordable Care Act.

2013 - 2014

**AMERICAN DENTAL ASSOCIATION**                                                    **Washington, DC**
The American Dental Association is the oldest and largest national dental society in the world.  It has more than 157,000 members from all 50 states, the District of Columbia and Puerto Rico.

*Senior Congressional Lobbyist*
- Responsible for advocating legislative goals of the Association.
- Served in leadership role presenting the views of the Association to members of Congress and staff on vital dental practice issues.
- Gathered and analyzed information regarding the actions of Congress leading to the development and implementation of legislative strategic priorities, as well as the day-to-day tactics.
- Developed and utilized the ADA Grassroots Program to achieve legislative success.
- Performed Membership Services activities and represent the ADA before coalitions of health, business, and labor representatives.

2011 - 2013

**AMERICAN CAPITOL GROUP**                                                          **Washington, DC**
The American Capitol Group is a full-service government-relations firm based in Washington, DC.      The firm helps corporations, industry associations, and non-profit institutions navigate Washington's legislative and regulatory environment.

*Partner*
- Served as Executive Director and advisor to the National Coalition of Healthcare Providers.
- Provided advisory and advocacy services for clients in healthcare industry in areas of government relations, and regulatory compliance on issues stemming from passage of the Affordable Care Act. Partial client list included: the American Dental Association, the American Osteopathic Association, the American

Thomas H. Dawson III, Esq. MPH
Page 2 (updated June, 2017)

Gastroenterological Association, the American Academy of Dermatology, and the Medicaid Health Plans of America, among others.

**Key Accomplishments**

- Established the National Coalition of Healthcare Providers (NCHP), an alliance of professional associations representing more than 350,000 healthcare providers and allied health professionals, with a focus on regulatory and legislative matters impacting the business operation of small practices.
- Achieved key modifications to the proposed rule on *Medicare and Medicaid Programs; Electronic Health Record Incentive Program—Stage 2* for the meaningful use objectives and measures specified by the American Recovery and Reinvestment Act of 2009 (ARRA) through a successful NCHP lobbying campaign.
- Influenced written legislation and participated in staff drafting of H.R. 6598 (112th), a bill to amend certain requirements and penalties implemented under the Medicare and Medicaid programs by the HITECH Act of 2009.

2007-2011
**U.S. HOUSE OF REPRESENTATIVES, COMMITTEE ON SMALL BUSINESS**                    Washington, DC
The Committee has oversight over government programs and initiatives that address the interests of American entrepreneurs and small business owners.

*Health Care Counsel*

- Provided counsel to the Committee Chair Congresswoman Nydia Velázquez (D-NY) and the Subcommittee Chairs on reimbursement policy, insurance market reforms, health insurance exchanges (HIEs), health information technology (HIT), employee benefits, tax and related health policy issues impacting small businesses and the development of the Affordable Care Act.
- Served as senior advisor to the Congressional Hispanic Caucus, working directly with Democratic leadership, the Congressional Black Caucus, the Congressional Asian Pacific American Caucus, and the Progressive Caucus to shape the Affordable Care Act.
- Worked directly with the Committees of Jurisdiction on health reform, developing key small business and insurance market language in the Affordable Care Act.
- As Senior Counsel for health care policy, supervised the activities of all junior Committee staffers working on health policy issues.
- Developed health policy, drafted legislation, and managed all formal communications with Hill staff and executive agencies on issues ranging from health information technology and Competitive Bidding in the clinical laboratory industry to the "Red Flags Rule."
- Managed all Committee communication with national physician and allied health organizations.

*Key Accomplishments*

- Organized Committee healthcare roundtable, participating in identifying federal policy impacting businesses within the health care industry.
- Coordinated monthly outreach meetings with multiple professional healthcare organizations for the purpose of setting Committee legislative agenda and developing policy recommendations.
- Instrumental in the repeal Medicare Competitive Bidding Demonstration Project for Clinical Laboratory Services. Held the first Committee hearings on the matter, and drafted the first bill, H.R. 3435: The Community Clinical Laboratory Fairness in Competition Act of 2007, to repeal the legislation.
- Developed the Committee's position on the Red Flags Rule. Drafted letters from Chairwoman Velázquez to the FTC, the Senate and House Committees of Jurisdiction outlining the impact of applying the Rule to practitioners. This led to a reevaluation by the FTC of the Rule and the exemption of healthcare providers from the rule.
- Drafted H.R. 6582 (110th): Small Business CHOICE Act of 2008. This bill was reintroduced as H.R. 850 (111th). The purpose of the bill was to encourage the development of small business cooperatives for

healthcare options to improve coverage for employees (CHOICE) through a small business tax credit. The bill received wide support among the small business and medical association community.

2001-2006
**U.S. DEPARTMENT OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION**                    **Washington, DC**
The Employee Benefits Security Administration (EBSA) is an agency of the United States Department of Labor responsible for protecting the integrity of pensions, health plans, and other employee benefits regulated under the Employee Retirement Income Security Act of 1974 (ERISA).

*Pension Law Specialist and Attorney*
- Advised senior political and career staff on health care and pension issues affecting ERISA covered employee benefit plans.
- Coordinated projects assigned by senior staff involving the analysis of legislative and regulatory proposals and the preparation of briefing material and testimony.
- Served as a Trial Attorney in the Office of the Solicitor in the Pension Benefits Security Division to resolve litigation and enforcement matters arising out of EBSA investigations.

*Key Accomplishments*
- Selected as Special Assistant to Deputy Assistant Secretary (DAS) in 2003 for the Office of Program Operations.
- Served as the Trial Attorney of record in a Brief for The Secretary of Labor as Amicus Curiae Supporting Petitioner, <u>Qualchoice, Inc. v. Robin Rowland, Inc.</u>, for En Banc Rehearing, (6th Cir. 2004)  (No 02-3614).

1999-2001
**FINANCIAL EXECUTIVES INTERNATIONAL**                    **Washington, DC**
The Financial Executives International (FEI) is a leading professional association for CFOs and other senior finance executives focusing on federal policy impacting corporate finance.

*Manager and Lobbyist, Government Relations*
- Supported the Vice President of Government Relations with strategic plans, materials, and communications related to FEI advocacy activities.
- Attended FEI Chapter and Board meetings on behalf of the government relations office to communicate about congressional activities and encourage action.
- Oversaw legislative fly-ins of FEI members, organized Hill meetings and policy agenda.
- Served as principal staff to the FEI Benefits Finance Committee, advocating on health care, employee benefits and related employer issues before internal and external audiences and stakeholders.
- Developed and maintained a grassroots program through the weekly newsletter, *Washington Watch*, to engage FEI members in contacting and interacting with elected officials on FEI issues.
- Advised the FEI Government Business Committee on government activity impacting financial practice standards, accounting principles, record keeping and reporting and financial rules followed by private business enterprises.
- Supervised legislative assistants.

1997-1999
**HEALTH POLICY ANALYSTS, INC.**                    **Washington, DC**
Health Policy Analysts is a health care consulting firm advising Fortune 100 companies.

*Associate and Lobbyist*
- Directed clients on public policy, planning, and legislative strategy with respect to employee benefits, health insurance and Medicare policy.

Thomas J. Dawson III, Esq. MPH
Page 4 (updated June, 2017)

- Oversaw national health reform initiatives as staff to the Corporate Health Care Coalition (CHCC)
- Advised members of the Employer Health Care Innovation Project (EHCIP) on state health policy initiatives.

1990-1991
**SUNSHINE HEALTH PLAN, INC.**                                                    **Pompano Beach, FL**
Sunshine Health Plan, Inc. is a managed care plan providing health care services to Medicaid beneficiaries throughout Broward County and Northern Dade County.

*Physician Recruiter*
- Managed the Plan's physician recruitment efforts.
- Presented approved offers and employment agreements to physician candidates.
- Acted as a facilitator to physicians in the credentialing process for hospitals and group practices.
- Involved in physician and support staffing retention.
- Negotiated all compensation packages and managed care relationships.
- Supervised team responsible for recruiting plan beneficiaries.

1989-1990
**Miami-Dade Public Schools**                                                                    **Miami, FL**
Miami-Dade County Public Schools is the fourth largest school district in the United States, comprised of 392 schools, 345,000 students and over 40,000 employees.

*Science Teacher, Booker T. Washington Middle School*
- Taught 7th and 8th grade students in the fundamental areas of science including biology.
- Prepared and developed instructional lesson plans.
- Sponsored an afterschool outreach program to engage students with unique needs.
- Held frequent parent-teacher conferences to identify and accommodate ESL student needs. Sent home extra materials and utilized visual representations to communicate concepts.
- Identified as outstanding first year teacher.

**BOARD EXPERIENCE**

2012-Present
**DC BOARD OF MEDICINE**                                                            **Washington, DC**
The DC Board of Medicine (BoMed) has the primary responsibility to license physicians and regulate the practice of medicine (MD/DO) in the District of Columbia.

*Board Member*
- Formulate and implement BoMed policies and procedures.
- Guide BoMed policy development as a member of Policy Subcommittee.
- Serve as a thought leader, providing strategic and expert advice, fostering collaboration, and building common purpose on the BoMed Telemedicine Taskforce.

2016-Present
**JOURNAL OF MEDICAL REGULATION AND THE FEDERATION OF STATE MEDICAL BOARDS (FSMB) EDITORIAL COMMITTEE**                                                                    **Euless, TX**
The Journal of Medical Regulation is the quarterly peer-reviewed publication of the FSMB, serving several thousand medical regulators across the U.S.

Thomas J. Dawson III, Esq. MPH
Page 5 (updated June, 2017)

*Committee Member*
- Advise the Editor-in-Chief on editorial policy for the FSMB's official publication.
- Serve on the editorial board of the publication.

2016-Present
**N STREET VILLAGE**                                                                          **Washington, DC**
 N Street Village is a community of empowerment and recovery for homeless and low-income women in Washington, D.C. It offers comprehensive services addressing both emergency and long-term needs in housing, income, employment, mental health, physical health, and addiction recovery.

*Board Member*

**EDUCATION**
1996-1999
**George Washington University School of Law**                                              **Washington, DC**
Juris Doctor
**George Washington University School of Public Health**
Master of Public Health

1991-1994
**University of Florida, School of Liberal Arts**                                            **Gainesville, FL**
Master of Arts in Philosophy

1984-1989
**Morehouse College**                                                                        **Atlanta, GA**
Bachelor of Arts in Philosophy/Biology

**ASSOCIATIONS AND BAR MEMBERSHIPS**
District of Columbia Bar, Member -- 2000
U.S. District Court Bar for the District of Columbia, Member
The Washington Latin School, Founding Member

**AWARDS AND RECOGNITION**
American Optometric Association, Public Policy Award – 2010
McKnight Foundation Fellow
Graduate Minority Fellow
Ford Foundation Scholar
Almanac of the Unelected: Staff of the U.S. Congress 2011
Insider's Guide to Key Committee Staff of the U.S. Congress 2010
Insider's Guide to Key Committee Staff of the U.S. Congress 2009

Thomas J. Dawson III, Esq. MPH
Page 6 (updated June, 2017)

**PUBLIC SPEAKING**

More than 10 years of public speaking experience, including experience before Financial Executives International, the Brooklyn Chamber of Commerce, the Hispanic Chamber of Commerce, Congressional Black Caucus Foundation 35th Annual Legislative Conference, International Franchise Association, Self-Insurance Institute of America, American Medical Association, American Dental Association, Hispanic Dental Association, American Bar Association, Mag Mutual Insurance Company, Pennsylvania Defense Institute, Claims & Litigation Management Alliance, Themis.

**PUBLICATIONS, BRIEFS, AND SELECTED WHITEPAPERS**

"Pension Participation among Black Americans," 2005 (Presented at the 2005 Congressional Black Caucus Foundation 35th Annual Legislative Conference).

Brief for The Secretary of Labor as Amicus Curiae Supporting Petitioner, <u>Qualchoice, Inc. v. Robin Rowland, Inc.</u>, for En Banc Rehearing, (6th Cir. 2004)  (No 02-3614).

<u>Rush Prudential HMO, Inc. v. Moran</u>: State Independent Review Not Preempted by ERISA, 2003.

"Health Care Purchasing Pools: Expanding Coverage through AHPs (Association Health Plans)," 2003.

"Pre-funding Employer-Provided Retiree Health Insurance," 2002.

"Defined Contribution Health Plans: Shifting Costs and Responsibility," 2002.

"Ohio Court Decision Reduces Damages Award Based On ACA," 2015.

"The Collateral Source Rule, The American Health Care Act, Its Impact on the Affordable Care Act, and The Mitigation of Damages," 2017

**EXHIBIT B**

```
 1        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                      FOR KING COUNTY

 3   ANTHONY CARMONA, a minor, by

 4   and through his Guardian ad    Case No: 15-2-12042-5 KNT

 5   Litem, KEITH KESSLER; SERGIO

 6   CARMONA and NORMA CARMONA,

 7   husband and wife,

 8                  Plaintiffs,

 9   -vs-

10   MULTICARE HEALTH SYSTEMS, INC.,

11   a domestic corporation,

12                  Defendant.

13   _____/

14

15        VIDEOTAPED DEPOSITION OF THOMAS DAWSON

16                 Washington, D.C.

17             Tuesday, August 30th, 2016

18                   12:30 p.m.

19

20

21

22

23

24

25   Reported by:  Alexandria Kaan
```

August 30, 2016

CARMONA v. MULTICARE                                    Thomas Dawson

Page 18

1  offered in the market and to take a look and see what
2  the value of those services might be in terms of their
3  reasonableness.
4      Q. And what part of your report discusses whether
5  the costs that were estimated by Ms. Bellerive or Ms.
6  Vinett was a reasonable estimate?
7      A. Well, "Reasonable" does not have the sort of
8  pejorative connotation that you might think of, it
9  doesn't have that necessarily everyday discussion.
10     Q. That's not my question, Mr. Dawson. We have to
11 show what a reasonable and necessary medical expense is.
12 Ms. Bellerive and Ms. Vinett set those numbers out
13 there. Correct?
14     A. Yes.
15     Q. In their life care plans?
16     A. Yes.
17     Q. Okay. What part of your report says that their
18 estimates of what the hourly amount is for a charge or a
19 procedure charge did not or was not a reasonable or
20 necessary estimate?
21     A. We don't make the determination about whether or
22 not their estimate was reasonable or necessary or not,
23 we don't stand in that position. We just simply -- we
24 don't stand in that position, that's not how the plan
25 focuses on value.

Page 19

1      Q. Okay. Your plan is looking at, in your opinion,
2  how these expenses can be met with an insurance plan or
3  a government program in the future. Is that correct?
4          MR. LARSON: Hang on a second.
5          Object to the form of the question.
6          Go ahead.
7      A. I think in a nutshell, yes, there is that aspect
8  of it.
9  BY MR. GARDNER:
10     Q. Who contacted you or your company to work on this
11 case?
12     A. The defense counsel.
13     Q. Which defense counsel? Was it Ms. Ringer? Was
14 it Levi? Was it an insurance company person? Who was
15 it?
16     A. It was Ms. Ringer, I believe, in this case.
17     Q. When was that?
18     A. Let me look at my records here for the first date
19 of contact.
20         MR. LARSON: I object to the form of that
21 last question.
22     A. First date of contact was 6/22.
23 BY MR. GARDNER:
24     Q. What year?
25     A. 2016.

Page 20

1      Q. Have you worked for Ms. Ringer's office before?
2          MR. LARSON: I'm sorry. I accidentally --
3  I'm sorry. I may have the wrong one in front of me.
4          THE WITNESS: Do I?
5  BY MR. GARDNER:
6      Q. If that was incorrect, I'd like you to just look
7  through your materials and correct that now.
8      A. Oh, I'm sorry. That's right because this is an
9  old -- we switched over to a new time system, and this a
10 new time system. That would have been 10/2015,
11 10/5/2015. We have a new time system, timekeeper
12 system, and I don't have -- sometimes it's a little
13 difficult to track both sides.
14     Q. And who was it who contacted you? Is it a letter
15 signed by Ms. Ringer? Is it an e-mail? Is it a phone
16 call? What do we have?
17     A. We have a phone call, and that would have been
18 Ms. Ringer.
19     Q. Have you worked for her firm before?
20     A. Yes, we have.
21     Q. How many times?
22     A. At least two prior times to this occasion.
23     Q. What are the names of those cases?
24     A. The names of those cases, one of them would be
25 the Kelly case. There are three cases: The Rogers case

Page 21

1  and the Alejo case.
2      Q. Can you spell "Alejo" for the record, please?
3      A. A-L-E-J-O, I believe.
4      Q. And did you testify at trial in any of those
5  cases?
6      A. No, I did not.
7      Q. Do you know if you were excluded as a witness in
8  any of those cases?
9      A. I don't believe I was.
10     Q. Do you know why you weren't called or do you know
11 if they went to trial? What do you know about it?
12     A. No, I don't recall any great detail about them at
13 the moment. I believe two of them are active.
14     Q. How many times have you testified as an expert in
15 the state of Washington?
16     A. None.
17     Q. In trial? None?
18     A. No.
19     Q. How many times have you testified as an expert
20 about future insurance benefits or how future benefits
21 will be paid by insurance or governmental programs
22 nationally, in trial?
23     A. None.
24     Q. How many times during that time have you been
25 identified, as you are in this case, as a potential

August 30, 2016

CARMONA v. MULTICARE                                    Thomas Dawson

Page 22

1  expert witness to testify at trial?
2     A. Quite a few, maybe over 100.
3     Q. Do you have any idea why, out of those over
4  hundred cases, you've never appeared as an expert at
5  trial?
6     A. The vast majority of them seem to have settled.
7     Q. What about those that have gone to trial? Do you
8  have any idea why you weren't called as an expert in
9  those cases?
10    A. I could only say that, based on the information I
11 have, I've been admitted in two cases to actually
12 testify, or rather not precluded from trial. One was in
13 the Valdez case in California. Another one was in
14 Illinois where they said I could come in and talk about
15 reasonable value. Outside of that, there are at least
16 three cases that I can think of where I was not
17 permitted to testify because the description of the work
18 was speculative.
19    Q. What are the names in the California and Illinois
20 cases?
21    A. The California case is Valdez, if I remember
22 correctly. And the Illinois case is Goranson. I
23 believe both of those cases quickly settled.
24    Q. And you use the term "Quickly." Why do you use
25 that term, quickly as in quickly compared to what?

Page 23

1     A. As compared -- one day we got the notice that I
2  was admitted, the next day it settled.
3     Q. And you believe there was an association, is that
4  why you use the word "Quickly"?
5     A. That's speculative. I have no idea why.
6     Q. Did you print out copies of the healthcare plans
7  that you contend would cover Tony's attendant care 24/7
8  for the rest of his life?
9     A. I printed out copies of the associated healthcare
10 plan that I recommend and those associated programs.
11    Q. And they're in your binder?
12    A. Yes, they are.
13    Q. And in your opinion, do they provide full
14 coverage for 24/7 attendant care for Tony for the rest
15 of his life?
16    A. No, there are different ranges in terms of what
17 they provide.
18    Q. The report that I have dated August 26th, 2016,
19 it just has an "X" by all of these coverage -- by all of
20 these options for long-term care suggesting they're all
21 covered. So I'm trying to figure out what your
22 definition of "Covered" is, whether it's the -- matches
23 what the life care planner says is needed or it's
24 something else?
25    A. Well, in general, when you talk about covered, we

Page 24

1  write with specificity in the footnotes exactly what is
2  covered and what is not. I do know in the qualified
3  health plans here to have some limitations depending on
4  the specific program. I can look in my binder here, if
5  that's all right, and pull out that information for you.
6     Q. Yeah, that would be helpful. So that
7  understanding that went on page 14 of your analysis of
8  Ms. Bellerive's report for the home residential care
9  options as an adult, you show Apple Health as covering
10 it, CORE waiver program is covering it with no footnote,
11 no asterisks. And then the qualified healthcare plan
12 from Premera Blue Cross Blue Shield you have a footnote
13 and an asterisks that has some limitations. I'm just
14 trying to figure out what your definition of "Covered"
15 means --
16    A. Okay.
17    Q. In that context?
18    A. So we're on page 14, you're saying?
19    Q. Yeah, you got multiple portions of this report
20 that are numbered differently. So it's 14 of your
21 "Analysis of Rebecca Bellerive's Life Care Plan."
22    A. Oh, okay, I understand. So when we talk about --
23 there are a number of different programs that we looked
24 at here that are related. What we're looking at here is
25 what we recommended as the sort of the coverage pattern

Page 25

1  for this individual, or what they could expect to
2  receive if they were to enter the market place or take
3  advantage of those services available to them. And you
4  may notice that the -- I mean, we can look at the
5  in-home support, we can look at the adult care services.
6  The Washington Qualified Health Plan, Premera Blue Cross
7  Blue Shield, that does have limitations and those
8  limitations are listed at footnote No. 15.
9     Q. As I read that, you're talking about 130 visits,
10 that's by a nurse, that's not attendant care. Correct?
11    A. No, what skilled nurse -- excuse me?
12    Q. When you say under the Premera plan, "Limited to
13 130 visits," what visits are we talking about? Visits
14 by a nurse?
15    A. It would be visits by whatever the plan
16 prescribed. Generally, in this particular case, if
17 we're talking about in-home care support, it would
18 either be a nurse of some type, a life care plan --
19 excuse me, an LCP or -- not LCP, an LPN or potentially
20 an RN. I doubt in an RN you would get that much
21 service, so you're really talking about an LPN or
22 a certified nursing assistant, a CNA.
23    Q. Define "Visit." Is that an eight-hour shift or
24 is that a visit to assess the health of the child?
25    A. Visits are different --



August 30, 2016

CARMONA v. MULTICARE                                    Thomas Dawson

Page 66

1  assumption that the next 60 years are going to be like
2  the last seven, not like the last 60 in total?
3      A.  Well, I will say -- and I should correct myself
4  -- actually, this is not really the first program we've
5  done away with the preexisting condition exclusion.
6  Medicare started out that way, Medicare doesn't really
7  have a preexisting condition exclusion.  It's a very
8  strict program, a very aggressive program.  It's there
9  for everybody over 65 years of age.  Without trying to
10  be a computer, because I'm pretty sure that it's a plan
11  that most people are happy with.  And that doesn't mean
12  they're not supplemental programs and the like, but most
13  people know that if you go to Medicare, they're not
14  going to turn you away because you have a preexisting
15  condition.  The program wouldn't be popular and it
16  wouldn't work if it didn't have those things.  And this
17  is the reason why you have our citizens saying, "Don't
18  cut back on our benefits on the Medicare," which is why
19  that program, Medicare, is so loved and so fought after
20  in terms of preserving what it provides.
21      Q.  So from 22 to 65, part of your opinion is based
22  on the assumption that the Affordable Care Act's
23  requirement that insurance companies not turn down
24  people on the basis of a preexisting condition remains
25  in effect.  Is that fair to say?

Page 67

1      A.  Yeah, I mean, again, it's more likely than not.
2  I just don't see the writing on the wall.  I see what
3  the insurance company, the insurance industry has said,
4  that if they were required to do the actual oral tables
5  over for the next ten years, what they've already done,
6  that would be almost an insurmountable feat.
7      I see the Republicans listening to the insurance
8  industry and listening to the economists, particularly
9  the leadership, and saying to us, "We understand that we
10  don't want to send this country into an economic down
11  spiral."  I also understand that we want to make sure
12  that individuals like Anthony can receive the care that
13  we need and that we don't drain the programs like CORE
14  and others because the resources aren't there, because
15  they're over taxed, because suddenly, we're not allowing
16  qualified health plans and others to participate in the
17  care environment, to provide care --
18      Q.  And we're also having to rely upon your opinions
19  as to what you think's going to happen politically with
20  these programs in the future in order for your report to
21  be accurate.  Is that fair to say?
22          MR. LARSON:  Object to the form of the
23  question.
24          Go ahead.
25      A.  My job is not to make an assessment politically

Page 68

1  one way or the other.  I'm just speaking in terms from a
2  policy perspective what I know to be happening.
3  BY MR. GARDNER:
4      Q.  Okay.
5      A.  And from a policy perspective, it's not feasible.
6      Q.  Have you been scheduled to testify in this case,
7  Mr. Dawson?
8      A.  Have I been scheduled to testify?  Yes, I believe
9  I'm on board to testify, yes.
10      Q.  What does that mean by "On board"?  Do you have a
11  date set aside?
12          MR. LARSON:  Do you have a date for us when
13  you'll rest?  We're working on that collectively as a
14  team that includes your office on getting dates.  But we
15  discussed the October 24th trial date and a moving
16  target of when we would be able to get him out to
17  testify.  Sorry for jumping in there.
18  BY MR. GARDNER:
19      Q.  You never know.  Maybe this will be the first
20  time that you're actually in a courtroom giving these
21  opinions, you just never know.
22      How many cases have you looked at total where
23  you've been identified as a potential expert witness?
24          MR. LARSON:  Object to the form of the
25  question.

Page 69

1      Go ahead.
2      A.  I would have to actually go back and look in my
3  office.  There have been a number of cases I've been
4  consulted on, so I'm going to give you an estimate of
5  sorts.  I would say that where I've actually been
6  identified as a witness, wow, 40 percent, 40 percent.
7  BY MR. GARDNER:
8      Q.  Of the total?
9      A.  Yeah.
10      Q.  Let's talk about how many cases have you been
11  consulted on that are in litigation, tort claims of some
12  kind, since you started this business?
13      A.  Now, between 70 and 80 percent.
14      Q.  70, 80 percent of what?  I'm looking for a gross
15  number.
16      A.  I'm sorry.  I'm sorry.  40 percent of 100 I have
17  been sort of named.  Of that a hundred percent -- on top
18  of that you could add another what, 30 to 40 percent on
19  top of that in which I've actually been consulted on to
20  be involved in the cases, yes.
21      Q.  Have you ever been -- go ahead.
22      A.  No, I'm done.
23      Q.  What percentage of the cases you've been
24  consulted on were on behalf of the injured person, the
25  Plaintiff?

August 30, 2016

CARMONA v. MULTICARE                                          Thomas Dawson

Page 70

1   A.  None yet.  I'm hoping that will happen, but none
2   yet.  I have opened myself up and I've actually talked
3   to firms.  I think this is a very useful tool that we
4   have in terms of helping folks identify how to access
5   care, which I think is the most important thing, we've
6   been working at it.
7   **Q.  What other firms have you done work for in**
8   **Washington other than Ms. Ringer's firm?**
9   A.  There is one other, I don't recall their name, I
10  would have to go back in my files.  I believe that was
11  early 2014, maybe late 2013.
12  **Q.  Johnson Graffe, does that ring a bell?**
13  A.  I remember the -- I remember the injury, but I
14  don't remember the name of the case.
15  **Q.  Okay.**
16          MR. GARDNER:  I have no other questions.
17  Thank you very much.  I appreciate you getting the data
18  sent to the Court recorder.  Mr. Dawson, I appreciate
19  your time today.  I was nice to meet you.  Thank you.
20          THE WITNESS:  All right.  Nice to meet you
21  as well.
22          MR. LARSON:  Just out of completeness, I
23  want to -- because I don't -- when we navigate this, I
24  want to attach just a healthcare delivery summary report
25  for Anthony Carmona.  I want to break the report out as

Page 71

1   a separate Exhibit No. 3.  And I'll give her my copy.
2          MR. GARDNER:  That's fine.
3          MR. LARSON:  I just think that would be
4   easier to navigate than the binders, so I'll provide
5   those.
6          MR. GARDNER:  Actually, I got a couple more
7   questions on that report.  Let me go back on -- yes, I
8   agree we should attach that as Exhibit 3, Levi.  I
9   didn't mean to interrupt you there.
10          MR. LARSON:  Okay.  Go ahead.
11  (Whereupon Exhibit No. 3 is marked for identification.)
12  BY MR. GARDNER:
13  **Q.  Who wrote the first draft of this report, the**
14  **August 2016 report for Mr. Carmona, for Anthony?**
15  A.  That would have been my lead staffer on this case
16  Patrick Coetzle.  So Patrick works with my managing
17  partner and myself.  That's who wrote the first draft.
18  **Q.  And is there a template or a format that's used**
19  **for at least the early part of the draft on all cases?**
20  A.  Yes, we have a checklist of sorts, what we expect
21  and that we go through.
22  **Q.  How does Patrick spell his last name?**
23  A.  Coetzle, C-O-E-T-Z-L-E.
24  **Q.  What is his background, educationally and**
25  **professionally?**

Page 72

1   A.  Yes, he's a second soon to be third year, he's
2   been trained by me.  He went to Georgetown University
3   Law.
4   **Q.  Second, third year what?  Second, third year law**
5   **student?**
6   A.  No, out of law school, out of law school.  He's
7   entering his third year.  He's coming up on his third
8   year out.
9   **Q.  How many changes did you make to the report, if**
10  **any, after it was drafted by Mr. Coetzle?**
11  A.  A lot.
12  **Q.  Do you have that original draft?**
13  A.  No, it's generally a living document and we go
14  back -- and I know everyone says that now, but it truly
15  is the case.  You sort of red line and then you kind of
16  go through it and then you read it, and then I throw it
17  back at Susan or she throws it back at me.  Coetzle,
18  like some of the younger attorneys, they're younger, so
19  you go through things.
20  **Q.  Well, but when it's e-mailed to you, you're going**
21  **to have a record of the e-mail of the original draft,**
22  **wouldn't you?**
23  A.  E-mailed to me?  No, we --
24  **Q.  Yeah, because it's sent to you electronically in**
25  **some way?**

Page 73

1   A.  No, generally what we do -- I work off a hard
2   copy.  I'm kind of old school, I'm a little older than I
3   look.  So I'm 49 years old and I tell everybody, "I
4   don't want anything e-mailed to me, give me the written
5   document."  I like to read and scratch.  That's what I
6   do.
7   **Q.  You certainly would have it.  He had to create**
8   **his electronically initially, didn't he?**
9   A.  Yeah, now, we should have that on record.  If
10  it's still there, if we have that, you will have a copy
11  of it, so I'll look for it.  But we have --
12  **Q.  Will you get it?**
13  A.  Yeah, absolutely.  But it is a living document we
14  have on the system, so we'll look for it.
15  **Q.  I do get that part.  And I also appreciate the**
16  **desire to go through it on paper.**
17          **Mr. Dawson, again, I appreciate you time?**
18          MR. LARSON:  I just want to ask a couple of
19  followup questions.  So we've marked healthcare delivery
20  summary report for Anthony Carmona, including that
21  healthcare delivery cost delivery analysis for Anthony
22  Carmona, the Vinett report, and healthcare delivery cost
23  analysis for Anthony Carmona's the Bellerive report in
24  their entirety as Exhibit 3.
25  BY MR. LARSON:

