


Deposition of:

# Thomas Dawson , III

*June 12, 2019*

In the Matter of:

# Willis vs. USA

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

SHERECIA WILLIS, Individually
and as NEXT FRIEND, PARENT,
and NATURAL GUARDIAN of
MINOR CHILD, CW                    Civil File No:
Plaintiffs                         1:17cv00015

vs.

UNITED STATES OF AMERICA
First Defendant
VENKATESAN GORANTIA, MD
Second Defendant
AUGUSTA HOSPITAL, LLC
d/b/a TRINITY HOSPITAL OF
AUGUSTA
Third Defendant
AUGUSTA PHYSICIAN SERVICES, LLC
Fourth Defendant
----------------------------/

Page 2

The deposition of THOMAS J. DAWSON, III, ESQUIRE, MPH, MA was held on Wednesday, June 12, 2019, commencing at 10:34 A.M., at the offices of TD&P Consulting, 1400 Spring Street, Silver Spring, Maryland 20910, before Heather Bjork Avalos, a Notary Public.

REPORTED BY: Heather Bjork Avalos

Page 3

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

LEIGHTON MOORE, ESQUIRE (Telephonically)
The Moore Law Firm, PC
100 Peachtree Street, Suite 2600
Atlanta, GA 30303
Telephone: 678-237-0330
E-mail: Leighton@moorefirmpc.com

ON BEHALF OF THE DEFENDANT UNITED STATES OF AMERICA:

SHANNON STATKUS, ESQUIRE (Telephonically)
Assistant US Attorney
Southern District of Georgia
P.O. Box 2017
Augusta, GA 30903
E-mail: Shannon.statkus@usdoj.gov

Page 4

APPEARANCES (Continued):

ON BEHALF OF THE DEFENDANTS AUGUSTA HOSPITAL, VENKATESAN GORANTIA, MD, AUGUSTA PHYSICIAN SERVICES:

F. MICHAEL TAYLOR, ESQUIRE (Telephonically)
Brennan, Wasden & Painter, LLC
801 Broad Street, Suite 501
Augusta, GA 30901
Telephone: 706-250-7373
E-mail: Mtaylor@brennanwasden.com

Page 5

INDEX

Deposition of THOMAS J. DAWSON, III, ESQUIRE, MPH, MA
June 12, 2019


| Examination by: | Page |
|---|---|
| Mr. Moore | 6 |

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 1 | Witness' CV | 9 |
| Exhibit 2 | Notice of Deposition | 31 |
| Exhibit 3 | Witness' testimony list | 37 |
| Exhibit 4 | Census Bureau state assessment of health insurance | 43 |
| Exhibit 5 | Witness' 5-21-18 report | 58 |
| Exhibit 6 | Brief No. 19-10011 | 68 |
| Exhibit 7 | Witness' 5-7-19 report | 73 |

P R O C E E D I N G S

\- - - - - - -

Whereupon,

THOMAS J. DAWSON, III, ESQUIRE, MPH, MA

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

MR. MOORE: So this is the deposition of Mr. Tom Dawson and TD&P taken for all purposes under the Federal Rules of Civil Procedure and Federal Rules of Evidence.

Shannon, we reserve objections except as to form, responsiveness, or privilege?

MS. STATKUS: Yes, I'm agreeable to that.

EXAMINATION BY MR. MOORE:

Q Mr. Dawson, would you please state your full name for the court reporter?

A Thomas James Dawson, III.

Q And what is your relationship to TD&P?

A I am the cofounder, CEO, and president.

Q The report that the United States has filed



in this action stated on its cover that it is the report of TD&P, but the CV is your CV. So I'm trying to get clear on the record that the opinions contained in the report are your opinions.

Is that correct?

A Correct.

Q And were other staff members at TD&P involved in the formation of those opinions?

A No.

Q Did anyone at TD&P help you gather information or prepare the report?

A Yes.

Q But the opinions are solely yours?

A Correct.

Q You've been deposed many times before, yes?

A Yes.

Q So you understand that you're under oath?

A Yes.

Q And that, especially in this telephone-deposition context, it's important for you to give verbal answers and not nod or shake your head,



that type of thing?

A Correct.

Q And we've been doing a good job of this so far. But as we get going, we may be tempted to talk over each other, anticipate each other's question or answer. It's important for the court reporter and for the benefit of the other people listening in on the call that we take turns speaking and not talk over each other.

Can we agree about that?

A Yes.

Q And from time to time, your counsel may object to one of my questions. You understand that those objections are just for the record and that you still have to answer the question if you can?

A Correct.

Q If any of my questions are unclear so that you can't figure out what I'm asking or how to answer it, please tell me and I'll try to clarify. But unless you tell me otherwise, I'll have to assume that you understood the question.



Can we agree on that?

A Yes.

Q And as we discussed, if you need a break, we can take one as long as there is not a question pending. If there is a question pending, if the Lord permits I would prefer that you answer it first. Of course, we'll accommodate you.

Do you understand?

A Yes.

(Dawson Deposition Exhibit 1 was marked for purposes of identification.)

Q Mr. Dawson, is the document before you your current CV?

A With some modifications, yes.

Q Do you mean there would need to be some modifications to bring it up to date?

A I've made some modifications to the wording.

Q Do you have a current CV that you could provide to us?

A Yes.

MS. STATKUS: Leighton, is this the CV that I sent to you this morning that was dated 6-19-19?
MR. MOORE: Well, I can't see what they labeled.
MS. STATKUS: The one sent this morning would have had a Bates stamp on the bottom starting with USA Willis depo 45.
THE WITNESS: That's mine. That's the right one.
Q That's the one you have in front of you, Mr. Dawson?
A That's the one I have in front of me.
Q In substance, is this current?
A Yes.
Q And so presently your employment is with TD&P Consulting, Incorporated?
A Correct.
Q How long has that been your primary employment?
A Since 2014.
2010 is when I started the company. 2014



when it became my sole source of income.
Q Before 2014, were you employed by the American Dental Association?
A Yes.
Q As a lobbyist?
A As a senior Congressional lobbyist.
Q And before that, you were employed by the American Capital Group?
A I worked in association with the American Capital Group.
Q Explain to me what you mean by that.
A I worked under the umbrella of the American Capital Group.
Q What is the American Capital Group? I mean I can see what's written here on the CV.
Does it not employ people like you?
A I wasn't employed by the American Capital Group. I worked under -- or in association with -- it was a grouping of people with different companies who are under the umbrella of the organization. So we all had our own -- we were all independent contractors.



Q I see. And was that also lobbying work?
A Yes. Sort of. It's hard to explain without detail.
Q Was it under the general category of government relations work?
A Yes.
Q Before that, you were on Capitol Hill?
A Yes.
Q And it looks like you were on Capitol Hill during the passage of the Obama Care legislation.
Is that right?
A Correct.
Q So when did you become a registered lobbyist?
A When did I become a registered lobbyist?
Q Yes.
A The first time I was registered as a lobbyist I believe was when I was with Health Policy Analysts. The next occasion in which I was registered as a lobbyist was when I was with Financial Executives International. And the next occasion in which I was



actually registered as a lobbyist -- I was not registered as a lobbyist with the American Capital Group because I did not lobby during that period. I had a cooling-off period as they would say. Then was with the American Dental Association.
Q The cooling-off period you referred to, is that because you worked on Capitol Hill?
A Correct.
Q So there was a period after working on Capitol Hill during which you could not registrar as a lobbyist?
A You're permitted to register as a lobbyist. You're not permitted to communicate with your previous committee.
Q So there are limits to the subject matter on which you can perform lobbying work?
A Correct.
Q Since 2013, you have been registered as a lobbyist?
A I have not been registered as a lobbyist since I left the American Dental Association.

Page 14

Q So does TD&P Consulting, Incorporated perform any lobbying work?
A No.
Q What is the nature of its work?
A Applied health policy and litigation support.
Q I think I understand what litigation support is, generally speaking. What is applied health policy?
A It's an area of policy in which policy professionals apply that -- their knowledge to real-world situations.
For example, in the present case or working maybe for a corporation to help them develop strategies and/or policies for the companies that they are involved in. Or working for a not-for profit or any practical application of policy.
Q So, roughly speaking, what percentage of TD&P Consulting, Incorporated's revenue comes from litigation support?
A I would say about 90 percent of it.

Page 15

Q And the other 10 percent comes from applied health policy?
A I'm sorry. I was confused about your question. All of the work is applied health policy.
Q Okay. So when you do litigation support and you form opinions such as you've done in this case, you consider that to be applied health policy?
A Yes.
Q Okay. So the remaining 10 percent of TD&P Consulting, Incorporated's income that does not come from litigation support, what types of projects does that revenue come from?
A Still applied health policy, but often giving consulting and/or advice to not-for-profit organizations or individuals.
Q Your education -- you have a law degree, correct?
A Correct.
Q Are you a member of the bar?
A Yes.
Q In what jurisdiction?

Page 16

A District of Columbia.
Q Do you practice law?
A No.
Q Is your bar membership active?
A Yes.
Q Do you have any disciplinary history in the jurisdiction where --
A No.
Q You also have a master of public health?
A Correct.
Q From George Washington University?
A Correct.
Q Was there a specialization in your studies?
A Yes.
Q And what was that specialization?
A Health policy.
Q How is health policy defined within the field of public health?
A Health policy is generally defined as those individuals who are involved in the development of health policy, specific emphasis on health economics,

Page 17

health cost -- healthcare cost, healthcare delivery, epidemiology.
Q You're not an epidemiologist, are you?
A No.
Q What was your -- did you write a thesis for your master's degree -- the master's in public health?
A The master's in public health does not involve a thesis, or at least I can't remember one. It's been a while.
Q And then you also have a master of arts in philosophy?
A Yes. Actually, I have a master's of arts in philosophy. And I am ABD regarding my Ph.D. in the area.
Q You have I have that in common.
What was your field of study in the discipline of philosophy?
A Philosophy is social science focussed on economic theory.
Q What was the topic of your dissertation?
A I don't remember exactly, but it was

regarding a gentleman by the name of Yahn Elster on rational choice theory.

Q And then you have some publications listed at the end of your CV. Can you identify any of those publications that overlap, with regard to subject matter, the topics on which you have formed opinions in this case?

A A few of them overlap. I would say certainly the last -- all of these actually have something to do with my understanding of healthcare and how it works.

For example, there was an article I wrote a while back called Healthcare Purchasing Pools, Expanded Coverage Through HPs. That was about purchasing pools and costs. In essence, the larger the pool of purchasers, the lower the cost. We have more purchasing power. And the focus was on how to improve or increase in purchasing power in order to stabilize the market -- or stabilize costs for that association purchasing healthcare.

Q What does that have to do with your



opinions in this case?

A When I am analyzing or looking at reasonable value, as I did in this particular case, what I look at are the different pools of purchasers and determine their purchasing power in order to come up with a conclusion about the impact that their ability to purchase in that market will have on overall costs.

Q Any other publication?

A Define Contribution Health Plans probably would have something to do with that. It's been a while. I have, actually, a few more things, but they're not published outright. They're actually a part of some presentations I've given.

Q Which ones are you talking about?

A The presentations?

Q Are they listed here?

A Some are. I think that I need to go back and look into my files to look at some other presentations I've given over the last few years. I've given a few, although I thought they were listed here.



Maybe they are. Maybe they aren't. Some of the speaking engagements talking about cost.

But anyway Defined Contribution Health Plans Shifting Costs and Responsibility speaks to healthcare costs in the marketplace and how to control those costs through defined contribution plans.

Q What about Ohio court decision reduces damages award based on ACA --

A That article speaks to a decision in the Ohio courts regarding the role of the ACA and whether or not it did impact the damages. That centered primarily on the question of whether or not the ACA was or was not a collateral source. Ultimately, I think that dealt with a municipality issue. But I did speak about that. In that particular case, I wrote an article on it.

Q Was that article published?

A I don't think this article was published. I'm not certain. Actually, I don't remember. I have a few articles that have been published. And I have not been the best record keeper on that point. I do need



to look back at some of the files.

Q What was the Ohio court decision that's referred to in the title of this paper?

A I don't recall.

Q Was the court applying Ohio law?

A That I recall. Yes.

Q Was it a federal or a state court?

A I believe it was a state court.

Q Was the damages award reduced in a post verdict proceeding?

A I don't recall.

Q How did the ACA figure into the reduction of damages in that case?

A I don't think the ACA figured -- let me restate.

The ACA -- if I recall correctly, the judge accepted the ACA as a collateral source admissible in this particular case, to be considered in this particular case. And therefore, based on that state's law, it could be reduced -- it could be used to reduce the amount of money the third party was responsible for

Page 22

to the plaintiff in this case.

Q So the jury awarded an amount of damages, and then the judge reduced that award based on the availability of the collateral source?

A Again, I don't know -- I don't remember how they treated the collateral source issue here. It may be the case that the judge allowed the jury to hear information about the collateral source. Or it could be the case it wasn't a post collateral source hearing. I really don't remember the details. I haven't actually seen this in a long time.

Q Okay. What about the next article, the Collateral Source Rule that American Healthcare Act Impact on the Affordable Care Act and the Mitigation of Damages. Is that a published article?

A The Ohio one might be a published article. This one right here may also be. I'm not certain. I don't remember. I would have to go look.

This may have been published on my website at some point. It may not be now. Or it may be published on other sites. My belief is that it's

Page 23

potentially a blog article -- website blog article. And that's all I remember at this point.

Q Do you have copies of these articles?

A I may have a copy of these articles. In fact, they generally sit in some file. I would have to look for the older ones. I don't recall again about the collateral source rule, the last one we mentioned. That may be at a -- that may be published. I forget with whom though.

Q If it were published, where would it be published?

A One of them I know for certain is published with the American Bar Association and in particular with the employee benefits section. I'm not sure which one.

And the other is published with a state law publication or something along those lines. I'm just not certain.

MR. MOORE: Shannon, would you -- does the United States agree to make a search for those publications listed in the CV and provide copies?

Page 24

MS. STATKUS: Yes. We'll look for those. If available, certainly provide those to you.

MR. MOORE: Okay. Thank you.

We may need to reopen the deposition for examination on the publication, but we may not. It just depends. But we're reserving that right.

MS. STATKUS: Okay. That's agreeable.

THE WITNESS: The --

Q Were you -- did you have more to say about the publications, Mr. Dawson?

A No. I thought you were asking me a question. I'm sorry.

Q What about your two presentations that are listed just above the publication section of the CV, The Emergence of the Reasonable Value Approach. That's a 2019 presentation.

Is that right?

A Yes, it's a presentation.

Q Authored by you?

A Authored by me and the members of the panel.

Page 25

Q I see. You were a panel?

A Correct.

Q Was that just a discussion? Or were there written materials that you and the members of the panel produced?

A There is a written discussion a part of that.

Q Is the subject matter of that document relevant to the subject matter on which you're giving opinions in this case?

A Yes.

Q Do you have a copy of it?

A In my files, yes.

Q Would you please provide that to the counsel for the United States?

A Okay. If it's permitted. I think I would have to ask.

Q Permitted by whom?

A I believe -- since it was prepared by a number of -- by a group of individuals on the panel and that the material was specifically for the -- that sort

Page 26

of discussion, that conference, there was some limitation in terms of who could have it and where it could go. I would probably have to get permission first from the other panelists.

Q Well, you understand that it's been requested in discovery in a piece of federal litigation. That would override any private agreement you may have not to share it.

A I'm not being obtuse here. I simply don't know.

MR. MOORE: Shannon, on the record, we're requesting copies of both of the presentations that are listed here in the CV. I think they're within the scope of the notice and document request that's included within the notice. So they have been requested. And we would like to have copies of those.

We lost Shannon. This might be a good time for a break.

Off the record.

(There was a break in the proceedings.)

MR. MOORE: Shannon, I'm not sure what part

Page 27

of the last exchange you heard, but there are two items listed under presentation, CLE courses, and professional development events on Mr. Dawson's updated CV.

MS. STATKUS: Sure.

MR. MOORE: I believe those are within the scope of what we've requested.

MS. STATKUS: I was on the call for that. And I did say, you know, to the extent that they are available and Mr. Dawson has them and that they are able to be produced, we'll certainly do that. I just have to -- you know, after the deposition I'll follow up on that and certainly let you know as soon as possible.

MR. MOORE: I appreciate that.

THE WITNESS: Can I ask a question?

MS. STATKUS: Sure.

THE WITNESS: My only concern about -- and the reason I'm hesitant -- I'm actually not hesitant -- is that the -- one presentation related to the emergence of the reasonable value approach here, which

Page 28

I think is improperly labeled CLM -- the bottom line is this. The presentation and the written document are sort of a compilation of several different persons' opinions, meaning it's not just one person who is involved. And the organization that we presented to -- which was in, I believe, New York at the time -- asked that none of the information necessarily go out without them getting it out to other individuals first, or at least within their organization. So I get that part, and I understand what you're saying here.

I guess my concern is that I'm not certain that the other panelists want their sections of the document revealed when the only thing that seems to be of importance is the small section that I discussed.

MS. STATKUS: I agree, Leighton, that -- right here we're only talking about Mr. Dawson's portion of that panel, correct?

MR. MOORE: Well, I don't know. I haven't seen the document. It might be that the other parts are necessary in order to understand his in its proper context. Without seeing -- I think discovery under the

Page 29

federal rules goes to documents, not just parts of documents. So we're certainly not waiving our right to have the whole thing. It may be that the only relevant part of the document is the part that Mr. Dawson is referring to. But I can't agree to that in advance without having seen it.

MS. STATKUS: Sure. I mean, I guess at this point, we certainly haven't even seen the document or the presentation that we're talking about. All I can tell you is I'll certainly make a good-faith effort to investigate it and turn over what is applicable.

And if there is an issue that comes up, I think we would be agreeable to discuss it if it involves other people's work as opposed to just Mr. Dawson.

Is that agreeable?

MR. MOORE: Let's agree to table that issue until you've seen the document.

MS. STATKUS: Yes.

MR. MOORE: Then we can confer about whatever is left.

MS. STATKUS: Certainly. I think that's fair.

Q Just so the record is clear, Mr. Dawson, you also have a copy of the DRI presentation.

Is that right?

A The DRI presentation? That is a slide presentation. So yes.

Q And if you would, please provide that to Ms. Statkus so she can review it.

A Yes.

Q Thank you. I think we are done with the CV for the moment.

Mr. Dawson, what did you do to prepare for your deposition today?

A In this particular case, I reviewed the types of files that were involved in the case. I reviewed some of the depositions, primarily the life-care plans. Certainly I reviewed, again, the report that I prepared -- or the reports that have been prepared. I've also reviewed a number of pieces of -- some of the things the are in the footnotes, the



primary document you have today, meaning the analysis or rather the report.

Q Could you be a little more specific about what you reviewed?

A I reviewed the report. I reviewed appendices. I reviewed the life-care plans, I reviewed the depositions, not all of them but the -- sort of the more important -- or rather the depositions that speak to the care of Mr. Willis. I reviewed your notice. And I reviewed the -- I believe you also provided, sort of, a notice of reasons to exclude me or something along those lines.

Q A motion to exclude your testimony?

A I think it may have been something like that. Yes.

Q Anything else?

A Not that I can recall. I usually recall as I go along in conversation. Something may trigger in my mind.

(Dawson Deposition Exhibit 2 was marked for purposes of identification.)



Q Mr. Dawson, Ms. Statkus produced some documents this morning -- first of all, can you tell me if you recognize that document?

A Yes, I do.

Q Is that the Notice of Deposition pursuant to which you've prepared for your deposition today?

A Yes.

Q And you also received the Notice to Produce Documents that's attached to the Notice of Deposition?

A Correct.

Q So Ms. Statkus has produced --

MR. MOORE: Shannon, I think it's six documents this morning? I'll read off the list.

MS. STATKUS: Yes, it is. It's six documents including the --

MR. MOORE: Let me start over.

Shannon, let me know if this is an accurate list.

There is the Notice of Deposition, which has been marked as Exhibit 2. There is a list of testimony of Mr. Dawson. There is a set of invoices to



the government from TD&P in this case. There is an updated CV, which we've already discussed. There is the United States objection to the Notice to Produce. And there is a three-page document regarding TD&P Consulting's medical damages analysis services.

MS. STATKUS: Correct.

MR. MOORE: And then I also have the expert report that are was already filed in the case. And then more recently, the United States has produced another expert report.

Shannon, does that sound like an accurate list of the documents that the government has produced that are responsive to the notice?

MS. STATKUS: Yes, it does.

Q Other than those documents, Mr. Dawson, do you have any other documents that you're producing today in response to the notice?

A I may have another document. As a matter of fact, I do. The document is a listing -- that I keep -- because I can't remember -- of the percentage of persons or individuals who take up different kinds

Page 34

of -- percentage of payers in the Georgia marketplace by payer type.

Q Okay. How is that done --

A I'm sorry?

Q How is that document relevant to your opinions and your reports in this case?

A That document gives me a description of the purchasers in the Georgia pool of individuals who purchase healthcare or take up healthcare -- the right word is not purchase but take up healthcare. In all cases, individuals don't necessarily purchase out of pocket. There are different ways that it occurs.

Q And so how is that used in formulating your opinions in this case?

A It gives me an opportunity to weight the value -- or rather the different kinds of costs experienced by individuals purchasing coverage in the market -- or rather taking up coverage in the market in Georgia.

Q And do you use those weightings to generate a weighted average cost --

Page 35

A It gives me an --

Q Do you use those -- you can go ahead. It's hard because we don't have any visual cues. So when I pause, you might think I'm done. You can go ahead. I'll just take it as a continuation of your previous answer.

A It gives me an opportunity to determine what the reasonable value of the items in the marketplace or goods and services in the marketplace might be given, sort of, the life-care plans I've been presented with.

Q Okay. We are going to need that document.

In addition, are there -- other than the publications and presentations that are listed on your CV, do you have other publications or presentations that are not listed on your CV?

A Not that I can recall.

Q Well, will you please provide the document regarding Georgia payors that you mentioned to Ms. Statkus?

A Would you like me to take a minute break

Page 36

and go ahead and get that information?

Q If you would like to take a break, we can take a break now. I mean, I --

A I can wait.

Q At a break, why don't you just send it over to Ms. Statkus and she can take a look at it.

A Okay.

Q I'm not sure we're going to be able to use it in today's deposition, but it sounds like we may have to reopen this deposition anyway.

A Okay.

Q Any other documents that you have that are responsive to the notice that have not been produced?

A No.

Q Let's talk a little bit about your prior testimony as an expert.

Have you ever testified as an expert at trial in any court in the State of Georgia?

A No.

Q Have you ever testified as an expert at trial in any federal court anywhere in the country?

Page 37

A No, not to my knowledge.

Q Have you ever been retained by a plaintiff in a case involving a claim for future medical costs?

A Yes.

Q Which case? Actually, this might be a little easier if we mark the testimony list as Exhibit 3 now.

MR. MOORE: Let's take a five-minute break.

(There was a break in the proceedings.)

(Dawson Deposition Exhibit 3 was marked for purposes of identification.)

Q Mr. Dawson, would you take a look at what's been marked as Exhibit 3?

A Yes.

Q Tell me what that document is.

A This is a list of the cases that I have been involved in -- or rather deposed in or in trial.

Q Cases -- are there cases in which you have been retained as an expert witness that are not listed here?

A Yes. Or retained in to provide services in

Page 38

general. Yes.
Q As part of your litigation-support function?
A Right.
I'm looking at the Montana 8th Judicial District Court.
Q In what context?
A That was a trial that I happened to be associated with.
Q So that's not responsive to my question, right?
A No. I'm talking out loud. I apologize.
Q That's all right. I just wanted to make sure.
So I had asked about cases in which you were retained that are not listed here. How many?
A I don't know.
Q In how many cases have you been retained but those cases are not listed on your testimony list?
A That I've been retained to work with in a litigation-support or a consulting role?

Page 39

Q Yes -- well, in which you've been retained as an expert witness but you did not testify -- let me ask the question this way.
Is this a complete list of all the cases in which you've testified as an expert witness?
A Yes. This would be a complete list of all of the cases I've testified in as an expert witness. Correct.
Q And then -- and the last case on the list is Stilverio versus Ford Motor Company.
Is that right?
A Yes.
Q And the first case on the list is Rowles versus Christiana Care Home Services?
A Correct.
Q So I think we have the same list.
So in how many cases have you been retained as an expert witness but not testified?
A I don't have that exact number in my mind. I don't have it off the top of my head.
Q Do you have a rough number?

Page 40

A No.
Q Is it more than five?
A Yes.
Q Is it more than 100?
A Yes.
Q Is it more than 200?
A I don't know beyond that point.
Q Do you have business records from which you could determine the answer to that question?
A Yes.
Q Would you please find that out the next time we take a break?
A Yes.
I don't think we distinguish between those cases that we have -- that I've testified in and those cases that I have just been retained in only. So you may get a number that includes the total.
Q If you can give me a total number of cases in which you have been retained as an expert witness, then I can subtract the number of cases on the testimony list from that number, and that will give me

Page 41

the other number, right?
A Correct.
Q Okay. So of the cases on this testimony list, have you ever testified for a plaintiff in a case involving a claim for future medical costs?
A No.
Q But I believe you said you have been retained by a plaintiff in a case involving a claim for future medical costs.
Is that correct?
A Correct.
Q Do you remember where that case was?
A Not off the top of my head. Although I can and I am currently gathering that information for you. I believe it's more than one case. I'm not sure how many. And I'm not sure how many happened to be merely just consulting.
Q Have you ever been excluded from testifying as an expert?
A I've never been excluded from testifying on the question of reasonable value in any case.

Page 42

I have been limited in my testimony to only speak about reasonable value.

And I have been excluded from testifying in a case on the grounds -- actually cases on the grounds that the Affordable Care Act is speculative.

Beyond that, I have not been excluded for any other reason.

Q In how many cases have you been excluded from testifying on any subject?

A I would need to go gather that information up, and I can do so on break.

Q Is it more than five?

A I don't know. I would have to actually go and look to see what cases I've been excluded from testifying and for what reason.

Q I'll tell you what. Let's take a break and let you go get that information and the information about your other retentions.

And on break, while we do that -- it looks like the document you sent me with the Georgia percentages is -- that looks to be --

Page 43

MR. MOORE: Madam court reporter, would you label that as 4.

(Dawson Deposition Exhibit 4 was marked for purposes of identification.)

Q Can you tell me, Mr. Dawson, what this document is?

A Well, this document represents sort of a shorthand version of the percentages of individuals who took up coverage through different financing vehicles.

So the straight English way of saying it is 49 percent of the people purchased care through their employer. 7 percent of the people in Georgia purchased care in the individual market. 17 percent of the people purchased care through, I guess, Medicaid, 12 percent through Medicare, 2 percent through other public, which is actually the Veterans Administration and the Indian Health Service to the extent that they are members of it. Then 13 percent of the population purchased coverage or care out of their own pockets or what we would call uninsured individuals.

Q Okay. What is the source of the data in

Page 44

this document?

A The Census Bureau. It's actually listed in our report. We identify where we get our data from. But it's the Census Bureau, particularly the MEPS Survey, the Medical Expenditure Panel Survey.

Q And is this line for Georgia that you've provided part of a larger document?

A Well, yes. It's a part of a larger census databank, if that's what you're asking.

Q Yeah. So is this a line from a spreadsheet basically?

A It's a line -- we created this particular image that you're seeing. But the data is taken from the Census Bureau.

Q But I mean this line for Georgia -- I mean I'm asking a really simple question. When you walked out of the room to go get this, what type of repository or document did you get it from?

A We created it. It's just a simple Excel. You create a simple -- I'm sorry. I'm laughing. You create an Excel column, and you plug in the information

Page 45

very quickly. It's not hard to do.

Q So you created this today?

A Yes.

Q From what? Did you go directly to the Census Bureau data?

A We already had the data as a part of our calculations. So I'm not understanding what more you're asking me to say about it other than it was drawn from the --

Q I think that's why you thought you thought it was funny because you don't understand my question.

My question is, you brought me a document in response to my Notice to Produce Documents. You brought it today into your deposition room. And my notice was served a couple days ago. And I'm wondering what document existed a couple days ago that it was apart of. Because this document doesn't look like a complete document to me. And I want the rest of the document.

A I don't think I can give you the rest of any document. To be honest with you, what you have in

Page 46

front of you, if you were referring to the actual report with the appendices, essentially contains that. And our footnotes certainly point to the Census Bureau. So if you -- and the MEPS surveys and the like.

So if you were to go there yourself, you would do exactly what I did in expectation at being at this hearing -- or being at this deposition and merely pull the information out. It's kind of a cut and paste.

Q So a document under the federal rules includes a collection of electronically stored information. It doesn't just include things that are printed out on a piece of paper or that are formatted for printing out on a piece of paper.

A You can cut this --

Q So if you have a spreadsheet or a database that contains this among other information and you relied on that spreadsheet or database in formulating your opinions in this case, I'm entitled to have that. That's what I'm looking for.

A Well, I'm happy to send you the Census

Page 47

Bureau report that contains the spreadsheet that contains this exact chart.

Would you like me to do that?

Q Great. Yes. If you would, send that to Ms. Statkus.

A I will send you the Georgia State Census Bureau Health Insurance Chart. I will get that and download it off of the -- from the Census Bureau and send it to you.

Q Well, here is the thing. What I'm requesting are documents in your possession and control that you relied on in forming your opinion.

So is there a document that is in your possession and control at TD&P that contains this information that you used in formulating your opinion? That's the document that I need.

A That would be the Census Bureau's state assessment of health insurance. It's called their health insurance panel survey or home health insurance panel survey. It's provided through the MEPS survey. Or it's provided -- if you open up document and the

Page 48

report in their document, they're provide exactly what you're asking for that looks exactly like what I'm pointing to. And that's where we pull the information. That's the document we use.

Q So is that the document that you referred to a moment ago, the Georgia State survey -- I don't remember the long name of it?

A Well, I wasn't giving you the exact name. The Census Bureau provides a state analysis of home -- medical home survey of what people -- how people receive their healthcare. That's -- and they provide the data exactly as I've cut out here. But I'm happy to give you the entire document so that you can look specifically at Georgia and see that information.

Q That's fine.

A Is that what you want, sir?

Q Well, I want what you relied on. If that's what you relied on, please send it to Ms. Statkus.

A I'll do that now. I'll take a break and make sure that's done.

(There was a break in the proceedings.)

Page 49

Q So go ahead.

A So there are essentially two files that the Census Bureau files that we rely on. One is the American Community Survey, which is how the Census Bureau compiles everything. And it -- a lot of data, a lot of Excel sheets. So we have to put in the right parameters to print the information out. Period. And they're huge Excel sheets --

Q Let me stop you there. I don't need you to print anything out. That was why I wanted the court reporter to get you. I wanted to make sure you weren't doing that. I'm not going to be able to digest a big census document quickly enough to ask you questions about it today and use it an as exhibit in your deposition.

I just want it to be sent electronically to Ms. Statkus. But I do appreciate the effort you're making to put it in a form that's usable to a non health policy person like myself.

As attorneys we do want to avoid document dumps where you get a bunch of stuff that's not

relevant to the case.

So is there a portion of that report that can be separated out electronically and sent to Ms. Statkus that contains all the relevant information that you relied on for your opinions in this case?

A Yes. I can make sure that's done. We can -- we've pulled it out halfway. We just need to support that with the other Excel spreadsheets that the CMS -- the Census Bureau provides. And it is in a format that you might not have the software or whatever -- maybe you do. It's just -- yes, you're right. It needs to be in a simple way.

Q Yeah. I do appreciate the effort you're making to put it in a form that's usable for me. If you can -- if we can just have an agreement that you're doing that and you'll send it to Ms. Statkus electronically, I think we can move on from that.

A Okay.

Q Thank you.

During the break, did you happen to check on the information about cases where you've been



excluded from testifying as an expert?

A Sorry. I'll go get that very quickly.

Q No. No. Let me try to get through some more since we're all together.

A Okay.

Q And we can come back to that.

A Okay.

Q In fact, it sounds like there's going to be enough here that I'm going to have to reopen this deposition on a future date. So if you can just provide that information also -- if we don't get to it today, if you could, just provide it to Ms. Statkus and she can provide it to me.

MS. STATKUS: What information are you referring to?

MR. MOORE: What I'm saying is the information about the times that he has been excluded from testifying as an expert. I said if we don't get to that today, if he could agree that just provide that information to you and then you could provide it to me.

MS. STATKUS: Sure. Okay.



MR. MOORE: Thanks.

Q I saw from your testimony list, Mr. Dawson, that you've testified as an expert in two post-trial collateral source hearings in the State of New York.

Is that right?

A Correct.

Q What is the nature of that proceeding?

A A post-trial collateral source hearing -- I believe it's a 45/45 hearing I believe it's referred to -- is merely a hearing after the liability has been determined and I believe some judgment has been arrived at regarding the amount of liability that the courts make a determination as to how much -- make a determination as to what collateral sources are available to the individual. And they reduce those amounts from, I guess, the entire, sort of, explanation of total liability in terms of damages.

Q Okay. So it's my understanding that under New York law the court -- the judge can reduce the amount of the plaintiff's award if the court finds that any part of the economic loss contained in the award



was or will be replaced, completely or partly, by a collateral source of payment.

Is that your understanding?

A Yes.

Q And the reduction is authorized when the collateral source payment represents reimbursement for a particular category of loss for which damages were awarded in the verdict, right?

A Correct.

Q Such as, for example, future medical costs that will be reimbursed from some collateral source payment?

A Correct.

Q Right?

And the amount of any collateral source reduction is determined in a post-trial hearing, right?

A Correct.

Q And that's a hearing without a jury, right?

A Correct.

Q Georgia law doesn't have any procedure like that, does it?

A I'm not a Georgia law expert, but I believe no.

Q Now, in those hearings, what type of testimony did you give?

A Very similar testimony to the type that I've given in Alabama where I was in front of a jury.

Q Well, respectfully, that's not really responsive to my question. What type of testimony was that?

A I sat on a stand. I was sworn in. And I testified as to the types of collateral, I guess, sources that would be available to the plaintiff in that case. And the value of those sources and how those amounts were determined, I believe as well.

Q Did you use the same methodology to form your opinions in the New York cases that you used to form your opinions in this case?

A In terms of methodology, I used a comparative pricing analysis. So in that sense -- this is not a yes or a no question. The better way to describe it is I looked at the market as a whole and



looked at the payers in the market to determine to what extent -- how individuals paid for their care or coverage or did not pay for their care or coverage in the marketplace to determine what the value of that care might be.

Q So in the New York cases, did you give opinions about reasonable value of medical services?

A So in the New York cases -- so I don't want to confuse my discussion. Discussions about reasonable value can be had during the trial portion of the case. So I offered my opinions in those cases to the attorneys on record and also two other experts who worked on the case. So they can offer their understanding of what they believe to be the value of the services -- or at least the reasonable value of the services. So that can be talked about during trial before the jury.

The collateral sources --

Q In New York?

A In New York.

The collateral sources could not be talked



about. So I did not specifically talk about the reasonable value of items in the market during the collateral-source portions of the hearing.

During that portion in which I was called in, I specifically spoke about those items that would be -- or are considered collateral sources and what their value happened to be.

Q I see. So --

A -- was covered, rather.

Q -- for example, if the plaintiff would qualify for Medicaid, would you testify -- did you testify in the collateral-source hearings about what part of the plaintiff's future medical costs Medicaid would cover?

A Correct.

Q And similarly if the plaintiff qualified for Medicare, you would testify in the collateral-source hearing about what portion of future medical cost Medicare would cover?

A Correct.

Q And it would be the same with any other



collateral source such as private health insurance.

Is that right?

A Correct.

Q Or veteran's benefits, if that were applicable?

A Correct.

Q Okay.

A We now have the document --

Q We now have which document?

A The information that related to the coverage rates that I pointed to earlier that we said we would pass on at later time.

Q How voluminous is the document? How big is it?

A Maybe ten pages possibly.

Like I said, the goal was to actually get it in a form that you could use without it wearing you out.

Q I appreciate that.

Could you have that sent to Ms. Statkus, please?

Page 58

A Yes. I think Mr. Johnson may have already done so.

MS. STATKUS: I'll forward it along as soon as I get it.

(Dawson Deposition Exhibit 5 was marked for purposes of identification.)

Q Mr. Dawson, you prepared at least two different reports in this case.

Is that right?

A Correct.

Q Are there two or more than two?

A Two.

Q One of them is dated May, 2018 and the other is dated May, 2019.

Is that right?

A Correct.

Q Does the later one replace the earlier one?

A Yes.

Q So is the first one --

THE WITNESS: Can we take a quick break real quick? Two seconds.

Page 59

MR. MOORE: Sure.

(There was a break in the proceedings.)

Q So you said the later report replaces the earlier report?

A Yes.

Q Can you give me a high-level summary of the differences between the two reports?

A Change in the status of the primary beneficiary of care. Therefore change in the status of Mr. C.W.

Q So when you say change in the status, what do you mean?

A Change in the program and/or coverage of the primary beneficiary care. And therefore change in the program and/or coverage of the -- Mr. C.W.

Q Okay. Is that the only change between the two --

A There are changes in terms of numbers, plan determination, style just simply because the initial report was given a year prior.

Q So the passage -- the interval of time

Page 60

created some changes?

A Correct.

Q Was the same methodology used to produce both reports?

A Yes.

Q Are your opinions in this case limited to those that were in your second written report?

A Can you restate the question?

Q Yeah. Do you have any opinions in this case other than those that are set forth in your second written report?

A No additional opinions. No.

Q In your first report -- and that's been labeled as Exhibit 5.

Is that correct?

A Correct.

Q In your earlier report, you stated that the ACA, Obama Care legislation, quote, changed the framework for the delivery of healthcare in America, end quote.

Do you stand by that statement?

Page 61

A Correct. Yes.

Q And it changed that framework in part by requiring Americans to obtain health insurance coverage, right?

A The individual mandate was part of the change.

Q And the individual mandate is the term that you're using for the provisions of the ACA that require Americans to obtain health insurance coverage, right?

A Correct.

Q And the ACA also changed the framework for delivery of healthcare in America by prohibiting insurers from denying coverage due to pre-existing health conditions, right?

A Correct.

Q And that's called the guaranteed-issue requirement?

A Correct.

Q Now if these provisions of the ACA were struck down, that would significantly change the system for delivery of healthcare in America, right?

Page 62

A It would -- if those provisions were struck down per se, there would be certainly significant changes to the take up of coverage.

However, because of the expansiveness of the law itself, it would be difficult for me to say that those two provisions would change the nature or the kind of care currently being received -- or would be received by the plaintiff in this given case.

Q The plaintiff in this case has pre-existing health conditions, right?

A Correct.

Q If private insurers were permitted to deny coverage due to pre-existing health conditions, that would take make it substantially more difficult, if not impossible, for him to obtain private health insurance, right?

A Well, with regard to private health insurance, it would make it difficult for him to obtain coverage at least for the first eighteen months.

One of the things that's not widely discussed -- well, actually, let's back up a little

Page 63

bit. Georgia adopted, in its own legislation, a pre-existing condition exclusion provision. And in its own state legislation, Georgia prohibits the exclusion of individuals because of a pre-existing condition. So with regard to Mr. C.W., it is unlikely that he would find it difficult to obtain coverage in the private market in the State of Georgia.

Q Has every state done that?

A I have not been asked to opine on every state in this case. So I will not.

Q Well, you still have to answer the question if you know.

A I can't answer the question, because I don't know.

Q You don't know if there are any states that do not have pre-existing condition -- let me re-ask that question.

You don't know if there are any states where there is not a state-level guaranteed-issue requirement?

A I have not surveyed every state. So I

Page 64

don't know.

Q Is there one state in the union that you're aware of that does not have a guaranteed-issue requirement under state law?

A I don't know.

Q So your opinion is that if the guaranteed-issue requirement of the ACA were struck down or repealed, that would not significantly change C.W.'s ability to obtain private coverage in the State of Georgia?

A Correct.

Q But you don't know whether it would affect his ability to obtain private coverage if his family didn't live in Georgia?

A No, I don't.

Q Do you have an opinion about whether the individual mandate and guaranteed-issue provisions of the ACA are constitutional?

A No.

Q Are you aware that the United States has taken the position that the individual mandate and

Page 65

guaranteed-issue provisions of the ACA are unconstitutional?

A I aware that a judge, I believe, in the fifth circuit of Texas took the position that it is unconstitutional. I'm also aware that that particular judge -- I believe his name is Mr. O'Connor -- has also taken the position, if I recount this correctly, that since the individual -- the elimination of the individual mandate is no longer there it -- and it is not severable from the entire Affordable Care Act that the Affordable Care Act in and of itself doesn't stand. So I'm familiar with him taking that position.

I'm also familiar with the position of the administration of this point. I believe Sessions has something along the lines to say that he did accept or acknowledge the validity of -- Sessions with the attorney general -- that the administration accepted the idea that the ACA or -- at least the individual mandate was -- that the individual mandate was in and of itself not constitutional and should be struck down. However, the administration did not believe beyond

Page 66

that -- or maybe that the other pieces of the law were necessarily not severable from -- the good parts, the parts that the administration liked, are not severable.

So to identify what the administration really ended up saying was that they liked the provisions that guaranteed 26-year-olds coverage with their parents. They liked the provisions that guaranteed coverage to -- access to coverage for individuals who wanted to have care. They liked the coal miner provisions in it that provided extended care there. They like the donut hole for -- you know, the ACA filled that donut hole that existed for the prescription drug care. They like that provision. They liked the -- and anyway the list kind of goes on.

So in terms of there being a question about severability, again, the courts are sort of out on that. It's not weighed favorably -- at least a decision has not weighed favorably in many persons' minds about whether or not it's an accurate description about whether or not the ACA is constitutional or not.

I believe personally that the decision is a

Page 67

little flawed in terms of the analysis, just from a legal perspective. But I'm not a lawyer -- I'm not here to be a lawyer in this particular case. So there you go. And I'll leave it at that.

Q Well, respectfully, most of that is nonresponsive to the question I asked.

My question was, are you aware that the United States has taken the position that the individual mandate and guaranteed-issue provisions of the ACA are unconstitutional and should be struck down?

MS. STATKUS: Object to form.

THE WITNESS: So I am aware, as I described initially, that a particular circuit has taken the position, a judge, that it is. But that there is significant disagreement around the country. And I'm also aware that a motion -- or rather a counter suit of sorts was submitted to the Maryland Circuit which I'm not sure -- one of those had standing and the other one did not -- regarding that issue.

So I believe the issue is out. It has not been heard before the Supreme Court. I also believe

Page 68

that it has been stayed by Justice O'Connor. Nothing is happening on it. Things continue as they continue for the moment.

(Dawson Deposition Exhibit 6 was marked for purposes of identification.)

Q And my question is not whether you understand that the courts have ruled the ACA to be unconstitutional -- maybe it would be easier with an exhibit.

Mr. Dawson, have you ever seen this document, Exhibit 6?

A I've seen this. Yes. I mean not in its current form, but I've seen it. Yes.

Q What do you mean not in its current form?

A Well, I had seen this document in the form presented by the courts.

Q I'll represent to you that this brief was downloaded from the document the court. I'm not sure what other version of it you're referring to.

A Well, I'm not upset about it. I'm not disagreeing with you. It didn't have -- yes.

Page 69

Q What was different about the version you saw?

A It didn't have the tiny writing at the top that I'm seeing here. That's it. That's all I'm saying.

Q Okay. Yeah. The information in the line at the very top of each page is from the Pacer system. That's the electronic filing system.

But the substance of the document, other than that, you've seen?

A Correct.

Q And if you'll look in the table of contents under the heading arguments -- and this will be on page 4 of the actual document. Big Roman II is the argument heading. And it reads, the individual mandate is unconstitutional because Congress eliminated the tax penalty on which the Supreme Court's savings construction rested.

Do you see that?

A Yes.

Q And then bit Roman numeral III reads, the

Page 70

individual mandate is not severable from the guaranteed issue and community rating provisions. And the rest of the ACA is not severable in turn.

Do you see that?

A Yes.

Q Do you understand this to mean that the United States Department of Justice has taken the position, in this litigation, that the ACA as a whole is unconstitutional and should be struck down?

A No. No. That's not what -- no. That is absolutely not what Sessions as the attorney general said when responding to this, and certainly not what the president said. So no.

Q You understand that Mr. Sessions is no longer the attorney general, right?

A I understand that he's no longer the attorney general.

MS. STATKUS: Object to form.

Q What do you understand the substance of this brief that's been labeled Exhibit 6 to be?

A A political document.

Page 71

Q Maybe I'll direct these questions to Shannon.

MR. MOORE: Shannon, is it the position of the United States in this case that the individual mandate provision of the ACA is constitutional or unconstitutional?

MR. TAYLOR: Object to form.

MS. STATKUS: That's completely inappropriate and I object to the form as well.

MR. MOORE: I'm entitled to know. Because Mr. Dawson's opinion in the case are based on the viability of the ACA.

And the United States can't take opposite positions in two different pieces of litigation. So I'm entitled to know.

MS. STATKUS: We're not discussing a legal opinion in the deposition right now. You're entitled to ask him about his bases for the ACA and how he uses that in his report. But I'm not going to discuss the United States' position on the ACA during Mr. Dawson's deposition.

Page 72

MR. MOORE: And so are you also not going to tell me if -- just for the record, if it's the United States' position in this case that the guaranteed-issue provision of the ACA is constitutional or unconstitutional?

MS. STATKUS: Correct. I'm not going to discuss that at the deposition either.

Q Mr. Dawson, have you read the document that is labeled as Exhibit 6?

A Portions of it.

Q Which portions?

A I believe it's the section that says the rest of the ACA's provision are inseverable. Sort of the recounting of section two; the Tax Cut and Jobs Act, just portions of that; the Supreme Court position, I've read portions of that; and I think that's basically it.

Q The next thing I would like to do is to go through the second report. Do we have that printed yet?

MS. STATKUS: I sent it to Mr. Johnson and

Page 73

Mr. Dawson and asked them to please print it out. I just got it. So I just sent it a couple minutes ago. It should be available.

MR. MOORE: Okay.

Q Mr. Dawson, could you mind if we took a break so that you could check and see if that is ready?

A Okay.

(There was a break in the proceedings.)

(Dawson Deposition Exhibit 7 was marked for purposes of identification.)

Q So let's go over your latest written report, which has been labeled, I believe, Exhibit 7.

Mr. Dawson, is the document that's been labeled as Exhibit 7 your operative expert report in this case?

A Correct.

Q Let's look at the executive summary on page 2. Does this contain -- does this executive summary contain a summary of all of your opinions in this case?

A Yes.

Q So if I understand it, you've done an

Page 74

analysis of coverage under various public benefits programs and/or private insurance that would be available to Mr. Willis under the current provisions of law and regulation that govern those programs.
Is that right?
A Well, it's -- that would include both in and outside of the insurance context.
Q Tell me what you mean by that.
A With and without insurance.
Q So you've done an analysis of his coverage with insurance and his coverage without insurance?
A Well, a more appropriate statement I guess would be I have done an analysis based on the different types of decisions that Mr. Willis is permitted to make in the current marketplace.
Q Okay. Permitted by what?
A Permitted under the law.
Q So have you done an analysis of what his future medical costs would be if he moved outside the State of Georgia?
A No need to do that. You're talking about

Page 75

his medical decisions. I'm talking about his medical decisions in his current lotion. If I were to make a decision about him making decisions about where he happened to be in the future in terms of residence, then that would mean me looking back at where he's been, which to my knowledge he hasn't been anywhere but Georgia, and then making some sort of future determination as to where he might go, which is still the State of Georgia.
Q You can't predict where he might go, can you?
A Not based on his past.
MS. STATKUS: Object to form.
THE WITNESS: Not based on his past behavior, no.
Q So is the yes or no answer to my question, no, you did not do an analysis of his future medical costs and coverage if he moved outside the State of Georgia?
A What I prepared was a valuation of his future medical costs and services based on him being in

Page 76

the State of Georgia.
Q Mr. Dawson, in order to have a clear record, the convention is that when an attorney in a deposition asks you a yes or no question you are to answer it yes or no if it can be answered that way at all. And then you can explain your answer. The question that I asked you I think can be answered yes or no.
Did you do an analysis of Mr. Willis' future medical costs and coverage for those costs if he were to move outside the State of Georgia? I think the answer is no.
Am I right?
A Correct.
Q And then in the third paragraph after the number of lists of your executive summary, you have what I take to be a criticism of the report prepared by plaintiff life-care planner, Ms. Barrons.
Is that right? Do you see what I'm talking about?
A Yes.

Page 77

Q And I take the substance of that criticism to be that Ms. Barrons, you claim, calculated C.W.'s future medical expenses incorrectly because she did not reduce those future medical expenses based on potential coverage under public benefit programs or health insurance.
Is that right?
A I don't think that was what I said.
I think I said that she did not calculate what his future coverage would be based on the different decisions that the plaintiff could make.
Q Okay. The fourth paragraph here, does that state an opinion regarding the reasonable value of healthcare items contained in C.W.'s life-care plan?
A Correct.
Q And is it your opinion that Ms. Barron's report over estimates the reasonable value?
A Correct.
It doesn't reflect the reasonable value in the market.
Q And have we just been through, at a high

level, all the opinions you're going to offer in this case?
A Correct.
Q So there are basically, I think, two buckets that your opinions fall into. One relates to collateral sources of payment for future medical costs. And the other relates to reasonable value of future medical costs.
Is that right?
A Correct.
Q Let's turn to page 4, healthcare summary. How does this figure into your opinions?
A It's merely a standard recounting that I provide of the case.
Q So you didn't -- is this -- is it fair to say this is a factual assumption that underlies your opinions rather than a finding that you made?
A Correct.
Q So you didn't -- your opinions don't encompass C.W.'s medical needs as such?
A We make no determinations as to his medical



needs. As a matter of fact, all of the assumptions in the life-care plans are assumed to be medically necessary.
Q But when you say "life-care plans," plural, you mean also Ms. Ridick Grisham's life-care plan?
A Any one that we're given, we start with the assumption that it's medically necessary.
Q Let's look at page 5, access to coverage. Does this section also state assumptions that underlie your opinions?
A Yes. That's in my conclusion.
Q And your conclusion is that the Affordable Care Act requires Mr. Willis -- C.W. to maintain minimum essential coverage, right?
A Correct.
Q That's one of your conclusions?
A Uh-huh.
Q And another conclusion is that the guaranteed-issue requirement in the ACA ensures that Mr. Willis will continue to have access to healthcare coverage in the future?



A Correct.
Q Is that right?
A Yes.
And that very same provision is in the Georgia law as well.
Q Do you know why Georgia has that provision in its regulations?
A No.
Q Do you know how long Georgia has had that provision in its regulations?
A No.
Q Do you know if it's related at all to the passage of the ACA?
A No.
Q No, you don't know?
A No.
Q I'm sorry. The no is still, I think, a little ambiguous in that answer. When you say "no," do you mean you don't know the origin of that Georgia regulation?
A No, I don't.



Q Let's look at page 6. This is part three, determination of disability. Is the determination of disability relevant to your conclusions regarding C.W.'s future medical costs?
A Yes.
Q In what way?
A Well, two ways. There has to be a determination of disability at the level with regard to Georgia and it -- with regard to Georgia law. There also to be a determination with regard to the federal government in terms of definitions so that C.W. may have access to other kinds of care and/or collateral sources in the future.
Q So that is relevant?
A Again, it places him in a specific special category based on that disability that makes available to him, independent of his resources, particular kinds of care that he needs based on his physical status.
Q The determination of disability then is relevant to your opinions regarding -- in the first bucket regarding collateral sources of payment and

Page 82

future medical costs but not to your opinion in the second bucket regarding reasonable value of those costs.

Is that correct?

A I have to think about that more before I said immediately that's correct. I would believe that my mind, when I'm doing my analysis, is generally aware of this. So reasonable value always takes into consideration the different kinds of care an individual will need and the kinds of services that are available to them. And when I am analyzing any given good or item, I have to be able to determine whether or not that item is covered and/or available to that individual under a given program. And therefore whether some given set of fees or pricing associated with it are going to be paid by that individual or by some other entity.

Q So are you saying that the determination of disability -- let's break it down.

The determination of disability is relevant to your opinions regarding available collateral sources

Page 83

because meeting the definition of having a disability under various state or federal regulations can be a qualifying condition for those programs, right?

A For those programs or goods or services. Certain kind of items specific to any one in Mr. C W's position may be made available that might not normally be made available to individuals in unrelated circumstances.

And at that point, I'm able to identify specific kinds of pricing and/or fees and/or non collateral sources that might be put forward to care for this individual or rather that are available to them for someone like that.

Q Let's back up. When you said non collateral source, what do you mean by that?

A There are instances in which in the marketplace -- or outside -- not outside of the marketplace. There are instances in which there are -- there's funding or benefits of some type that are provided to an individual that are not required to be paid back. And therefore they would not be

Page 84

traditionally considered a collateral source.

One item we are often familiar with that's described in this manner are services provided through IDEA. So if you receive nursing services during school hours or some supplemental care during the summer that comes through IDEA, that is not necessarily -- depending on how the state takes it -- a collateral source.

Q Now, Mr. Dawson, you're not here to provide any opinions, legally speaking, about what does or doesn't constitute a collateral source, right?

A No, I'm not here to do that. But I have been asked by you to explain why we take determinations of disability into consideration in order to make a determination about reasonable value. And I think I have been asked to explain what the impact of those determinations have upon our determination of reasonable value.

Q I was trying o break this down part by part. So I was focussing on the first bucket. So with regard to your first set of opinions regarding what

Page 85

collateral sources are or may be available to C.W., the determination of disability is relevant to that because it helps C.W. qualify for benefits under various programs, right?

A Correct.

Q And then with regard to the reasonable value issue, I think you were saying that a determination of disability also can figure into that analysis.

Is that correct?

A Correct.

Q And maybe we'll get a little more specific about that when we come to the methodological part of the report.

Down at the bottom of page 3 -- page 6 and the top of page 7, are those all of the definitions of disability that you applied in forming your opinion?

A Yes. Those are the ones related to Georgia law.

Q Well, there are two CFR definitions as well, right?

A I'm sorry. I went straight down to the bottom of the page. I didn't start where I have listed rules. Yes. Under the rules, there are CFR definitions. Yes.
Q There are two CFR definitions and two Georgia Code definitions?
A Yes. Correct.
Q And those are the definitions of disability that you applied in forming your opinion?
A Correct.
Q And did you conclude that C.W. qualified as having a disability under all of those definitions?
A Well, the regulations -- he qualifies under the regulations.
Q At both the state and federal level?
A Yes. Based on what were in his medical records and based on what that state requires, yes.
Q Let's turn to page 8. This is part four, Medicaid, waivers, and other special needs programs.
Let's talk first about eligibility for Medicaid. My understanding of your opinion here is



that C.W. would not be eligible for Medicaid without a waiver because of his family income but that he is eligible for Medicaid under the Katie Beckett waiver program in the State of Georgia.
Is that right?
A Yes. That's one of the programs. Yes.
Q Are there others?
A I believe I mentioned the Medically Needy program as well.
Q You did mention that one. My recollection was that you thought he was -- yes. You did conclude that he is qualified for eligibility in the Aged, Blind, and Disabled Medically Needy program.
So those are two paths to Medicaid eligibility for C.W. in your opinion?
A Correct.
Q Katie Beckett and Medically Needy?
A Correct.
Q What types of things does Medicaid cover?
A Well, the Medically Needy program and the Katie Beckett program are specifically designed for



individuals in Mr. C.W.'s position. When I say that, I'm describing someone who is significantly disabled and needs a certain level of care -- at least described as significantly disabled. So it's a -- if you need -- I guess the best example -- a G tube, assistance of some given type by a particular kind of care provider, beds, slings, you name it, these kinds of programs provide additional services in that way.
Q And you have not done an analysis of whether C.W. would qualify for Medicaid through a waiver program in any state except for Georgia, correct?
A No, I have not.
Q So, for example, if his family were transferred for work purposes to South Carolina, you haven't done that analysis?
A No. But I feel very confident saying that at least the Katie Beckett program would more likely than not apply to him.
Q But you don't know?
A Well, he has not moved to South Carolina.



Q So the answer is, no, you don't know?
A Correct.
Q Next on page 10, you look at the applicability of the Individuals With Disabilities Education Act, IDEA. You conclude that C.W. qualifies as a child with a disability pursuant to the IDEA.
Is that correct?
A Correct.
Q And because of that, federal law entitles him to a free, appropriate public education.
Is that right?
A Correct.
Q And as part of a free, appropriate, public education a school district that receives federal funds would have to provide him with certain special educational services, right?
A Correct.
Q And those special education services include the ones that you've listed at the top of page 11?
A Correct.

Page 90

Q And those services have to be provided as part of C.W.'s education, right?
A Correct.
Q So, for example, when school is out for the summer, the school district would not have to provide all of those services?
A That's not true.
Q They might have to provide some. They don't have to provide them all, do they?
A There is a particular provision under federal law that provides for individuals receiving necessary treatment that is determined in their individualized education program during the summer.
Q Sure. Like an extended school year for example?
A Well, the services can also be provided in the home as well. There is no restriction as to the location, at least in that sense.
Q In order for those to be provided, would they have to be determined to be educationally necessary?

Page 91

A Well, they would have to be a part of the individual education program, the IEP. And that would be a part of the determination.
Q And then you also looked at the Georgia Children's First Program?
A Yes. It's a Title 5 grant.
Q And he won't be eligible for that program only until the age of five, right?
A Yes, sir.
Q After that, that program would provide no coverage?
A I believe so.
Q And you didn't do any analysis of similar programs in other states?
A No.
Q Let's look at part five on page 13.
This is your analysis of eligibility for Champ VA.
Is that right?
A Yes.
Q Is this -- now, in your original report, I

Page 92

think you thought he would be eligible for TriCare, right?
A Right.
Q And that is not true now, is it?
A Correct.
Q So in the space of a year, he went from being eligible for TriCare to not being eligible for TriCare?
A Correct.
Q Are there any circumstances that could change in C.W.'s life that would affect his eligibility for Champ VA?
A Not to my knowledge.
Q How are healthcare services delivered through Champ VA? Maybe that's too broad.
Do you know if a person who receives healthcare services under Champ VA is required to, first, seek medical treatment at a military facility before seeking treatment at a nonmilitary facility?
A I don't --
Q The question --

Page 93

A I don't have an immediate answer to that. I don't understand how you're trying to ask the question. But I --
Q For example, there might be some or even all healthcare services that a person receiving Champ VA would want to take advantage of for which they would have to, first, go to a doctor on the base and then get a referral to a doctor off the base if they couldn't provide the service on the base.
Do you know whether that is part of the way the Champ VA program works?
A No.
Q No, you don't know?
A No.
Q Is it fair to say you didn't take that possibility into account in formulating your opinions set forth in this report?
A Whether or not the individual would first have to go to a military base before going somewhere else outside of the military --
Q Whether or not there are any restrictions

Page 94

under the Champ VA program on the manner in which a beneficiary can receive healthcare services.

A I think my knowledge might be limited. The way I understand the program, at least based on the work I've done around it, individuals can receive care through the Champ VA program. And like most people who are involved in VA, you use VA provided care. Now, to the extent that the VA doesn't provide that care, there may be other options for you that you can be guided to.

Can an individual have care independent of the VA? Certainly. You can have care provided through a private entity, a private insurer, something along those lines. Certainly an individual could have a spouse that might have care provided through them. In that sense, often individuals are permitted to take advantage of the private insurance first.

But with regard to having Champ VA care alone, which is what I believe I hear -- which is what I believe -- and not accessing that care directly before one went outside of the Champ VA system, I'm not certain if it happens different than one having to go

Page 95

through the VA system first.

Q Okay. So the way in which a beneficiary would go about receiving these services was not part of your -- since it's not something that you knew, it couldn't have been part of what you considered in formulating your opinion.

Is that right?

A Well, if you're asking --

Q For purposes of your opinions, would it matter to you if, hypothetically, Champ VA required C.W. first to go to the Veterans Administration or to a base to receive healthcare services and the program wouldn't reimburse expenditures on non VA or non base medical care unless that procedure had been complied with?

A Are you referring to how benefits are coordinated and who pays first and who pays second -- oh, that's what you're referring to. Are you -- is this a coordination of benefit question, how the benefits are coordinated and who pays?

Q No, not exactly, no.

Page 96

It's a question about how the patient actually receives the care. For example, if I have certain types of HMOs that are available in the private marketplace, I have to go to an in-network doctor if the services are available from an in-network doctor. Otherwise, the program won't pay for it, right? You're familiar with that type of set up?

A Yes.

Q And so that places a restriction on my choices regarding where I get my healthcare, right? I mean, if I want the program to pay for it, I have to comply with their rules about what they'll pay for, correct?

A In general.

Q And that type of restriction on how a patient actually goes about getting their healthcare and choosing which doctors to go to, that isn't something that you considered in formulating your opinions in this case, is it?

A I'm actually trying to understand the question but also answer you more directly. It sounds

Page 97

to me as if you're asking both a question about receiving benefits and then how those benefits are going to be financed.

Q I'm not asking either of those questions. I'm asking what you considered in formulating your opinions. So if some of these programs you're claiming C.W. is eligible for place restrictions on the way in which he has to go about getting his healthcare services, that didn't affect your opinions -- that fact, those restriction didn't affect your opinions in this case, did it?

A I am going to reserve -- I don't know how to answer that question to be honest with you. I can't say that it didn't affect my opinion. You've asked me whether or not I considered the question of reimbursement, the coordination of benefits. Yes, I did consider the coordination of benefits in terms of who paid and when, who was eligible to pay for whatever service. Those questions were considered by me.

Q That wasn't --

A But that's not your question.

Page 98

Q That's not my question.

For example, if C.W. receives services from Medicaid, he has to go to providers who accept Medicaid, right?

A Not necessarily, no. It depends on the nature of the -- so there are a lot of -- the simple answer to a question that I am -- would be inclined to answer is that the program does define the scope of the services you can receive and therefore how those services are going to be paid for or financed.

So if you're talking about the Champ VA program, Champ VA does have rules for who you go to, what services are going to be provided, what you need from the very beginning. And certainly it would apply in the case of Mr. C.W., that it's going to have rules in place in terms of ensuring that this individual is able to receive the best possible care necessary.

Now, with regard to.

Q -- just that, right?

A Actually, the --

Q I'm sorry. I --

Page 99

A Actually, the Champ VA program -- Champ is not the kind of program that is very -- I don't want to say -- the VA program is not famous for saving money. Let's just leave it at that. So there are many avenues by which individuals can make a choice to use programs that are a bit more expensive if it's determined that it's necessary.

In the case of Mr. Willis, I am -- I hesitate to say that I did not consider how the benefits would be coordinated or how the benefits would be paid for in different situations. I don't believe that I -- my analysis considered anything that was not medically necessary or that it would be paid for beyond. Whether or not Mr. Willis or his mother chose to not follow the rules, I can't speak to that.

Q Okay. But here is another way of asking my question. So there is a medically necessary procedure that C.W. needs. He can go get it at the VA hospital or he can go get it at the Mayo Clinic. But he can't go get it at the Mayo Clinic and have it paid for by Champ VA because they want him first to go to a VA

Page 100

doctor --

A I don't know that to be true.

Q I'm just asking you to make this assumption. I'm just saying this type of analysis is not something that is figured into your opinions, is it?

A I would never make the assumption. What you're asking me to do is to actually make a medical decision. I don't do that. I don't make medical determinations.

Q That's not what I'm asking you to do.

A That is actually a medical determination.

Q You're not understanding my question.

A I'm not.

Q In formulation your opinions in this case, you didn't consider that some of these types of coverage place restrictions on the choices that C.W. and his family can make about their care, restrictions they wouldn't have if they just got cash in damages that they could go pay for healthcare with at the Mayo Clinic or in Switzerland or Canada or wherever they

Page 101

want to go, right? That's not part of your analysis?

A The choice as to where this individual could go because the family or the medical provider assumed it was better is a medical decision. I don't make those kinds of decisions. And I'm not making it on behalf of the family. If you can show me in the information I've been given where the individual should go based on a doctor's opinion about where they should go, I would 100 percent be able to say that's where they would be permitted to go if it's medically necessary.

So to the extent that the decision is not one that has any impact on medical necessity, I'm not going to opine about it at all. Medical necessity decisions, even the choice of provider, are things that I don't get involved in.

Q But what if it's not a question of medical necessity. What if it's just what the family thinks is best but the VA doesn't agree?

A I have not --

Q Who gets to decide?

Page 102

A I'm not the person to make that decision, sir. That's not what I'm called here to do. I'm a healthcare cost expert. I don't do that.

Q What you're called here to do is to make sure the family gets only enough money to take care of C.W. if they also take advantage of all of these other programs and then they won't be free to make those other choices because they won't have the money to do it?

A Sir, I have not done that in this particular case. As I presented at the very beginning, and I hate to interrupt here. I want to make sure the record is correct. What I have --

MS. STATKUS: I'm going to object to the form of that question.

THE WITNESS: What I have been able to do is demonstrate what the cost of care would be for the plaintiff, Mr. C.W., in the various scenarios -- in other words, different types of decisions he can make. If he made a decision not to have insurance or not to take advantage of the programs, I provided what that

Page 103

cost will be. I have provided what the cost will be if he chooses to make different kinds of decisions.

I think it is best to describe what I have done, as the expert here on costs, is to explain what the reasonable value; i.e., what the cost could potentially be to the plaintiff in different situations. One of those situations is one without insurance and the other is with insurance. And all of those choices in terms of programs in-between.

Q And by "cost," you mean his out-of-pocket cost, right?

A Total out-of-pocket costs. Yes.

Q Not the cost that being borne by the insurance company that's paying more in benefits than it's taking in in premiums or the VA that is subsidizing his care or Georgia that's paying its Medicaid funds to pay for his care? Those costs are not part of the costs you're talking about --

A Actually, I look at all costs, because I have to look at the costs in the marketplace. So when I analyze cost, I actually look at the cost being borne

Page 104

by the different operators in the market, the different payors in the market. So I look at the cost that's being borne or potentially being borne by the plaintiff -- or Mr. C.W. in the market.

And not only do I do that, I accept Mr. C.W.'s own estimation of what he believes to be his cost in the market in the future. And I do that for all of the payers in the market, what all of those payers believe to be their costs in the market. And I accept that data on its face value. I don't -- on its face. I don't question it.

I merely determine if -- based on the number of individuals in the market who actually pay out of pocket like you're suggesting that C.W. does, what -- or how is it weighed in the overall scheme of things. And that allows me to come up with this sort of reasonable value. And that's a very quick way of talking about it.

But I don't think I'm able to talk about, in a qualitative sense, whether one choice in terms of provider is better than another choice in terms of

Page 105

provider if it places me in the position of making a medical decision, a decision that only a physician should make or a healthcare --

Q I'm not asking --

A Then I don't have to answer any more of the questions, I guess, about that type of thing, because that seems to -- makes me feel -- I could be wrong -- as though I'm in that position. And I'm not here to talk about that.

Q No. I haven't asked you to do that.

Let's look at page 13 -- no. Let me turn to page 14. Part six, commercial healthcare coverage options.

And what you did in this part, as I understand it, is you analyzed the plans that are available under the Georgia Health Insurance Exchange, right?

A Correct.

Q And that's an insurance exchange that's set up pursuant to the ACA, right?

A Correct.

Q And you selected a plan that you believe is typical for the Georgia marketplace.
Is that right?
A Correct.
Q And you determined what the monthly premium and out-of-pocket maximum are for that plan?
A Correct.
Q You looked at it at one point in time, correct?
A Correct.
Q So you didn't look at trends with regard to increase or decrease in premiums over time or -- is that right?
A We looked at the most recent --
Q Didn't analyze that?
A We looked at the most recent data. We didn't look at trend data.
Q And you also didn't look at trend data in terms of what this plan covers, the scope of coverage under plan or comparable plan.
Is that right?



A Well, we always look at what the benchmark plan covers in the state.
Q But you didn't look at whether insurers in Georgia in the marketplace have been offering more expensive and less generous plans over time, right? You didn't do that type of analysis?
A No. There was no -- no.
Q And so you can't make any projection, just based on the analysis you did, about whether plans available under the Georgia Health Insurance Exchange are likely to get more expensive and/or cover fewer of C.W.'s medical needs, can you?
A I can only say one thing. I can say that to the extent that C.W.'s medical needs are medically necessary, they will be covered.
Q Now, what do you base that on?
A Several things. Federal law, Georgia law, definitions with regard to medical necessary, health policy in the state itself, the plans that are -- medical necessity almost has its own legs now these days. But in Georgia, it seems to be very clear that



if care is needed for an individual in order for them to live, then that care -- in terms of survivability, then that care is going to be provided.
Unless what I've been viewing in the life-care plan is not medically necessary, it's my understanding that that medically necessary care will be covered.
Q Now, in your first report -- let's go back to -- which exhibit was that?
A 5.
Q In your first report -- and look at part six which starts on page 21 -- you looked at this same plan, right?
A Yes.
Q And you referred extensively in this section of your first report to the guaranteed-issue requirement of the ACA, right?
A Yes.
Q And you scrubbed all that out of your second report. Why --
A I don't understand what you mean by scrub



out.
Q Well, you removed all the references to the ACA from part six of your second report. Why is that?
A It's a year later, and there was no need to talk about it.
Q Does it have anything to do with the fact that the United States has taken the position that the ACA is unconstitutional?
MS. STATKUS: Object to form.
THE WITNESS: No. It just made the report cleaner. I think it's understood -- I think if you look at this report that we provided you, we spoke about the presence of the ACA in the very first section, part one of Exhibit 7.
So I think it's implicit and probably it was redundant to continue to talk about the ACA. So that was the reason why it was not included again.
Q So you're still relying on the guaranteed issue -- so are you still relying on the guaranteed-issue requirement of the ACA in forming your opinions in part six of your second report, as you did

in your first report?
A Well, you know what I'm specifically relying on is the benchmark plan of the state that the state has already adopted. And I'm also specifically relying on Georgia's own guaranteed-issue provision itself.
It's not really necessary for me to rely on the larger -- or federal provisions in this particular case to talk about state law -- to talk about state insurance law since the ACA did not change the role of the state in terms of governing insurance. As a matter of fact, the state's, sort of, role here is preserved.
Q Are you talking about the McKaren Ferguson --
A No. McKaren Ferguson has nothing to do with what I'm referring to at all. That's an entirely different thing.
What I'm actually referring to, what has been established under ERISA in a lot of language -- basically, the state has and continues to maintain the right to regulate insurance. So the Affordable Care



Act does not, sort of, eliminate that right that a state may have.
So in this particular case, when we talk about the guaranteed-issue provision, the state has the -- has the -- it can, and in this particular case Georgia does, put in place a guaranteed-issue provision. And it has the authority and the right to regulate insurers in its state as it chooses, which it has done.
So it's saying to insurers in the state that if you choose to operate in the state you must guarantee access to coverage in our state to anyone who seeks coverage. And that is a Georgia rule. That's not a federal rule.
Q And so my question is -- to go back to my actual yes or no question, in your second report, are you still relying on the guaranteed-issue provision of the ACA like you did in your first report -- you expressly did in your first report?
A I expressly --
Q Are you still relying on it, yes or no?



Are you still relying on it in part six of your second report or not?
A As I mentioned in the both the first and second report -- as least I believe I did -- the guaranteed-issue provision of both the ACA and the guaranteed-issue provisions of Georgia law itself are both in play here. So they're both equally -- not equally important. They're both important.
However, what you're suggesting that at some point the ACA should go away, as you want to argue, my response to you is that that does not eliminate or somehow diminish the impact of Georgia law itself which states that Mr. Willis -- Mr. C.W. will have access to coverage because it's guaranteed under state law. And any provider of coverage in the state -- insurance coverage in the state that intends to operate in the state must provide coverage to him if he seeks it.
Q And you don't know whether Georgia adopted that regulation as a result of the passage of the ACA?
A I don't know either way or the other. What



I do know is that that's the law.
Q And you don't know whether, were the ACA to be struck down, Georgia would repeal its regulation?
A I've read deeply enough into the regulation to know that the regulation is not attached to or connected with the law being struck down.
Apparently Georgia did not mention, in any of its language that I read in regard to that regulation or any of the -- the rules related to that regulation, rather, I didn't read anything creating a direct connection to the existence or nonexistence of the ACA.
Q Sure. And my question was not would it automatically be struck down just by operation of law. My question is, you don't know whether, if the ACA were to be struck down, Georgia might decide to repeal its regulation -- it's guaranteed-issue regulation? You can't predict that.
A No, I cannot predict it.
But I can say it's highly unlikely. And reason I would say it's highly unlikely is based on my

Page 114

knowledge of insurance in and of itself. And one of the things I think that Georgia would want to prevent -- and possibly many other states around the country if something like that were to happen -- would be what we would call, in the insurance world, is a death spiral of sorts, and economic or -- death spirals actually, where the entire healthcare system would begin to, sort of, fall apart under its own weight.

Q You're not an expert on Georgia politics, are you Mr. Dawson?

MS. STATKUS: Object to form.

THE WITNESS: I'm not speaking -- I didn't speak to Georgia politics. I'm just simply speaking about the healthcare.

Q Right. I'm not characterizing your answer. I'm asking you a separate question.

You're not an expert on Georgia politics, are you, Mr. Dawson?

A No.

Q Let's go to part seven, reasonable value.

A Yes.

Page 115

Q So you state here that the reasonable value of services is the fair market value.

Is that right?

A Yes.

Q Okay.

A I said it reflects the fair market value. But yes.

Q And is there any -- are there any circumstances where the fair market value and the reasonable value would differ?

A Are there any circumstances in which the fair market value and the reasonable value would differ? By and large, no.

Q When you say "by and large," are you -- can you think of any specific circumstances where they would differ?

A In general, no.

Q There might be. You just can't think --

A Well, I don't like to give absolutes, but I have not come across any instances in which they would necessarily differ.

Page 116

Q So even though the two concepts might be distinguishable for practical purposes, they're going to be the same number, right?

A Essentially, yes.

Q And in the healthcare context, you say three principles should be followed when calculating reasonable value. I just want to understand these principles. Principle one, the calculation should be independent of any one individual's experience of price, mode of healthcare payment, and medical condition or diagnosis.

What does that mean?

A It means that you don't look to one specific individual and say that -- it's best to give an example. There is a difference between person A having a dollar in his pocket and saying that most people have a dollar in their pocket.

Q Okay. How does that relate to principle one?

A In other words, one person -- we're talking about one person's experiences, not the same as talking

Page 117

about a class of individuals' experience. So group A has a dollar -- or on average, group A has a dollar in its pocket. That average dollar is different from one person's experience of a dollar. It's not the same.

Q So relating this to reasonable value, are you trying to say that the reasonable value of a good or service should be based on aggregate data from multiple individuals in many, many different situations, and it shouldn't be the value that it's reasonable to think this one individual may have to pay for the goods or services?

A Correct.

Q Because the -- if you average out all the differences in individual circumstances, if you eliminate those, the numbers that you may come up with as the fair market value is higher than some people have to pay, and it's lower than some other people have to pay, right?

A Well, if you're talking about individual cases, the reasonable value is distinct from --

Q Right. The --

Page 118

A Yeah. The reasonable value is distinct from individual cases.

Q So the reasonable value is a kind of average of what payors in the marketplace have to pay.

Is that right?

A Well, the reasonable value is the experience of the cost between payors and payees for lack of a better phrase.

Q I'm sorry that we lack a better phrase, because I don't understand that one. The experience of. That sounds so metaphysical. And I say this from one philosopher to another.

But the experience of cost is one thing, and cost is another thing?

A Right.

So --

Q What --

A So, essentially, it's how you -- there is a relationship between the buyer and the seller. And the buyer and seller have a relationship that creates a certain -- that's basically an experience. They both

Page 119

have an experience. There is a relationship between the two.

And that relationship between the two, particularly if we're talking about buyers -- the one group of buyers of a similar type and sellers of a similar type. That reasonable value is a reflection of the average price in terms of the selling price and the purchase price between the two of them, that experience.

Q So I'm having a little trouble with the term "experience" just because it sounds qualitative and subjective. It doesn't sound objective and measurable. Price now, on the other hand, sounds like something you could collect data on. But people's experience, that sounds very wishy-washy.

How does the concept of experience quantifiable?

A I think that what's happening here -- maybe I need to use a different term. So I'll need to think for a second. But in economics, the word experience is used all the time. So your experience of price is just

Page 120

another way of saying here is a transaction.

Q Got it. Okay. So it is something that's observable?

A Exactly.

Q I could watch you buy a television?

A Yes.

Q And I've seen a transaction in which you've had the experience of price?

A Exactly.

Q Okay. I think I understand a little better now.

And so what you're saying is for experience of price could we just substitute the term transaction?

A I'm not going to do that necessarily. By the way, I do believe you understood what I was saying, but we'll just keep it moving. I'm sorry.

Q Well, yeah, we can avoid the commentary. I'm actually trying to understand, because I'm not an economist.

A Okay.

Q Let's move to principle two. The

Page 121

calculations should use objective and independently verifiable pricing and cost data derived from the actual payments made by market-defined payors, that is public insurers, commercial insurers, self-insured.

A Yes.

Q And so what you're saying there is that you should get reliable data about what different categories of payors are actually paying for goods and services in the healthcare marketplace?

A Correct.

Q And then principle three, the calculations should use population data regarding the take up market -- wait. This may be a compound adjective.

A It's actually missing the word of, the take up of market defined modes of healthcare financing. That is a typo on my part.

Q So what it should say, if I understand the language, is -- this refers to the percentages in Exhibit 4.

Is that right?

A Uh-huh.

Page 122

Q Is that a yes? For clarity.
A Yes. Yes.
Q So that should figure into the calculation?
A Correct.
Q Are these three principles that you came up with, or are they principles that are published somewhere? Where did you get them?
A Well, functionally, what I have derived based on my own experience from the use of the, sort of, standard comparative pricing analysis or methodology that's applied. And comparative pricing, that particular methodology that's used is -- this is sort of standard. You can find this when you want to find out how to do pricing. If you want to do a pricing analysis and you're doing a comparative pricing analysis and you're doing it in the healthcare sector or any particular sector, they will use these kinds of principles to describe it.
Q Okay. So would you say that these three principles are generally accepted in the field of healthcare policy as a way to calculate -- or as

Page 123

principles that are relevant to calculating the fair market value of goods and services in the healthcare marketplace?
A And the most accurate way to -- the latter of what you said is correct, that these principles are relevant to calculating value in the market if one is applying a comparative pricing analysis.
Q And you say that the federal government and university purchasing departments apply methodologies like this when they're determining the reasonableness of prices?
A Yes.
Q Do you apply the same methodology as the federal government or any -- I think you cited Stanford -- any particular university purchasing department? Or is your methodology somewhat different?
A I actually apply a very similar methodology to what the federal government has used. And I also rely heavily on the work of Sedgewick -- you probably remember him -- on damages as well, just to make sure that my thinking is in line, with general, with what

Page 124

the courts like to work with.
And, of course, in this case, I've made sure that I've aligned myself with the thinking of the Georgia courts as well to make sure that I'm explaining myself in a way that makes sense to the courts.
Q So I think the answer to my yes or no was, no, your methodology is not exactly the same as the federal government or the university purchasing departments, but it's similar to what the federal government does.
Is that right?
A We all use -- it's the same methodology, just different stuff. The methodology of doing comparative pricing is structurally the same, just different stuff, different actors performing the analysis.
Q In different contexts?
A In a different context. Correct.
Q Would you agree that -- let's talk about a marketplace that I'm more familiar with like buying a used car.

Page 125

A Okay.
Q If I want to sell my used car to Car Max or another dealer, they're going to pay a lower price than I'm going to pay if I want to buy a used car from them, right?
A Okay.
Q I mean do you agree with that?
A I've never bought a car from Car Max. I think if you've talking about purchasing or selling I would put myself in the position of maybe the plaintiff and say something along the lines -- if this is what you've referring to -- that when I walk into a dealership do I pay the sticker price or not. No one pays the sticker price.
Q That's not really what I want. No. That's not my question.
A Oh, what direction -- I'm sorry.
Q My question has to do with the fact that purchasers in the marketplace, payors, can be indifferent positions in the market and that can affect the price that is reasonable for them to pay.

Page 126

A So that's a confusion about what I mean by reasonableness or what anyone -- what the courts -- what reasonableness is about or reasonable value is about.

The question is not whether or not it's reasonable to the individual. For example, this is where we got into a qualitative discussion. I as a seller can believe it's reasonable to sell my services for fixing a broken arm, for example, at a million dollars. I can think that the fixing of a broken arm is worth a million dollars. But the market says that fixing a broken arm is worth $200 tops. So that's what the reasonable value is.

Q This is not responsive.

A Okay.

Q Let me ask the questions and sort of lead you along. And you can just answer the questions that I ask.

So the question is, for example, suppose my friend is a purchasing agent for Home Depot. He buys appliances for Home Depot all day long in huge lots.

Page 127

Home Depot is a major market player. I go to buy a refrigerator, and I pay $1,000 for it. And I tell him that. And he says, that's not reasonable. I get those for $500 all day long.

A I'm sorry. Are you asking me a question?

Q Yeah. I'm figuring out how to phrase the question part of this.

In that scenario, what's reasonable for Home Depot to pay for that refrigerator is very different from what's reasonable for me to pay for that refrigerator because we're in different market positions, right?

A I'm not understanding why we're talking about different market positions in this particular case. I would think we're talking about apples to apples and oranges to oranges, correct, not different market positions. The market position of X is different from the market position of Y.

Q That's kind of my point.

So what is reasonable for Home Depot to pay for a refrigerator, that's not a price I can expect to

Page 128

get, right, because they're buying a million refrigerators and I'm baying one at retail.

You accept that, right? I mean that's pretty basic.

A What I'm a little bit confused on -- and you can help me here -- is why you would be equating a Home Depot who is -- whose market, if segmented properly includes Sears and includes Wal-Mart and -- that's the market in which Sears operates in for the purchase of refrigerators. It's refrigerators that it purchases are a bit different than the refrigerators being purchased by the everyday individual consumer. So it's a different market.

Q No. Home Depot sells the same refrigerator that I bought.

A You know, you're actually confusing --

Q Let me finish. They buy it at wholesale because they're buying a million of them. And they get a big discount, because they're buying a million.

A This is sort of a standard confusion. This is a huge confusion actually. I don't know how to help

Page 129

us out of that. I think to the record it will be clear, but I'm not sure if I can help us out of the confusion that's being made.

But what I will say to you is that in regard to reasonableness and reasonable value, both purchasers and sellers must be on par. That is always standard in any relationship. You can't have differences of power.

Q Could you repeat what you just said, Mr. Dawson?

A I believe both purchasers have to be on par with one another. This is the reason why we talk about different purchasing groups in this particular case. We talk about the individual market as a market. We talk about the insurance market. We talk about the group market. We talk about -- so all of these individuals are purchasing groups, and they all have varying degrees of purchasing power.

Based upon all of their -- and they use the word position. But it's certainly more accurately used in the way being described now. But based on their

Page 130

position or their influence in the market, they can drive the value of goods and services either north or south based on their purchasing power. So there you go. It doesn't really get any more complicated than that.

Q Sure. And so when you're talking about a price that is reasonable to expect to be able to get a good or service for, the purchasers' market position or market influence has to be taken into account, right?

A We always take the individual's position into account. But the individual's position should be taken into account based on the market in which that individual participates -- not market, but that group in which the individual participates. What group does the individual participate in.

If that individual participates in the uninsured market, then let's talk about what the purchasing power of individuals in the individual market happen to be. In this particular case, the individual has been permitted -- at least Ms. Barrons has been permitted to set the market rate for the

Page 131

individual market.

Q I don't understand what you mean by saying that Ms. Barrons had been permitted to set the individual market rate.

A So our analysis of reasonable value assumes, without trying to define, that Ms. Barrons has offered an estimation of what the -- an individual would pay out of pocket, someone without insurance. We accept that estimation as being a valid description of what the cost of services are for the uninsured person. And we apply it to our analysis. We don't question that number.

Then we use that number as a part of the many numbers that we're given in the pool of individuals participating in that market to arrive at what the reasonable value of goods and services are in that market.

Q So let's look back -- I think I understand what you're saying. Lets look back at Exhibit 4, the Georgia percentages. Do you have that available?

A I'm sure it's somewhere. I can't find it.

Page 132

Give us a minute. Let me go and find it. I know where it is.

(There was a break in the proceedings.)

Q So, Mr. Dawson, while you were out, we had a brief conversation. So I'm going to ask a few questions, along this line sort of general conceptual line. And then we're going to adjourn in the next fifteen or twenty minutes and let Ms. Statkus go. And we are going to reconvene when everybody can.

Did we agree on 1:30 on Tuesday the 18th?

MR. TAYLOR: That what's I have.

MS. STATKUS: That's fine.

THE WITNESS: That's what I have.

Q So, Mr. Dawson, we were talking about different categories of payors in the marketplace, right?

A Yes.

Q And the fact that some payors get a lower price and some payors get a higher price, right?

A Well, some payers pay differently. Payers pay differently from one another. They can.

Page 133

Q Well, normally in a market, payors with greater influence pay less and payors with less influence pay more, other things being equal, right?

A True. Yes.

Q And so you said that in doing your calculations of reasonable value you look at what group a given payor falls into?

A Correct.

Q And so in this document, that we have labeled Exhibit 4, are these headings: Employer, non group, Medicaid, Medicare, other public, uninsured. Are these categories of payor in the healthcare marketplace?

A Yes.

Q And some of these payors have more influence over the price they can command than others do, right?

A Correct.

Q Medicaid, for example, sort of pays what Medicaid wants to pay?

A Correct.

Page 134

Q Medicaid gets to dictate a reimbursement schedule, correct?

A Medicaid sets a fee schedule. It doesn't really dictate -- yes. It has a fairly structured formula. And it does have to -- it works with the -- for all intents and purposes, say the American Medical Association, along with several other entities, get together and work out, with whatever federal entity, what the pricing ought to be based on a sort of formula what the fees and costs might be.

Q And Medicaid also has the additional clout in the marketplace of being a public agency with appropriated funds and regulations that require it to be accepted under certain circumstances, right?

A You're referring to Medicare, correct, not Medicaid necessarily, right?

Q Well, both. But, yeah, Medicare. You know more than I do, obviously, about the differences.

But Medicare would be in a similar position in that it is also a federal program that can, at the end of the day, make a decision about what a schedule

Page 135

of reimbursement is going to be?

A So that is -- the Medicare schedule -- Medicaid by the way is a state and federal program and employers, and then, of course, you have VA and uninsured. All of those different players in the marketplace -- I'm using the word "player" quite liberally now -- follow given sets of rules that are established by the federal government.

So whether we're talking about employers or whether we're talking about the uninsured, there quite literally are a set of rules by which individuals can transact business in the market. We don't have an unhindered I'm going to do and behave as I want. So to that extent, yes, Medicare has rules. But those rules that are related to Medicare's behavior are also related to the behavior of private insurers in the market as well.

Q The rules aren't completely identical, right?

A Well, interestingly enough, the -- as our president has said, who knew healthcare was so

Page 136

complicated. But the bottom line is that there are features of Social Security law that impact how -- impact private insurance behavior in the marketplace. Without going into a lot of detail, there really are rules in terms of how much -- or how the marketplace will behave in the sense that sellers can only charge what's reasonable and buyers are protected to the point where they're not going to be allowed to really purchase what's not reasonable. That's kind of how our market works in a very simplistic description.

Q Well, I think -- let's get back to our line of questioning, because we want to try to wrap it up in the next few minutes.

I think we agreed that each of these categories of payor has a different degree of influence over the price that it can command in the marketplace.

Is that correct?

A Yes.

Q And that influence depends, in part, on the volume of business that the category of payors represent or payee, right? Let me give you an example

Page 137

if that question wasn't fair. If I'm BlueCross BlueShield, I represent a lot of people.

A Yes.

Q And when I come to a hospital and say here is what I would like to pay -- or to a hospital system and say here is what I would like to pay for these services, the hospital system is going to push back to a point but the negotiations are going to be influenced by the fact that they get a benefit from being certain of actually getting paid for this huge number of patients, right?

A Okay.

Q I mean do you agree with that?

A I'm thinking about it. It's a bit more complicated than that, actually a lot more complicated.

Q I'm just saying this is one factor.

A Okay.

Q Isn't that one factor? That if I individually walk into a hospital and say, hey, this is what I would like to pay, they'll tell me to pound sand. But if BlueCross walks in there and says this is

Page 138

what we would like to pay, there will be a negotiation. And BlueCross gets to have that negotiation because it represents a large volume of business for the hospitals, right?
A Yes. But BlueCross is also just like -- anyway, the bottom line is that they're all governed by a set of rules established under the Social Security Act. So that might be a bad example. Anyway, the bottom line is -- and BlueCross BlueShield is also a specific kind of entity. It's a not-for profit operating in the market unless it's one of the for-profit BlueCross BlueShield, which is a different kind of entity.
So if you're talking about a not-for profit one, they do come in as a kind of purchaser. If we want to accept, for instance, that they are a large purchaser and they get to purchase in volume, that's great. But, again, as I said before, there are certain rules around that purchasing behavior.
And so the significant amount of savings that you're talking about -- if they could charge a

Page 139

hundred million dollars beyond what they wanted to -- or what something costs, they would. They're just not permitted. There are limits.
Q When you say they could charge --
A I'm sorry --
Q I'm talking about not what BlueCross charges consumers but what BlueCross tells the hospital it wants to pay for specific coded services.
A Right. So of course there are a bunch of negotiations around all of that. You're right.
But at the end of the day, there is a specific band in terms of pricing that are applied to the cost of different items in a hospital setting. So a hospital setting is different. And in a hospital setting, we have lots of things to contend with in terms of what's billed -- or rather what's charged and what is actually paid and even what is actually paid by an uninsured individual and how it's paid.
Q I'm trying to get to it. And maybe this is just afternoon and we're getting tired. I'm trying to get to a specific point which is that, other things

Page 140

being equal, larger players in the marketplace have more negotiating power?
A Absolutely. Now that is a true statement. The larger you are, technically speaking, the more negotiating pawer you have. And that's before we lay on top of this regulations and rules and laws and all other kind of stuff. Yes.
Q Okay. And is that one reason why -- just one reason but is that one reason why Medicaid's reimbursement rates are quite low compared to the face value of a hospital bill or compared to what a private insurance company would pay to reimburse for a service?
A Yeah. One of it --
Q In other words, Medicaid represents a whole lot of people?
A Medicaid does represent a lot of people. It's not the majority of the marketplace. It does represent a lot of people.
If you look in the case of Georgia, it represents about 17 percent of the marketplace. So that's not everybody.

Page 141

Q No, it's certainly not.
Is there, in Georgia, an individual private insurance company that represents 17 percent of the marketplace?
A I don't know the answer to that question off the top of my head. I would beg to argue the point that to the extent -- the answer is both yes and no. And you're going to laugh at the answer. So most --
Q That's okay. I want to hear it.
A Most Medicaid -- state Medicaid plans have -- most of them don't run their own programs anymore. Most of them outsource to insurers. BlueCross BlueShield has a Medicaid plan. Aetna, United Healthcare, they all have these contracts with the states and/or federal government if it's on the Medicare side. And so essentially you've got the same large insurers operating as the administrators for these plans and making money based on those savings. So they just operate these plans assuming the risks and controlling costs through their own structures that they happen to have in place.

Page 142

So the same insurers who are handing employer-sponsored care are the same insurers who are handling individual market care or same ones in general handling Medicare and Medicare as well. It's the same folks, just a different banner.

Q But the banner seems to make a difference in the reimbursement rate?

A Well, yes, there is a difference in the reimbursement rate, certainly on its face and certainly the states have some rules. But -- so there is a significant difference -- or can be a significant difference between Medicaid and Medicare. And, really, that's about the population and what the needs of that population happen to be.

Q Would you agree that of the categories of purchaser that are listed on Exhibit 4 the one with the least negotiating power is the uninsured?

A I would think that the -- I would say that the least -- the uninsured are in a category that is -- they're operating pretty much by themselves in that sense or the -- we call them the self-insured. Because

Page 143

the self-insured are individuals who are willing or do pay out of pocket. And so in that sense, they violate the law by not adhering to the mandate to not have insurance -- to not be a part of one of those groups.

But certainly in this particular case, there is really no reason for the plaintiff to be in that group.

Q Well, that wasn't my question though. My question is, the uninsured, as a group, really don't have any negotiating power?

A No.

Q They're not represented or organized?

A Well, to the extent that they are uninsured, they are not a part of any plan. Correct. They pay out of pocket. Correct. The amounts that they pay can vary, but there is generally an amount that -- there is still a sense that they pay an amount that is commonly found in the locale or that's a prevailing rate in the market.

Q Are there reliable data about what the uninsured actually pay?

Page 144

A There is lots of data out there -- we look at it often -- about that the uninsured pays. More importantly, that data can be fairly grandular in the sense that we can even go so far as to look at what people pay based on race, ethnicity, and -- in terms of the uninsured -- and age up until a certain point, because the data is not collected below age nineteen. But, yes.

Q Where are those data collected?

A Census Bureau collects that data. The Medical Expenditure Panel Survey which is drawn from the Census Bureau collects that data. The National Insurance Health -- National Interview Health -- I am getting tired. I can't remember the exact name. It does a quarterly update on that kind of information.

So the data is out there. It talks in a very general way and sometimes in a very specific way about that what the uninsured experience as cost, which is important to know.

But at the same time, when one is speaking about reasonable value, that is still a very different

Page 145

question. And I would argue that the reasonable value of care is more likely than not what an individual will experience in Georgia if they don't have insurance. Something closer to the reasonable value is what I would like to say.

Q Do you have those data for Georgia?

A What do you mean?

Q Well, the data about what uninsured people pay.

A Do I have the data about what uninsured people pay? I have --

Q These --

A Hold on.

In this analysis, I accepted the plaintiff's number as being the amount that uninsured persons pay in the market.

Would you like me to go get a different number?

Q No.

My question is, in doing your analysis -- and we'll get to your calculations next time. My

Page 146

question is, in doing your analysis, did you go pull the data on what uninsured people pay in Georgia?

A Well, the answer to that question is no. We allowed your -- the plaintiff to provide us with that number. And the reason we allowed the plaintiff to provide us with that number is because in determining the reasonable value it tends to be a little -- when looking at the reasonable value, it is, in my estimation, more appropriate to allow the plaintiff or whomever the party is presenting the number at that given time, to be able to describe what they believe to be the value of care to them as an uninsured person.

MR. MOORE: I think what we'll do now -- I know Shannon has to go. I think we will go ahead and adjourn now and reconvene Tuesday at 1:30.

(Deposition concluded at 2:50 P.M.)

Page 147

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary will be made on the Errata Sheet.

________________________
Thomas J. Dawson, III, Esquire, MHP, MA

________________________
Date

(If needed, make additional copies of the Errata Sheet on the next page or use a blank piece of paper.)

Page 148

ERRATA SHEET

Case:

Witness: Date:

PAGE/LINE SHOULD READ REASON FOR CHANGE

Page 149

State of Maryland
Prince George's County, to wit:

I, HEATHER AVALOS, a Notary Public of the State of Maryland, County of Prince George's, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 17th day of June, 2019.

HEATHER AVALOS,
Notary Public
My Commission Expires:
December 29, 2019