

Deposition of:
# Thomas Dawson

*August 19, 2019*

In the Matter of:

# Willis, Sherecia Vs. United States Of America, Et Al.

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 2 of 20

Thomas Dawson                                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF GEORGIA
 3                      AUGUSTA DIVISION
 4    SHERECIA WILLIS, INDIVIDUALLY,
 5    AND AS NEXT FRIEND, PARENT,
 6    AND NATURAL GUARDIAN OF MINOR
 7    CHILD, CW,
 8            Plaintiff              Case No.
 9        vs.                        1:17cv00015
10    UNITED STATES OF AMERICA, ET AL,
11            Defendants
12    _____/
13            Pursuant to Notice, the continued
14        deposition of THOMAS DAWSON was taken on
15        Monday, August 19, 2019, commencing at 1:18
16        p.m., at the offices of TD&P Consulting, 1400
17        Spring Street, Suite 500, Silver Spring,
18        Maryland, before David C. Corbin, a Registered
19        Professional Reporter and Notary Public.
20
21
22
23
24
25            REPORTED BY:  David Corbin, RPR
```

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 3 of 20

Thomas Dawson
August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 2

```
 1            A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF:
 3        LEIGHTON MOORE, ESQUIRE
 4        The Moore Law Firm
 5        100 Peachtree Street, Suite 2600
 6        Atlanta, Georgia 30303
 7        leighton@moorefirmpc.com
 8    ON BEHALF OF THE DEFENDANT:
 9        SHANNON STATKUS, ESQUIRE
10        Assistant US Attorney
11        Southern District of GA
12        PO Box 2017
13        Augusta, Georgia 30903
14        Shannon.statkus@usdoj.gov
15    ON BEHALF OF THE DEFENDANT:
16        F. MICHAEL TAYLOR, ESQUIRE
17        Brennan, Wasden & Painter, LLC
18        801 Broad Street, Suite 501
19        Augusta, Georgia  30901
20        mtaylor@brennanwasden.com
21
22
23
24
25
```

Page 3

```
 1             I N D E X
 2    Name of Witness
 3    Thomas Dawson
 4    Examination:                      Page
 5    By Mr. Moore                        5
 6    By Ms. Statkus                     69
 7
 8             E X H I B I T S
 9    Exhibit 8 C.V.                      6
10    Exhibit 9 Power point presentation 23
11    Exhibit 10 Case list               66
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        IT IS HEREBY STIPULATED AND AGREED that
 2  the reading and signing of this deposition are
 3  waived.
 4            THOMAS DAWSON,
 5  duly been sworn to tell the truth, the whole truth,
 6  and nothing but the truth, testifies as follows:
 7            E X A M I N A T I O N
 8  BY MR. MOORE:
 9      Q.  Mr. Dawson, good afternoon.
10      A.  Good afternoon.
11      Q.  Do you recall that we began your
12  deposition a couple of months ago?
13      A.  Correct.
14      Q.  And we are reconvening today.
15      A.  Correct.  I'm having trouble hearing you.
16  You're going in and out.
17          MR. TAYLOR:  I'm back, I got dropped.
18          MR. MOORE:  All we've done is swear in the
19  witness.
20          MR. TAYLOR:  Okay.  Thank you.
21      Q.  Mr. Dawson, I would like you to --
22          OPERATOR:  Mike Taylor.
23          MR. MOORE:  Mike, do we have you.
24          THE WITNESS:  Hello.
25          MR. MOORE:  Mike Taylor, do we have you on
```

Page 5

```
 1  the line?
 2          MS. STATKUS:  I don't think he's on the
 3  line any more.
 4          MR. MOORE:  We'll just have to wait for
 5  him.  Mike, do we have you again.
 6          MR. TAYLOR:  Yeah.  I don't know what's
 7  going on here.  I'm here.  You all there?
 8          MR. MOORE:  Yeah.  Proceed?
 9          MR. TAYLOR:  Please, proceed.
10      Q.  Okay.  Mr. Dawson, would you please -- the
11  first exhibit I would like to ask you about is your
12  CV?
13      A.  Yes.
14          (Deposition Exhibit 8 marked.)
15      Q.  Which I just received today and I would
16  ask the court reporter to mark that as Exhibit 8.
17  Because we went through seven last time.  Do you
18  have that in front of you?
19      A.  Yes.
20      Q.  Could you just let me know what is
21  different about this C.V. from -- since your last
22  deposition?
23      A.  I believe the previous C.V. did not
24  include the -- here we go.  What page is it on.  Or
25  does it include.  There should have been mentioned
```

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 4 of 20

Thomas Dawson                                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 6

1  on the previous C.V. -- previous C.V., and I wasn't
2  certain, that I was considered or rather I was
3  identified as a key committee staff member in
4  Congress in 2010, 2009.  Also the same thing in 2011
5  as well.  Key committee staff members are identified
6  as senior members of staff on Capitol Hill who are
7  involved in drafting and/or handling some of the
8  more detailed or technical aspects of the
9  legislative process on behalf of the legislators.
10     Q.  Okay.  Is that the only change?
11     A.  That was, I believe, added.  And that's
12 all I can really point to right now, yes.
13     Q.  Are there any additional cases?
14     A.  No, not that I'm aware of.  I believe we
15 did add some of the CLE courses that you mentioned
16 before, as to whether or not I was involved in some
17 of that.  So we did offer up our presentations,
18 rather my presentations.
19     Q.  Okay.  Do you have any publications or
20 presentations that are not listed on your C.V.?
21     A.  Not to my knowledge.
22     Q.  Okay.  Have you testified in any
23 additional proceedings since your last deposition?
24     A.  I was involved in a deposition recently in
25 a case called Dorwoldt.

Page 7

1     Q.  Would you spell that, please?
2     A.  D-O-R-W-O-L, I want to say, D-T.
3     Q.  Where is that case pending?
4     A.  It's in Illinois.
5     Q.  In state court or federal court?
6     A.  State court.
7     Q.  Is it Cook County?
8     A.  I believe so.
9     Q.  Who is the plaintiff's lawyer?
10    A.  Excuse me.
11    Q.  Who is the plaintiff's attorney in that
12 case?
13    A.  I don't recall.
14    Q.  Do you -- are you testifying on behalf of
15 a defendant?
16    A.  I am testifying on behalf of the
17 defendant, yes.
18    Q.  Is it a personal injury case?
19    A.  Yes.
20    Q.  Does your testimony relate to the
21 calculation of future medical costs?
22    A.  Yes.
23    Q.  Have you produced an expert report in that
24 case?
25    A.  I'm sorry.  Excuse me, I didn't hear you.

Page 8

1     Q.  Do you have --
2         THE WITNESS:  It's difficult for us to
3     hear you.  You're actually going in and out.
4         (Off the record colloquy.)
5         MR. MOORE:  Can everybody hear me now?
6         THE WITNESS:  Yes.
7         MR. MOORE:  All right.  Could the court
8     reporter please read back the last question if
9     you're able to.
10        (Reporter read back question.)
11    A.  Yes.
12    Q.  Is that the only case that needs to be
13 added to your testimony list in order for it to be
14 up-to-date?
15    A.  Yes.
16    Q.  Since the time of your last deposition,
17 have you received or are you aware of any orders
18 excluding you in whole or in part in testifying in
19 any case?
20    A.  No.
21    Q.  Has anyone filed a motion to exclude you
22 from testifying in any case since the time of your
23 last deposition?
24    A.  Not to my knowledge.
25    Q.  Okay.  All right.  Let me turn to your

Page 9

1  opinions.  You assumed in your expert report in this
2  case that CW has a legal obligation under the
3  Affordable Care Act to maintain health care
4  coverage, right?
5     A.  Correct.
6     Q.  That's what's referred to as the
7  individual mandate of the ACA?
8     A.  Correct.
9     Q.  And you also assume that coverage under
10 the ACA will have certain minimum features, right?
11    A.  Correct.
12    Q.  For example, it will cover preexisting
13 conditions?
14    A.  Yes, correct.  Correct.  Yes.
15    Q.  Okay.  And that's because the ACA
16 prohibits insurers from denying coverage on the
17 basis of a preexisting condition, right?
18    A.  Correct.
19    Q.  Okay.  Now, is that what you determined to
20 be the guarantee issue requirement of a ACA?
21    A.  Yes.
22    Q.  And your opinions in this case regarding
23 future medical costs are based on the assumption
24 that those requirements of the ACA that we just
25 described will continue enforce, correct?

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 5 of 20

Thomas Dawson                                                    August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 10

1  A. In part, yes.
2  Q. In formulating your opinions with regard
3  to coverage available under the ACA, are you
4  assuming that the individual mandate of the ACA is
5  legally valid?
6  A. I'm not actually making any assumptions
7  regarding the law as to its validity or not. My
8  thoughts on that is that it is the law and therefore
9  in my analysis basing my assumptions on what's in
10 front of me in terms of the law.
11 Q. If the individual mandate of the ACA were
12 legally void, that would undercut the legal
13 assumptions underlying your opinions in this case,
14 correct?
15 A. It would not undercut my assumptions about
16 cost, no.
17 Q. It would undercut your assumptions about
18 the availability of coverage under the ACA?
19 A. It would in this particular case not
20 change my opinion with regard to access to coverage.
21 Q. That's not exactly my question, because I
22 take it that you're referring to other programs, not
23 the ACA; is that right?
24 A. Actually what I'm referring to
25 specifically is that the ACA, as I've described it

Page 11

1  in the past, provides sort of a frame work for how
2  health care is delivered. So it doesn't change some
3  of the fundamental structures of the health care
4  delivery system in our country. What that means is,
5  for example, where there was a limitation to the
6  extent at which the preexisting condition exclusion
7  could be applied, today, in other words we're not
8  allowed to have a preexisting condition exclusion in
9  current insurance contracts, whether they are inside
10 of the exchange or off of the exchange. Prior to
11 the Affordable Care Act, preexisting condition
12 exclusions had a limitation on them, which came
13 about in 1993 or '94 specifically, that were applied
14 to plans throughout the country. And essentially
15 there was a 18 month limitation on preexisting
16 condition exclusions. After that period of time,
17 insurers essentially were required or are required
18 to cover individuals that participate in their plan.
19 Specifically if you look at Blue Cross Blue Shield,
20 which is a not for profit in general, most Blue
21 Cross Blue Shield are not for profit plans. Those
22 not for profit plans were limited in what they could
23 do in terms of excluding individuals from
24 participation on their plans due to a preexisting
25 condition. In other words they could not prevent an

Page 12

1  individual from becoming a member of their plan
2  purely because of a preexisting condition, because
3  Blue Cross Blue Shield in general or the Blue Cross
4  Blue Shield plans had a not for profit status.
5  Q. Are you saying that even before the
6  passage of the ACA, Blue Cross Blue Shield could not
7  deny a person coverage on the basis of a preexisting
8  condition?
9  A. What I'm saying is that prior to the ACA,
10 not for profit plans like Blue Cross Blue Shield
11 were not permitted to deny an individual access to
12 their plan due to a preexisting condition.
13 Q. So if I as an individual, not through an
14 employer plan or anything like that, but if I as an
15 individual, we're talking about prior to the passage
16 of the ACA, wanted to get health insurance from Blue
17 Cross Blue Shield, suppose I have leukemia, and I
18 wanted my treatment for leukemia to be covered by
19 Blue Cross Blue Shield, I could just go to them and
20 fill out an application for insurance and they would
21 have been required to insure me?
22 A. They would have been required to insure
23 you, yes. Whether or not -- the extent to which the
24 preexisting condition exclusion would apply to
25 leukemia, they would have been the same standards in

Page 13

1  many cases, but they could not have denied you from
2  participating in that plan. So that's been around
3  for a long time.
4  Q. Then why did Congress pass the guaranteed
5  issue requirement of the ACA if people could already
6  get insurance with a pre-existing condition?
7  A. Because Blue Cross Blue Shield wasn't
8  everywhere for one thing. In fact Blue Cross Blue
9  Shield really -- in fact I had a number of
10 conversations with the leaders of Blue Cross Blue
11 Shield on some of these issues. But the bottom line
12 is that the guaranteed issue provision required all
13 insurers in the marketplace to allow individuals who
14 wanted insurance to be covered and not be denied
15 immediately because of the preexisting condition.
16 So it changed that sort of policy. And ultimately
17 it really took a big weight off of Blue Cross Blue
18 Shield who had been sort of shouldering, I guess,
19 burden of individuals who were high utilizers of
20 health care.
21 Q. Are you familiar with the health care
22 proposals being made by current presidential
23 candidates such as Medicare For All?
24 A. Yes, I'm familiar.
25 Q. In formulating your opinions in this case,

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 6 of 20

Thomas Dawson                                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 14

1  have you taken into account that the ACA might be
2  replaced by one of these programs?
3      A.  I've looked at those.  They are out there.
4  Based on the experience I've had, having been around
5  for a little while looking at different kinds of
6  formulations of health care plans, it is healthy not
7  to base current assumptions about the future of
8  health care and/or health care cost on the
9  speculation -- based on the speculation of what one
10 given candidate or another has to say about health
11 care.  Having said that, I will add one piece that I
12 will think satisfy your answer -- your question.  It
13 is also important to recognize that there are
14 limitations in our health care system as to what can
15 or can not be done.
16      OPERATOR:  Mike.
17      MR. MOORE:  Mike, are you out or in?  I
18 think we lost Mike again.
19      A.  So that would be my thought.  Not my
20 thought on it but there are limitations as to what
21 one can do in our health care system without causing
22 harm.
23      Q.  Any such proposal, if it passed at all,
24 probably would undergo modifications in both houses
25 of Congress before passage, right?

Page 15

1      A.  Yes.
2      MS. STATKUS:  Object to form.
3      Q.  And you don't claim to be capable of
4  predicting the end result of that legislative
5  process where you sit today, do you?
6      MS. STATKUS:  Same objection.
7      A.  I'm not claiming to be able to predict
8  that outcome of that particular legislative process,
9  no.
10     Q.  Okay.  Because that would be, as you said,
11 speculative?
12     A.  It would be premature right now, yes.
13     Q.  Are you aware that President Trump
14 recently stated that there is or will be a
15 Republican alternative to the ACA, which he says
16 will be unveiled after the 2020 election?
17     A.  Yes.
18     Q.  Do you know what the provisions of that
19 plan will be?
20     A.  I don't.  But they are pretty much in line
21 with the provisions that we're seeing from both
22 sides that won't cause economic harmony more.  So I
23 would describe the following aspects that are
24 germane to this particular case.
25     MR. TAYLOR:  I'm back.

Page 16

1      MR. MOORE:  Mike, are you back in?
2      MR. TAYLOR:  Yeah.  My server went down
3  and took my phone out.  It's back up.  If it
4  does it again, I'll use my cell phone.  Sorry
5  about that guys.
6      A.  No worries.  So the particular aspects of
7  the -- both the Republican and Democratic proposals
8  that I'm well aware of, that I've been doing a lot
9  of work on and also understand would require
10 significant -- they will require change but not
11 significant change to the structure of our health
12 care system.  So there are particular things that
13 are important that are germane to this case.  The
14 first item that's germane to our case here is
15 whether or not the individual has access to
16 coverage.  So we know that all individuals who
17 participate in the marketplace will have access to
18 coverage.  No one is going to be stopped at the door
19 from finding coverage.  I think both the Democrats
20 and Republicans agree that individuals should have
21 access to coverage.  The question has been for
22 Republicans how should individuals have access to
23 coverage.  Can they make choices that are different
24 than those prescribed under the current plan, under
25 are the current Obama plan.  So that's been the

Page 17

1  difference.  We've seen President Trump, through
2  different regulatory tools, come up with abridged
3  versions of health care that are considered less
4  expensive or more short term so that individuals can
5  make different kinds of decisions.  Again, that's a
6  question of access.  So none of his plans have
7  talked about eliminating access to care.  There is
8  nothing that's been proposed in that fashion.  So
9  the plans both on the Republican side and the
10 Democratic side are consistent there.  They are also
11 consistent with regard to the idea of guaranteeing
12 access to coverage, which is important here.  I just
13 said one version of it, but I'm going to talk about
14 it in terms of the preexisting condition exclusion.
15 So part of guaranteeing access or making sure that
16 all individuals can access coverage, meaning
17 purchase some type of coverage they want, is that
18 they are not going to be denied the opportunity of
19 taking up coverage in a given plan of their
20 choosing.  Again, this notion of choice is healthy
21 here, and that's what the President, the current
22 President, has been putting forward.  Certainly
23 that's what the Republicans have been putting
24 forward.  And the Democrats have been saying the
25 very same thing with regard to their notion of

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 7 of 20

Thomas Dawson                                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 18

1  Medicare For All. So those are two very important
2  components of health care proposals that we've seen
3  come forward, and they have been consistent --
4  consistently present both from a Democratic
5  perspective as well as a Republican perspective.
6  And they impact this case.
7      Q.  Mr. Dawson, as you sit here today, you
8  don't know whether any of these alternative
9  proposals will become law, do you?
10     A.  I don't know what will become law, but I
11 am fairly comfortable, or rather I am comfortable,
12 saying they will have those features in place which
13 are most important to the plaintiff here.
14     Q.  You can't predict what -- how that will
15 affect the cost of health care with any specificity,
16 can you?
17     A.  Well, I can say that I'm very comfortable
18 saying that the more people we have in the
19 marketplace the more control we have over cost in
20 the future.  The more people in the marketplace
21 lower costs will be in the future.  What I can say
22 with a lot of certainty is that prior to the
23 Affordable Care Act, health care costs were
24 escalating at over 8 percent per year.  Very
25 quickly.  I know that that rate of increase has

Page 19

1  decreased significantly.  I believe that whatever
2  plan in terms of cost comes into place currently
3  will -- or in the future, will not increase or allow
4  health care costs to increase at that rate.  And I'm
5  comfortable that any plan that maintains this notion
6  of guaranteed coverage, meaning pays attention to
7  the notion of preexisting condition exclusions and
8  makes sure that that's not a necessary part of any
9  plan, will control cost.  Participation --
10     Q.  Mr. Dawson, what's your methodology for
11 predicting future legislative developments?
12         MS. STATKUS:  Objection.
13     A.  I'm sorry, I don't believe I was
14 predicting future legislative developments.  What I
15 was saying is that currently I've seen the
16 following.  I've seen Republicans and Democrats both
17 recognize the importance of the preexisting
18 condition exclusion not being reimplemented again in
19 insurance policy.  And I've seen the Republicans and
20 the Democrats both be very committed to the idea of
21 guaranteeing access to coverage for individuals who
22 want care.
23     Q.  So here's my question, Mr. Dawson.  I'm
24 trying to figure out, when you say you're
25 comfortable, are you describing assumptions you're

Page 20

1  making or are you describing opinions that you're
2  prepared to back up with a methodology?
3      A.  I'm not understanding your question.
4      Q.  Well, when you say that you are
5  comfortable predicting that health care in the
6  United States is going to continue to have certain
7  features, is that an assumption that you're making
8  or is that part of your expert opinion?
9      A.  Well, it's part of my expert opinion that
10 there are certain features in our health care system
11 that are in place right now that have been very
12 successful, that have been very successful at
13 helping to keep people covered, helping to control
14 the rate of escalation in cost.  Not that health
15 care costs aren't increasing, but the rate of
16 escalation in cost are well managed, just based on
17 those features that I've described.  So it's part of
18 my expert opinion.  It's certainly shared by me and
19 other professionals who do this kind of work.  I
20 don't think I'm saying anything that's outside of
21 bounds.  If you were to look at the national health
22 care expenditure survey, that certainly supports
23 what I'm saying.  So I'm comfortable with that.  I'm
24 comfortable with following some of the explanations
25 of other experts like myself who support that

Page 21

1  conclusion.
2      Q.  So my question then, I mean you understand
3  the difference between an assumption and an opinion
4  in terms of providing expert testimony, right,
5  Mr. Dawson.  I mean if you make an assumption,
6  that's one thing.  If you're offering an opinion, it
7  has to be based on a reliable methodology.
8      A.  Understood.
9      Q.  I'm asking you what is your methodology
10 for predicting future political and legislative
11 developments?
12     A.  Well, I'm not here to actually predict
13 those sort of things.  I thought -- I'm not here to
14 predict those at all.  I have no idea what's going
15 to happen in the future.  I can say comfortably,
16 based on my experience, 25 plus years at this point,
17 or 25 years of experience, that the legislative
18 process has occurred in a certain way and continues
19 to occur in a certain way, and it is unlikely
20 that -- there is no methodology there that -- there
21 is a methodology, it's based on the years of
22 experience that I have and also seeing how the
23 legislative process works and seeing how other
24 policy makers have been involved in thinking about
25 these issues.  I really don't know any other way to

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 8 of 20

Thomas Dawson                                         August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 22

1 explain it. But I'm not here to be a predictor of
2 the future. I'm not, what do we call it, someone
3 who has a crystal ball on these sorts of things.
4 But in my professional opinion those aspects of the
5 law have been in place, they have been supported by
6 both Democrats and Republicans. I submit to you as
7 a policy professional that it's unlikely that they
8 will go away.
9     Q. All right. I would like to ask you a few
10 questions about a presentation that has been
11 produced to us entitled Making Dollars and Sense Out
12 of Letters of Protection, Deconstructing Value
13 through Data. Do you have a copy of that available?
14    A. Yes, I do.
15    Q. Would the court reporter please mark that
16 document as Exhibit 9.
17       (Deposition Exhibit No. 9.
18       (Deposition Exhibit 9 marked.)
19    Q. Are you one of the authors of this
20 presentation?
21    A. I am actually the author of the
22 presentation. My colleague, Mr. Johnson, was there
23 with me and he co-presented, but I'm the author of
24 the information, yes.
25    Q. Okay. DRI, the Defense Research

Page 23

1 Institute?
2     A. Yes, we were invited to speak there.
3     Q. And that's an organization for defense
4 attorneys?
5     A. I believe so, yes.
6     Q. Would you turn to the page with the
7 heading summary?
8     A. Correct.
9     Q. Second page of the document. Can you tell
10 me what a letter of protection is?
11    A. Yeah. A letter of protection is a
12 document commonly used in Florida by Florida
13 attorneys, I believe plaintiff attorneys primarily,
14 to limit what can be seen in terms of medical bills
15 by the defense.
16    Q. To limit what can be seen by defense
17 attorneys?
18    A. Correct. In terms of the sort of bills
19 and what not -- what not is not the best term, but
20 in terms of bills. So in this sense, letters of
21 protection give the plaintiff the opportunity to
22 present their idea or their calculation of what the
23 cost of care is for the plaintiff.
24    Q. Where did the numbers in the letter of
25 protection come from?

Page 24

1     A. The numbers come from the plaintiff.
2     Q. They just make them up?
3     A. I don't know how plaintiffs necessarily
4 come up with these numbers. I do know that in my
5 evaluation of Florida cases that I've been involved
6 in, the numbers are not always consistent with the
7 value that we've seen in the market when doing our
8 analysis.
9     Q. I think we covered some of this last time,
10 but just for an overview, hospitals typically have
11 what they call a charge master or master list of
12 prices for health care services, correct?
13    A. Correct.
14    Q. And insurance companies and other large
15 third party payers don't pay the charge master
16 prices, do they?
17    A. Generally, no.
18    Q. And that includes public third party
19 payers like Medicare, Medicaid, Champ VA?
20    A. Correct.
21    Q. They don't pay the charge master price,
22 right?
23    A. Correct.
24    Q. Okay. The large third party payers have
25 their own reimbursement rates that determine what

Page 25

1 they actually pay, right?
2     A. What their fees are going to be is
3 something that they often have predetermined and
4 have contracted to pay those amounts.
5     Q. So that's a yes?
6     A. Yes.
7     Q. In the case of private insurers, the
8 prices that they pay are determined by negotiation?
9     A. That's the simplest way to say it, yes.
10    Q. Okay. In the case of public insurers, the
11 reimbursement rates are set through an
12 administrative process?
13    A. Depending on -- yes.
14    Q. And the charge master prices are put out
15 by the hospitals at the starting point for
16 negotiation of the amounts that insurers actually
17 end up paying. Is that fair?
18    A. I would say that there is very little
19 connection to -- in the case of hospitals, which
20 must be -- which we need to distinguish from
21 physician payments or independent practice or
22 physician payments. There is often not a lot of
23 connection to what they negotiate or potentially may
24 receive as payment from an independent third party
25 or an insurer or a public payer.

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 9 of 20

Thomas Dawson                                                    August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 26

1  Q. Why do hospitals have charge master lists?
2  A. Well, I mean there's both historical and a
3  practical reason. Historically, we didn't have
4  quite the system we have right now. It wasn't
5  certainly as sophisticated and as mature, but over
6  time it became a convenient way for insurers -- not
7  insurer, sorry, for hospitals to be a bit -- that's
8  not the best way to explain this. The best way to
9  explain it is this. Hospitals are often at a
10 disadvantage in terms of knowing what the allowed
11 amount or what the -- their largest payer, often
12 Medicare or Medicaid, are going to pay for their
13 patients for given procedures in their hospital. So
14 in order to maximize the amount of money that they
15 will receive for the patients that happen to be in
16 their facilities, they generally have charge rates
17 that are high enough to insure that they are paid
18 the maximum amount they can be paid regardless of
19 the fluctuations that occur in a given year.
20 Q. Does the hospital refer to those charges
21 as usual and customary rate?
22 A. Well, a hospital can refer to it as the
23 usual and customary rate, yes.
24 Q. In the case -- but insurance companies,
25 whether private insurers or public programs like

Page 27

1  Medicare or Medicaid, pay a discount compared to
2  that usual and customary rate, correct?
3  A. Discount is the wrong word to use. It's
4  not actually accurate to say they pay a discount.
5  There is no discount. It is what they have
6  negotiated to pay, and/or in the case of private
7  insurers -- excuse me, in the case of the public
8  payers, it is what's been contracted to be paid
9  based on the Government's fee schedule. There is no
10 discount.
11 Q. But it's lower than what the hospital
12 calls the usual and customary, right?
13 A. It is different than or lower than what
14 the hospital would describe as usual and customary.
15 But usual and customary is elusory in terms of it
16 being a term. If I were to give an example, usual
17 and customary, and there are lots of different
18 formulations, but generally it's what the provider,
19 the health care provider, wants to charge. It may
20 not necessarily be based on any sort of system or
21 methodology. And it doesn't have to be.
22 Q. Okay. In the case of public insurers, are
23 reimbursement rates publically available?
24 A. Depending on what we're talking about.
25 But the answer to that question is yes.

Page 28

1  Q. Okay. So you can send in a Freedom of
2  Information Act request or go to a Government web
3  site or something like that and determine what for a
4  given ICD 10 code Medicaid will pay in a given
5  region; is that right?
6  A. Yeah, that you can do. Yes.
7  Q. In the case of private insurance
8  companies.
9  A. Correct.
10 Q. Are the reimbursement rates or fee
11 schedules, are those publicly available?
12    OPERATOR: Mike.
13    MR. MOORE: Mike, are you in or out? We
14 lost Mike again.
15    THE WITNESS: Want me to wait on him?
16    MR. MOORE: Yeah, we might as well. I
17 think we should do that personally.
18    OPERATOR: Mike.
19    MR. MOORE: There we are.
20    MR. TAYLOR: I'm back. Use my cell phone
21 this time.
22    MR. MOORE: All right.
23 Q. Mr. Dawson, in the case of private
24 insurers, is there a similar way to get
25 reimbursement rates, are they publicly available?

Page 29

1  A. No, private rates are not publicly
2  available in that way. No.
3  Q. Is that information typically kept
4  confidential by the parties to those agreements?
5  A. Yeah, private insurers in general operate
6  by keeping a lot of their basic information to
7  themselves, yes. How they negotiate, yes, they do.
8  Q. Now, someone who had self paid typically
9  receives a bill from the provider at what the
10 provider deems to be the usual and customary rate,
11 correct?
12 A. Yes, they will receive a charge rate, yes.
13 Q. Talking about what's on the bill?
14 A. Charge for bill rate, yes.
15 Q. Okay. Now, of the bills that providers
16 issue to self pay patients, a certain percentage of
17 those just go unpaid, right?
18 A. Yes.
19 Q. For example, someone who isn't able to
20 afford health care may receive treatment in the ER
21 and just not pay the bill, right?
22 A. Yes. But that bill may be paid under
23 something called emergency Medicaid actually. So
24 when you have individuals like that who are in
25 emergency situations, emergency Medicaid actually

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 10 of 20

Thomas Dawson August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 30

1 covers those individuals regardless of their status.
2 When I mean status, I mean immigration status.
3     Q.  Some people get hospital bills discharged
4 in bankruptcy, correct?
5     A.  Yes, some people do.
6     Q.  And then at the other end of the spectrum,
7 some bills that hospitals issue to self pay payment
8 are paid -- to self pay patients, are paid in full,
9 right?
10    A.  I am not familiar with honestly self pay
11 patients paying bills in full.  That was not my
12 experience.
13    Q.  You don't think there has ever been
14 anybody who has paid a hospital bill in full?
15    A.  No, I would never say that.  I'm just
16 saying it's not common.  Not something I'm familiar
17 with seeing.
18    Q.  -- in the middle --
19    A.  Go ahead.
20    Q.  Okay.  So in the middle of the spectrum
21 then, some percentage of self pay patients are able
22 to negotiate and pay a discount from the usual and
23 customary rate; is that right?
24    A.  They don't pay whatever -- they don't pay
25 the usual and -- they don't -- yes, they may not pay

Page 31

1 the bill that's the charged amount, that's true.
2     Q.  Okay.  But the amount of the discount from
3 the charged amount that they pay is whatever they
4 can negotiate individually with the hospital,
5 correct?
6     A.  I'm not sure of the administrative
7 processes of hospitals, but I will say that it is
8 uncommon in my experience for individuals to pay the
9 billed or charged amount.
10    Q.  Are you saying you don't know how the
11 amount they do pay in those situations ends up
12 getting determined?
13    A.  The amount that they do pay, I am not
14 aware of the specific details of how that is arrived
15 at.  What my analysis often tells me is that
16 individuals either do or they don't pay the charged
17 amount.  And what they do pay, whether they be self
18 pay or not, is generally not the charged amount.
19 That's what my work tells me.
20    Q.  Okay.  In your 2019 report, your expert
21 report in this case, at page 17 of the report, this
22 is Exhibit 7 from your previous deposition, you
23 wrote the following, I'll just quote it, "generally,
24 providers are not open about the price they expect
25 to be paid for their services, and payers do not

Page 32

1 readily reveal how much they have paid", end quote.
2 Is that an accurate statement?
3     A.  Yes.
4     Q.  Does that mean that there's not publicly
5 available reliable data regarding the percentage
6 discount that self pay patients are able to
7 negotiate in individual cases?
8     A.  You're kind of speaking a language that's
9 different from what I'm familiar with with regard to
10 describing this.  Can you do two things.  One, can
11 you restate the question a different way.  And then
12 maybe break it up into two parts.
13    Q.  Okay.  We talked about how you can send in
14 a FOIA request or go online and find out what the
15 Medicare or Medicaid reimbursement schedules say,
16 right?
17    A.  Correct.
18    Q.  And we talked about the fact that you
19 can't do that with private insurance companies,
20 right?
21    A.  Correct.
22    Q.  Okay.  You also can't do that with self
23 pay individual patients, right?
24    A.  Correct.  Yes.
25    Q.  Okay.  Have you authored any peer reviewed

Page 33

1 studies that address what percentage of the usual
2 and customary rate a self pay patient is likely to
3 pay?
4     A.  No.
5     Q.  Are you aware of any peer reviewed studies
6 that address what percentage of the usual and
7 customary rate a self pay patient is likely to pay?
8     A.  No, I'm not.  Not to that kind of
9 specificity, no.  I've looked at the question in
10 many different ways but not quite like that.
11    Q.  Are you familiar with the methods that
12 hospitals use to collect from self pay patients?
13    A.  Yes.
14    Q.  Hospital liens for example?
15    A.  Uh-huh.  Yes.
16    Q.  And you're aware that when a hospital
17 takes a lien, they take it in the amount of their
18 bill, right?
19    A.  Yes, their billed amount, often they do.
20    Q.  And that's their usual and customary rate?
21    A.  Yes, it's at the rate that they have
22 established.
23    Q.  All right.  Let's go back to your
24 presentation then.  On page three of the exhibit you
25 have an introduction?

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 11 of 20

Thomas Dawson                                            August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 34

1  A.  Yes.
2  Q.  And the first bullet within the
3  introduction says "taking control of the damages"?
4  A.  Uh-huh.
5  Q.  What do you mean by that.
6  A.  In many cases I found that prior to some
7  of the thinking -- prior to people beginning to
8  really talk about the question of reasonable value,
9  often times defense attorneys, and I'm now starting
10 to get a few cases from plaintiff's attorneys as
11 well, often times defense attorneys just merely
12 accept whatever is being said about the damages.  So
13 my response --
14 Q.  I would love to have one of those cases.
15 A.  You know, I don't know -- again, I gave
16 this presentation in Florida, so often times that is
17 how the defense attorneys respond, particularly in
18 cases involving letters of protection.  They really
19 just don't know how to value those cases without
20 really having any information in front of them that
21 they are permitted to use, so they fight or discuss
22 the case on different terms.
23 Q.  And so your goal in presenting this method
24 to these defense attorneys in Florida was to enable
25 them to reduce the amount of damages awards, right?

Page 35

1  A.  No, that's never really been my sort of
2  position with regard to any of the work that I do.
3  My goal has, and it continues to be, and I've been
4  very honest with the defense bar, is to have both
5  plaintiffs and defense counsels begin to argue about
6  the value in the market as it stands.  So that there
7  is -- so that we don't really -- so that we don't
8  harm the entire health care system.  That's all.  To
9  be balanced in our presentation and our examination
10 of numbers and to really use the data that's
11 available to really take care of people based on
12 what their actual needs are and to provide them with
13 the monies that they need to take care of those, to
14 address those needs.
15 Q.  Under the second bullet, you have
16 subheadings A, B, C and D?
17 A.  Uh-huh.
18 Q.  And so B reads, "myth: charged or billed
19 rates reflect the actual value of the plaintiff's
20 medical expenses."
21 A.  Correct.
22 Q.  And then it looks like you contrast that
23 with subheading C, "reality consumers of medical
24 goods and services do not pay the billed or charged
25 rate."

Page 36

1  A.  True.
2  Q.  And then D says, "charged for billed rates
3  represent, quote, phantom or, quote, illusory
4  costs."
5  A.  Correct.
6  Q.  Does that mean costs that the providers
7  don't really expect someone to pay?
8  A.  Yeah, it does.  There is illusory costs,
9  they don't expect providers to pay that.
10 Q.  And so is the goal of your method here to
11 come up with costs that reflect what the providers
12 do expect consumers to pay?
13 A.  Well, the reasonable value, what they
14 expect to be paid fairly in the market.  What the
15 market can bear and therefore what they expect to be
16 paid.
17 Q.  Okay.  Let's look at the fourth page.
18 Valuing medical expenses.
19 A.  Yes.
20 Q.  Does this page describe what you take to
21 be the current prevailing approach to determination
22 of medical expenses?
23 A.  Correct.
24 Q.  Okay.  And your method is presented in
25 this dak as the challenge to that approach?

Page 37

1  A.  Well, yes.
2  Q.  And so then on the next page, the
3  takeaway, your challenge depends on the answers to
4  the three questions with the little arrows in the
5  top half of the page; is that correct?
6  A.  Correct.
7  Q.  Okay.  And those are whether the charged
8  and billed rate reflect the value of medical
9  expenses, whether consumers of medical services pay
10 the billed or charged amount, and whether the charge
11 for billed amount reflects the reasonable value of
12 those expenses?
13 A.  Correct.
14 Q.  Is that right?
15 A.  Correct.  Yes.
16 Q.  Okay.  What's the difference between those
17 three claggers.  What do you mean by those?
18 A.  I think it's -- it was my way in this
19 discussion to sort of reinforce the idea that if
20 we're going to start talking about reasonable value,
21 what that means, we need to strip away -- rather
22 walk away from this notion that some particular
23 number in the market is a reflection of fair market
24 value or reasonable value.  And so my goal in this
25 discussion by presenting it, the same question

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 12 of 20

Thomas Dawson                                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 38

1 really in three different ways, was to walk the
2 audience toward how to think about what the answer
3 is.  And even how to think about usual and
4 customary.  Because I do have a way of thinking and
5 talking about that as well that I think it's
6 important and I'm sure you'll walk us in that
7 direction when you're ready.
8    Q.  Let's turn to the next page, the takeaway
9 continued.  You say "in the real world, market
10 pressures actually lead to more than one price for
11 medical services."  Does that mean that different
12 payers pay different prices?
13    A.  Market pressures, yes, it means that the
14 bigger you are, for example, the -- well, the law of
15 numbers I guess.  The larger you are, the more you
16 can buy, you can buy in bulk, the more you can
17 influence the market, the more -- or the less -- the
18 lower your costs will be per medical good or
19 services that you may be purchasing.  I mean that's
20 sort of a common feature that we see in our economy.
21 So larger purchasers pay less than smaller
22 purchasers of items.  That's one feature.
23 Government regulation has an impact on what we may
24 pay, just merely by having a regulation in place.
25 If you're part of a union or you happen to be in a

Page 39

1 local market, there are many different things that
2 have some kind of impact or influence over what the
3 value of an item or a good is in the market.
4    Q.  So let's turn to the last two pages of
5 your dak.  The first page is -- well, both of them
6 contain the heading reasonable value example?
7    A.  Yes.
8    Q.  Do you have that in front of you?
9    A.  Yes.
10    Q.  Okay.  On the right-hand side of the
11 second to last page you've got a CPT code at the
12 top, 99214, office visit?
13    A.  Yes.
14    Q.  And below that you've got four different
15 prices?
16    A.  Correct.
17    Q.  Are those four different prices for the
18 same service?
19    A.  Yes.
20    Q.  Okay.  And the difference that the -- the
21 prices correspond to different payers, right?
22    A.  Correct.
23    Q.  Okay.  So for that same service, Medicare,
24 in your example, paid $208?
25    A.  Correct.

Page 40

1    Q.  Medicaid paid $40.  Commercial insurance
2 paid 180.  And a self pay patient pays $300?
3    A.  Correct.
4    Q.  Is that right?
5    A.  Correct.
6    Q.  Why does the self pay patient pay $300 for
7 a service for which Medicare only pays $40?
8    A.  Well, this is an example, one.  And two,
9 in my sort of experience I believe it's important to
10 include in my analysis of reasonable value what the
11 self pay individual is likely to experience as a
12 charge.  So not that I believe they are actually
13 going to experience this, but it's important to pay
14 deference to what they believe their charge --
15 rather their fee is going to be.  So when I do an
16 analysis, and not of that particular individual but
17 just self pay in general, so when I do an analysis
18 of the market -- and there are usually a couple more
19 categories, they are not necessarily here.  When I
20 do an analysis, I look at what is considered to be
21 the charge rate that's presented to me, sometimes by
22 the plaintiff, sometimes by the defense, or
23 sometimes just by the market in which we've been
24 asked to take a look.  And I look at that charge
25 rate, or that UCR, whatever it is that's required,

Page 41

1 so I can get a sense of what an uninsured or a
2 self -- shouldn't call it uninsured, but what a self
3 pay person might experience.  And I look for what
4 that cost might be.  If it's high, it's high.  If
5 it's low, it's low.  I look for what that is.  After
6 I've done that, I look at the rest of the market and
7 I look at what the rest of the payers are paying in
8 the market for a given service or good.  Once I've
9 done that, it's important to weight the amount of --
10 it's important to weight the actual influence of
11 that payer in the market in order to determine what
12 the overall reasonable value is.  So quite frankly
13 for me it doesn't matter if it's Medicare, Medicaid,
14 it doesn't matter if it's some self pay out there,
15 it doesn't matter if it's ending in health service,
16 it doesn't matter to me if it's the VA.  It doesn't
17 matter to me at all.  What I do is I look at all the
18 different payers in the market, I look at what the
19 different payers are paying, and I look at the
20 amount of influence they have on the market in terms
21 of their participation, in terms of their overall
22 membership in their group.  And that's what we have
23 done here.  We look at the market participation
24 rate.  And then we, based on that market
25 participation rate, arrive at a sort of value of

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 13 of 20

Thomas Dawson                                     August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 42

1 sorts in this particular case that we believe to be
2 reasonable based on those rates.
3    Q.  So you -- what you've done then is you've
4 created a, and I think this is described on the last
5 page of your dak, a weighted average, is that right,
6 based on market participation rates?
7    A.  Correct.
8    Q.  Okay.  And so in your example, 30 percent
9 of the market consists of Medicaid patients?
10   A.  Yes.
11   Q.  Right.  And they are only paying $40 for
12 this service?
13   A.  Correct.
14   Q.  Or Medicaid is paying that on their
15 behalf?
16   A.  Uh-huh.
17   Q.  Okay.  If you took them out of the
18 example, your weighted average would go up
19 considerably, right?
20   A.  Correct, yes.
21   Q.  Suppose in a given market -- suppose in a
22 given market your numbers were used to determine an
23 award of damages.  Let's just assume that we're in
24 the world of your reasonable value example here.
25 And let's assume that the patient doesn't have

Page 43

1 Medicare or Medicaid or commercial insurance.  The
2 patient is a self pay patient.  In your example,
3 that patient could expect to pay $300 for an office
4 visit, right?
5    A.  That particular patient, yes, I'm sure
6 they could.
7    Q.  Now, your method would only give them
8 $161 in damages with which to pay that $300 charge,
9 correct?
10   A.  Well, the methodology I rely on in terms
11 of determining what the fair market value is, or in
12 this particular case another way of saying its
13 reasonable value, doesn't really give anybody
14 anything.  It merely determines what the reasonable
15 value is for a service in the marketplace.  That
16 is -- it's sort of stripped of indicators like
17 whether or not the individual is a Medicare or
18 Medicaid patients.  It's stripped of indicators in
19 this particular case of even age and the like,
20 although we often times have to include that in our
21 analysis.  So those sorts of indicators are not a
22 part of the analysis.  That's what gives it its
23 objectivity.
24   Q.  But that's not really responsive to my
25 question.  My question is if the award of damages to

Page 44

1 our self pay plaintiff were based on your weighted
2 average, it would be $161?
3    A.  If it's based on reasonable value -- if
4 it's based on reasonable value, it's $161.  That's
5 the reasonable value in this example.
6    Q.  But that's not what they can expect to pay
7 in the marketplace?
8    A.  What they can expect to pay in the
9 marketplace is the reasonable value.
10   Q.  But that's not what your assumptions are.
11 You told me earlier that Medicare paid $208,
12 commercial insurance pays $180, self pay patient can
13 expect to pay $300.  All those numbers are higher
14 than $161, right?
15   A.  Again, sir, we're just describing what the
16 reasonable value is.  I was demonstrating how one
17 determines reasonable value.  That's all I'm doing
18 here, determining how one determines reasonable
19 value.  And the reality is --
20   Q.  So in your example Medicare pays
21 substantially more than the reasonable value of an
22 office visit, right?
23   A.  It pays more.  I mean in this particular
24 case it pays more.
25   Q.  Commercial insurance pays more than the

Page 45

1 reasonable value of an office visit?
2    A.  In this particular case, yes.  Now, mind
3 you, these numbers do not reflect the market at all
4 in any way.  Commercial insurance would never --
5    Q.  I'm just looking at the example?
6    A.  This is just an example.  I think you
7 may be fixated on this example of reasonable value
8 other than what the purpose of this example is.  And
9 the purpose of this example is to demonstrate how
10 one arrives at reasonable value, apply a weighted
11 analysis, and also to demonstrate or rather to
12 explain what reasonable value is.  Reasonable value
13 is not meant to pull up or describe a particular
14 individual in a particular case.  That's not its
15 purpose.  Reasonable value is merely designed to
16 give us an image or a picture of what the fair
17 market value is.  For example, if a doctor has an
18 individual coming into their door, using this
19 example, not knowing anything about whether or not
20 they were a Medicare patient, Medicaid, commercial
21 or self pay, their expectation in terms of the fair
22 market value that they can reasonably expect at the
23 end of the day is $161.  That would be the
24 expectation that, not knowing who the person is
25 walking into my office, I should expect, reasonably,

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 14 of 20

Thomas Dawson                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 46

1  $161. That would be the fair market value for my
2  services.
3      Q. So in your example, 70 percent of the
4  patients are paying more than the fair market value.
5  Or somebody is paying that on their behalf, correct?
6      A. Well, sir, this example right here is, and
7  I really do think we're getting hung up on some of
8  the minutiae because this is surely not the
9  structure of how we see --
10     Q. I'm not asking you to criticize the
11 question, I'm asking you to just answer the
12 question. In your example, 70 percent of the
13 patients, 70 percent of the office visits, are being
14 compensated at a rate higher than what you're
15 calling the fair market value, correct?
16     A. Sir, at this point I'm not even sure if I
17 can answer your question. You seem to be conflating
18 quite a few different ideas and terms. I've tried
19 to separate them out specifically for the purposes
20 that they were designed. I've done, I believe, my
21 best at explaining what we're doing here. But to
22 describe this as actual office visits and the like,
23 it creates -- it's not an accurate description of
24 what the purpose or the role of this is. And it's
25 very far away from my analysis.

Page 47

1      Q. Let's say it this way then. I'll reask
2  the question if you prefer. So in your example, 40
3  percent of the market participants are on Medicare,
4  right?
5      A. 40 percent, yeah. 40 percent of the
6  market are Medicare in this example, yes.
7      Q. Right. 20 percent are on commercial
8  insurance?
9      A. Yes.
10     Q. Right?
11     A. Yes.
12     Q. 10 percent are self pay?
13     A. Yes.
14     Q. That adds up to 70 percent of the market?
15     A. Yes.
16     Q. All of those market participants pay more
17 than the fair market value for an office visit,
18 right?
19     A. It appears so.
20     Q. And 30 percent of the market is Medicaid,
21 correct?
22     A. Yes, sir.
23     Q. And those 30 percent of people only pay
24 less than 25 percent of the fair market value in
25 your example; is that correct?

Page 48

1      A. Yes, sir.
2      Q. So when it comes to an individual, that
3  individual's market position, that is which of these
4  four categories they fall into, seems to have a very
5  substantial effect on what they can expect to pay
6  for an office visit?
7      A. Sir, this is not about --
8      Q. Is that accurate?
9      A. No. This is not -- it's -- this is --
10     Q. I'm not talking about your fair market
11 value now, I'm talking about what they can expect to
12 pay?
13     A. Sir, this is -- I can not answer your
14 question unfortunately.
15     Q. Well, I'm sorry, you're required to.
16     A. No, I don't mean that I don't want to. I
17 apologize for saying that without being clear. But
18 I can not answer your question in terms of what
19 you're looking for because there's a distinction or
20 a difference between an individual case and a case
21 regarding reasonable value. There is just a huge
22 distinction. For example, a dollar in the real
23 world is different from a reasonable value dollar.
24 They are not the same kind of dollar. The reason
25 for that is that the reasonable value dollar is a

Page 49

1  composition of numerous different instances of
2  purchases or potential purchases that a group of
3  people might make. As opposed to -- and they all
4  have different experiences by the way. As opposed
5  to one instance of an individual purchasing
6  something in the market. They are just very
7  different experiences. It's not the same. And if I
8  can go back and say this example was designed purely
9  so the audience could understand, everyone in that
10 audience, particularly based on the discussion I
11 gave, knows that commercial rates are generally
12 higher. They know that self pay is generally the
13 highest. They know that commercial is generally --
14 lower than that. They know that Medicare has a rate
15 that's below that. And they know that Medicaid has
16 a rate below that. We also talked about during that
17 discussion, my presentation, we talked about
18 travelers insurance, or rather people outside of the
19 company who pay for individuals that come into this
20 country. We also talked about Indian health
21 insurance and the like. We talked about a number of
22 different purchasers in the market and where they
23 sit at the end of the day. So this was merely an
24 example to describe how one could calculate
25 reasonable value and that it did not matter what

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 15 of 20

Thomas Dawson August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 50

 1  label one placed on these different scenarios.  I
 2  could have merely labeled these different scenarios
 3  A, B, C and D to explain reasonable value and that
 4  would have been satisfactory.  So I hesitate for us
 5  in this discussion to get fixated on this individual
 6  case that's not applicable here.
 7      Q.  This is your example, right?
 8      A.  It was my example.  And I've given you the
 9  explanation I gave to my audience.  As I said to my
10  audience and I'm saying to you in the same way, when
11  coming up with reasonable value, here are the things
12  you do.  It does not matter whether it's A, B, C or
13  D.  I explicitly made that clear to my audience.  I
14  was purposefully trying not to have these Medicare,
15  Medicaid, commercial, self pay match up with
16  anything.  The goal was to explain the methodology
17  for determining reasonable value.  And I thought I
18  was able to do that successfully during the
19  discussion.
20      Q.  And that's the methodology that you used
21  to formulate your opinions on reasonable value in
22  this case?
23      A.  Right.  It's called comparative pricing
24  analysis.  It's sort of standard in my profession in
25  terms of policy professionals and persons who use

Page 51

 1  economic theories and the like to actually drive the
 2  discussion about policy and cost.  So, yes,
 3  comparative pricing is a standard approach used by
 4  the Federal Government and everyone else who is
 5  involved in determining what's the appropriate cost
 6  for an item in the marketplace.
 7      Q.  If the Federal Government uses this fair
 8  market value approach, why do you have Medicare
 9  paying five times as much for the same service as
10  Medicaid pays in your example?
11      A.  I am not sure why you're asking or what
12  you're asking.  I'm not certain where you're going
13  here.  I will say again that the Federal Government
14  applies a methodology known as comparative pricing.
15  I do the very same thing.  They do, they meaning the
16  Federal Government, applies this methodology.  When
17  the -- when the Department of Health and Human
18  Services happens to be paying for or determining
19  what the fair cost is for a market item for them to
20  purchase under the FAR, federal acquisition
21  regulations, very similar regulations are applied
22  under the DAR, the defense acquisitions regulations
23  when purchasing goods and services in the
24  marketplace.  They vary depending on the nature of
25  the market one is purchasing in.  And I apply a

Page 52

 1  methodology that is based on what is accepted as a
 2  standard among individuals who are involved in the
 3  determination of cost.
 4      Q.  So I don't think you answered my question.
 5  I mean do Medicare and Medicaid fee schedules
 6  typically reflect different amounts for the same CPT
 7  code?
 8      A.  Do Medicare and Medicaid reflect different
 9  amounts.  They can, yes.
10      Q.  Does Medicaid typically pay less?
11      A.  Depends on the state.
12      Q.  What about in Georgia?
13      A.  In Georgia Medicaid pays less.
14      Q.  So you're not claiming that either the
15  Medicaid fee schedule or the Medicare fee schedule
16  itself reflects fair market value?
17      A.  In order for you to be able to determine
18  fair market value, one must look at all of the
19  participants in the marketplace.  Fair market
20  value --
21      Q.  I understand.
22      A.  So no one particular --
23      Q.  I understand your methodology.
24          MS. STATKUS:  I would ask that you let him
25      finish the question, please.

Page 53

 1          MR. MOORE:  It's nonresponsive.  But you
 2      can make your speech.  Go ahead.
 3          MR. TAYLOR:  Objection.
 4      A.  So no one participant in the marketplace
 5  can be reflective of the fair market value.  No one
 6  participant's fees or payment can be reflective of
 7  the fair market value.  You need first to know what
 8  all are paying.  What you can say about Medicare and
 9  Medicaid is that they do influence the market.  They
10  are described generally as price setters, because of
11  the significant amount of influence.  They both
12  influence -- together they influence over
13  30 percent, 33 percent, of the market.  That's a
14  huge, big mountain of influence.
15      Q.  So to go back to my question.  The -- it
16  is not your contention, is it, just so the record is
17  clear, that the Federal Government, when it's
18  reimbursing providers for health care service, pays
19  fair market value?
20      A.  I'm not saying anything related to that.
21  I'm talking about the determination of reasonable
22  value.  The determination.
23      Q.  No, I understand.  In applying your
24  methodology that's illustrated in these two slides,
25  last two slides of your dak, do market participation

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 16 of 20

Thomas Dawson                                                    August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 54

1 rates vary depending on the locality for which
2 you're determining a fair market value?
3   A.  Yes.
4   Q.  Are there some localities where the
5 Medicaid rate is higher than some localities where
6 it's lower?
7   A.  When you refer to rate, what are you
8 referring to, the amount of fees?
9   Q.  Market -- yeah, right, good question.
10 Yes, that would be the next question.  Are there
11 some localities where the market participation rate
12 for Medicaid patients is a higher percentage and
13 other localities where it's a lower percentage?
14   A.  Yes.
15   Q.  And in formulating your opinions regarding
16 the reasonable value of CW's future medical costs,
17 did you use market participation rates from a
18 specific locality?
19   A.  Yes.
20   Q.  What locality?
21   A.  The one that he currently lives in.
22   Q.  Augusta, Georgia?
23   A.  The one that was assigned, yes, based
24 on -- yes.  I'm not going to say that until I look
25 at it because honestly I don't recall.  So before I

Page 55

1 jump out there and say, yes, Augusta, Georgia, let
2 me look at the background I have here.  I need to
3 put my glasses on to see.
4   Q.  Sure.
5   A.  He.  Grovetown, Columbia County.  Yeah,
6 Columbia County, Georgia.  That's where we have him
7 located.  And that's the --
8   Q.  What is the Medicaid market participation
9 rate for Columbia County?
10   A.  Okay.  I have that somewhere.  Hold on.
11 I'm sorry if I don't remember that off the top of my
12 head.  I don't.
13   Q.  That's all right.
14   A.  But I do know --
15   Q.  Is it contained in your report?
16   A.  Yes, it is actually.  And it's -- we can't
17 calculate our numbers without knowing what that is.
18 So it is in the report.  Or at least it should be.
19 I usually put it in a footnote along with the other
20 numbers as well.  If I don't have it, I can provide
21 it to you later.
22   Q.  That would be great if you could provide
23 the --
24   A.  The participation rates, yes, I can do
25 that.

Page 56

1   Q.  Participation rates for Medicaid,
2 Medicare, the ones you used in this particular
3 opinion.  That would be helpful.
4   A.  Yeah, I can do that.  In fact I know I had
5 it somewhere.  I usually come prepared with that,
6 but that's my apologies.  I'll get it to you.  Is it
7 all right for us to take a five minute break?
8       MR. MOORE:  That's perfectly fine.  Good
9   time to do that.
10      (Short break was taken.)
11 BY MR. MOORE:
12  Q.  Mr. Dawson, during the break were you able
13 to find the information regarding market
14 participation rates for the locality of Columbia
15 County?
16   A.  We were able to find the information for
17 Georgia.  And it's in our analysis.  The current
18 population -- if you look --
19   Q.  Did you use statewide numbers?
20   A.  I believe we used --
21   Q.  Or County numbers?
22   A.  Statewide numbers.  And that may have been
23 because of the individuals age.  As a matter of fact
24 it is because of the individuals age.
25   Q.  So you did not -- did you not have access

Page 57

1 to County level numbers?
2   A.  I don't recall.  I believe I made the call
3 to use statewide numbers because they worked to the
4 benefit of the child, the plaintiff.
5   Q.  But you don't recall?
6   A.  Well, I'm saying that I used these numbers
7 because they worked to the benefit of the child.
8 That's the only reason I would have.  Because of the
9 age of the individual, have more data, more
10 children.
11   Q.  So what were the participation rates for
12 Georgia that you used?
13   A.  For children under the age of 19 -- excuse
14 me, in general the participation rate was 17.4.
15   Q.  For Medicaid?
16   A.  Uh-huh.
17   Q.  And what is the participation rate for
18 Medicare?
19   A.  15.5.
20   Q.  And commercial insurance?
21   A.  Commercial insurance is, where are we.  VA
22 is 2.4 and commercial is 52.3.  So it worked out
23 better for the child.
24   Q.  And self -- and self pay?
25   A.  And self pay is -- public health insurance

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 17 of 20

Thomas Dawson                                       August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 58

1 is 17.9, Medicare is 5.1.  VA.  Medicare, Medicaid,
2 VA, public.  Kaiser study.
3     Q.  Are you not able to just look and see what
4 self pay percentage was?
5     A.  No, I'm not.  I don't have the Kaiser
6 study in front of me which is the one that I'm
7 looking for.  But I have here the census study, but
8 not -- this is the one that we provided to you last
9 time.  I'm just trying to find out which one it is.
10 And this is not the one that's going to give me what
11 I wanted.  This is the one that the VA, Medicaid,
12 Medicare and public health insurance, alone or in
13 combination, is 22 -- it's just public health
14 numbers.  Georgia percent coverage.  Coverage alone
15 or in combination, Tricare.  Direct purchase is
16 12.4.
17     Q.  Mr. Dawson, is it not in your report?
18     A.  No, a footnote is in the report.  But
19 you're asking me --
20     Q.  And it cites the study?
21     A.  Exactly, it cites the study, exactly.  The
22 footnote is in the report, but you're asking me to
23 go into an actual study and provide you with an
24 exact number.  So that's different.  I'll have to
25 ask.

Page 59

1     Q.  You can just provide me with that number
2 later?
3     A.  Right.  Which is what I was saying.
4     Q.  I don't want to take everybody's time.
5     A.  I will ask Shane to print out this
6 particular footnote for me and that will make it
7 easier.
8     Q.  We've got a line of people on the phone.
9 You can supplement with that after the deposition.
10         (Off the record colloquy.)
11     A.  I recall you asking me this question last
12 time, and I thought we gave you the information.
13 But I guess not.  I honestly was not prepared to do
14 it again.
15     Q.  If you did, I'll find it there if I'm just
16 not remembering.  And if you did not, if you would
17 please supplement with it.  As long as we have an
18 agreement to that effect, I'm not worried about
19 getting it right this moment.
20     A.  But the numbers are very generous in terms
21 of the population.  It really worked out better for,
22 and it's a habit that I've had, but it does work out
23 better for the individual particularly at a younger
24 age when you don't have a very large data pool to
25 look at a larger segment of the population.  So if

Page 60

1 the County is small, you want to have a larger
2 number so you'll have the benefit of that larger
3 population.  If that makes sense to you.
4     Q.  Do you recall whether you had the County
5 level data?
6     A.  I know we had the County level data.  We
7 did use the County level data in terms of
8 determining what the Medicaid rates was.  Excuse me,
9 the Medicaid and Medicare rates were and all of that
10 kind of good stuff.  But in terms of determining the
11 population participation, it is more useful to be
12 conservative in your analysis when you are looking
13 at -- it's just a more conservative approach.
14     Q.  I see.  Now, whatever the market
15 participation rates are for the different sources of
16 payment, future changes in the law could change what
17 those percentages turn out to be, correct?
18     A.  I don't understand your question.
19     Q.  Well, for example, when the ACA was
20 passed, some states expanded Medicaid.  That
21 increased the market participation rate for Medicaid
22 patients, correct?
23     A.  Correct.
24     Q.  Okay.  And so if there were a change in
25 the law in the future, such as one of the proposals

Page 61

1 being floated either by the Trump administration or
2 by the Democratic presidential candidate, no matter
3 which one it was, it could change what the market
4 participation percentages are, correct?
5     A.  I feel as though we have had this sort of
6 part of our conversation before.
7         MS. STATKUS:  I just -- I want to let you
8     know at the last deposition I did send the
9     percentages that Mr. Dawson had with him and I
10     just re-sent them to Leighton and Mike via
11     e-mail.
12         MR. MOORE:  Thank you.
13     Q.  We may have covered it in the last
14 deposition and I may have forgotten it.  If that's
15 the case, I apologize for taking your time with it
16 again.
17     A.  No worries.
18     Q.  To go back to my question.  If there is
19 further health care reform legislation, one result
20 of that legislation could be that the
21 participation -- the market participation rates you
22 found in your report would not be the same in the
23 future, correct?
24     A.  Well, market participation is expected to
25 stay at around 90 percent.  Right now it's about

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 18 of 20

Thomas Dawson
August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 62

1  90 percent nationwide.  That's based on the national
2  health expenditure survey that I track on a regular
3  basis.  And the most recent one was actually just
4  put out, I want to say, either May or June of 2018.
5  But that survey tells --
6     Q.  Let me stop you because I think -- I think
7  you're using market participation in a different way
8  than you did in your presentation, your DRI
9  presentation.  What I mean by market participation
10 rates are how many people are on Medicare, how many
11 people are on Medicaid, how many people have
12 commercial insurance, how many people have VA, self
13 pay, that type of thing.  None of those numbers add
14 up to 90 percent, do they?
15    A.  I am basically saying to you that
16 according to the national health expenditure survey,
17 that nationwide the expectation is that coverage,
18 insurance coverage, should remain around 90 percent
19 nationwide.
20    Q.  Okay.  That's not my question.  My
21 question is the percentages of people that have
22 Medicaid or that have Medicare or that have
23 commercial insurance could change relative to each
24 other?
25    A.  Oh, yes.

Page 63

1     Q.  Correct?
2     A.  Yes, sure.
3     Q.  For example, if we had Medicare For All,
4  everybody would be on Medicare, just to take it
5  literally?
6     A.  Well, I mean --
7     Q.  Correct?
8     A.  Technically, the way you described it, it
9  could potentially -- I don't believe that's the
10 intent, but okay.
11    Q.  Right.  I mean just taking their slogan
12 literally.
13    A.  Yes.
14    Q.  So that -- just to give you an idea of
15 what my question is.  So if the percentages changed
16 within your weighted average, that would change the
17 reasonable value that comes out of the weighted
18 average formula, correct?
19    A.  Yes.
20    Q.  And as you sit here today, we can't
21 predict how those percentages may change in the
22 future based on future changes in the law?
23    A.  I can make very good estimates,
24 predictions, about what future costs will be based
25 on the information I have today.  I, like my

Page 64

1  colleagues in this profession, we're really not in
2  the business of predicting what might happen outside
3  of current law.  I mean it's just not -- I mean one
4  can do all kinds of discussions and analysis and
5  projections that way.  But based on what we have in
6  front of us, I think the information I've given is
7  fairly sound.  I do know that there are things that
8  will change cost overall in the health care market.
9  We do understand that.  There is a natural growth
10 rate, about 2.5 percent in health care.  We
11 understand these things.  So -- but to talk about
12 the possibility of some law or potential for a law
13 coming into fruition without any real bones to it is
14 not useful thinking.
15    Q.  Because it's speculative?
16    A.  It's -- yeah, I mean if you -- it's just
17 not useful thinking to talk about laws that don't
18 exist.
19    Q.  And that you don't know if they will
20 exist?
21    A.  I am -- yeah, I have no opinion about laws
22 that do not exist.
23    Q.  All right.  The last thing I have is the
24 exclusion list that you provided?
25    A.  Yes.

Page 65

1     Q.  Do you have that?
2     A.  Yes.
3     Q.  Okay.  Could the court reporter please
4  mark that as our next exhibit.  I think it's ten.
5         (Deposition Exhibit 10 marked.)
6     Q.  Is that a complete list of the cases in
7  which your testimony has been excluded in whole or
8  in part?
9     A.  I believe this is a list of the
10 exclusions.  But, again, none -- yes, none of these
11 are substantive exclusions obviously.
12    Q.  Well, I don't know that that's obvious.
13 But my question is is that a complete list of the
14 cases in which your expert testimony has been
15 excluded in whole or in part?
16    A.  This is a list of testimony in which I was
17 not permitted to testify for non-substantive
18 reasons.
19    Q.  It's a list of cases where your testimony,
20 your proposed expert testimony, was not admitted
21 into evidence by the court?
22    A.  Correct.
23    Q.  Okay.  And looks like in several of these
24 cases your testimony was excluded on the basis of a
25 collateral source rule; is that correct?

17 (Pages 62 - 65)

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 19 of 20

Thomas Dawson                                                                August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 66

1  A.  In at least the Illinois cases I was
2  excluded in part.  Not in total.
3  Q.  Well, it looks like there's this
4  California case, Orlando A. Soliz, where you were
5  excluded from testifying about collateral source; is
6  that right?
7  A.  Yeah.  Yes.  That's there, yes.  The court
8  just simply said -- it wasn't a written order.  They
9  wouldn't let anybody in to talk about it, period.
10  Q.  Including you?
11  A.  Including me, exactly.  So no one could
12  talk about it.
13  Q.  Okay.  And then in the two cases above
14  that, the New Jersey case and the Illinois case, it
15  looks like your testimony was excluded on the
16  grounds that it was not shown to be reasonably
17  certain that plaintiff would be covered by the ACA
18  or private health insurance?
19  A.  Correct.  Illinois has been -- in part has
20  permitted my testimony in part -- has permitted my
21  testimony with regard to reasonable value but not
22  with regard to the ACA and its been being a type of
23  collateral source.
24  Q.  And then this New Jersey case at the
25  bottom of the list, Stazak, S-T-A-Z-A-K?

Page 67

1  A.  Yes.
2  Q.  That case there was a similar ruling,
3  correct?
4  A.  In that case they simply weren't going to
5  let me in because I was speaking -- not that I was
6  speaking about the ACA but because they felt as
7  though my testimony might lend itself to the
8  Affordable Care Act.
9  Q.  So the quoted language is, "ACA was too
10  speculative."
11  A.  Are we talking about the same one?  I'm
12  sorry, you're talking about the Cook County.
13  Q.  I'm talking about the Stazak, which is at
14  the bottom of the list, it's on the second page of
15  the list as I have it.  Superior Court of New
16  Jersey?
17  A.  Yeah, I remember that case.  That's a -- I
18  believe -- I want to say 2014 or 2015 decision.
19  Q.  Yeah, you don't have a date on it on your
20  list?
21  A.  Yes, he just simply said too speculative,
22  you can't come in.
23  MR. MOORE:  Okay.  That's all I have.  I
24  appreciate your time.
25  A.  Thank you.

Page 68

1  MR. TAYLOR:  I have no questions.
2  E X A M I N A T I O N
3  BY MS. STATKUS:
4  Q.  I have a couple of follow-up questions.
5  Can you hear me okay?
6  A.  Yes.
7  MR. MOORE:  Yes.
8  Q.  In the last deposition we were talking
9  about Champ VA coverage.  Mr. Dawson, is there a
10  distinction between access to care and reimbursement
11  under Champ VA?
12  A.  Yes, there is.  There is a very
13  distinct -- there is a distinction.  Champ VA is the
14  kind of care that any participant in a Champ VA plan
15  can take to any provider.  It doesn't prevent a
16  participant, in this particular case the plaintiff,
17  from going to any provider they choose.  So access
18  is available to that individual today, and in my
19  opinion will be available to that individual
20  tomorrow.  There is nothing that prevents access.
21  And it's something that we see that's consistently
22  found in the current law that we have in place with
23  regard to health care under the ACA.  And also
24  it's -- it has been affirmed in the positions, at
25  least the policy positions of Republicans and

Page 69

1  Democrats.  So that access will continue.  There is
2  also this question of reimbursement.  And with
3  regard to reimbursement, although one may have
4  access to care and you can go to any provider you
5  would like to provide, the VA Champ system is only
6  going to pay a certain amount.  In fact it pays an
7  amount.  And if an individual happens to see a
8  provider who is willing to accept Champ VA coverage,
9  and my understanding is that most will accept Champ
10  VA coverage, then that individual will not
11  experience any significant out of pocket
12  expenditures, or any expenditures.  However, if that
13  individual goes to a provider who chooses not to
14  accept or bill Champ VA directly, then that provider
15  will be paid the amount that is allowed under the
16  Champ VA program and the remaining portion could
17  potentially be the responsibility of the plaintiff.
18  But the key point here is that there are very, very
19  few instances in which Champ VA is not accepted.  It
20  seems to be consistently the case that it is the
21  kind of plan that providers who are in the market
22  provide access to their services for individuals who
23  have carrier coverage.
24  Q.  Earlier in the deposition today Mr. Moore
25  was asking you about the ACA and implications if

Case 1:17-cv-00015-JRH-BKE   Document 217-3   Filed 09/03/19   Page 20 of 20

Thomas Dawson August 19, 2019
Willis, Sherecia Vs. United States Of America, Et Al.

Page 70

1 that law were repealed. And you indicated that it
2 does not -- that if that law were repealed it would
3 not change your opinion in regards to access to
4 coverage for CW. Can you kind of explain what you
5 meant by that?
6     MR. MOORE: Objection to form.
7  A.  The bottom line is that Mr. CW will
8 continue to have access to coverage. There is
9 currently no particular policy coming out of both
10 the Republican or Democratic side that's trying to
11 limit access. More importantly, the preexisting
12 condition exclusion, that limitation on that
13 provision that had been common prior to the ACA,
14 does not exist any longer. In addition to that, we
15 find that in Georgia law, and I believe that's in my
16 report, it has -- the preexisting condition
17 exclusion is something that is not permitted under
18 Georgia law. So they have actually adopted it as
19 part of their own law preventing insurers and others
20 who participate in the state's insurance market from
21 denying individuals coverage for a preexisting
22 condition. I'm going to look here, but I'm pretty
23 sure that I mentioned that in my report.
24  Q.  If the ACA is repealed, how does that
25 impact the qualified patients access to Champ VA?

Page 71

1  A.  If it's repealed, it won't impact their
2 access and ability to participate in that plan.
3 Again, as I said, the preexisting conditions that
4 they have under Georgia law, under any law, they
5 will be able to certainly take up coverage through a
6 qualified health plan as well as hold that Champ VA
7 plan, which would further limit sort of any
8 particular out of pocket expenses they may
9 experience. So in my opinion that individual's
10 access to coverage will not change or not be
11 diminished, and in addition to that they will
12 continue to have access to coverage in the
13 marketplace both under Champ VA and also in the
14 private marketplace.
15     MS. STATKUS: I think that's all the
16     follow-up questions I had for you. Anybody
17     else?
18     MR. MOORE: I just want to let the court
19     reporter know we do have a minor plaintiff in
20     this case. I think Ms. Statkus just used his
21     full name. If you could redact that down to
22     the initials, please. And if I did the same
23     thing at any point during the deposition, we
24     would appreciate that being redacted down to
25     the initials. Thank you. We're done as far as

Page 72

1 I'm concerned.
2     MR. TAYLOR: Are we done, gentlemen,
3 ladies?
4     MS. STATKUS: Yes.
5     (Deposition concluded at 3:17 p.m.)

Page 73

1     STATE OF MARYLAND
2     I, David Corbin, a Notary Public in and
for the State of Maryland, do hereby certify
3 that the within named, THOMAS DAWSON,
personally appeared before me at the time and
4 place herein set according to law, was
interrogated by counsel.
5
    I further certify that the examination was
6 recorded stenographically by me and then
transcribed from my stenographic notes to the
7 within printed matter by means of
computer-assisted transcription in a true and
8 accurate manner.
9     I further certify that the stipulations
contained herein were entered into by counsel
10 in my presence.
11     I further certify that I am not of counsel
to any of the parties, not an employee of
12 counsel, nor related to any of the parties, nor
in any way interested in the outcome of this
13 action.
14     AS WITNESS my hand and Notarial Seal this
21st day of August, 2019, at Centerville,
15 Maryland.
16
17         _David C. Corbin_
18         David C. Corbin
            Notary Public
19
20
21 My commission expires November 19, 2019
22
23
24
25

19 (Pages 70 - 73)